TWIN DISC, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 508–78.

United States Claims Court.

Aug. 27, 1986.

Robert C. Miller, Arlington, Va., for plaintiff.

James E. Nilles, Milwaukee, Wis., of counsel.

A. David Spevack, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

SETO, Judge.

Plaintiff seeks recovery under 28 U.S.C. § 1498 of reasonable and entire compensation for the unauthorized use and manufacture, by or for the United States, of the inventions described and claimed in U.S. Letters Patent No. 3,328,961 ('961 patent), entitled "Multiple-Stage Hydraulic Jet Propulsion Apparatus For Water Craft", and U.S. Letters Patent No. 3,405,526 ('526 patent), entitled "Multiple-Stage, Hydraulic Jet Propulsion Apparatus for Water Craft". The '961 patent was issued on July 4, 1967, on an application filed October 13, 1965, by patentee George R. Aschauer. The '526 patent was issued on October 15, 1968, on an application filed March 1, 1967, by patentee inventor-plaintiff George R. Aschauer. Both the '526 patent and the '961 patent were assigned to Twin Disc Clutch Company, Racine, Wisconsin, a corporation of Wisconsin.

A lengthy four-week trial on the merits, including a subsequent two-day oral argument, was held addressing the issues of validity, infringement, double patenting, new matter, statute of limitations, sections 184, 185, and 102(b) violations regarding the 10 claims of the '961 patent and the 6 claims of the '526 patent. The accounting phase was deferred for a later trial, pending the determination of liability.

## THE '961 PATENT

The application for the patent in suit was filed on October 13, 1965, by inventor George R. Aschauer, on application Serial No. 495,640, and issued on July 4, 1967. The patent is entitled "Multiple-Stage, Hydraulic Jet Propulsion Apparatus for Water Craft". The patent application describes a multi-stage hydraulic jet propulsion apparatus for waterborne craft wherein the second stage impeller is driven faster than the first stage impeller and wherein the housing surrounding these impellers converges toward the discharge end. (DX–97, p. 1). The device is shown in the sole drawing present in the '961 patent, herein reproduced on the following page to facilitate reference.

The multiple-stage, hydraulic jet propulsion apparatus for a water craft consists of a propulsion unit with a housing having an intake 1 flushed with a bottom 2 of the water craft, with a discharge end 3, of the housing, extending through the stern 4 of the craft. (DX–97, p. 3). A Nozzle N extends rearwardly beyond the stern for receiving the stream of water from the housing from the boat, and discharging it to propel, steer, or reverse the direction of the boat. A power plant 5 drives the drive shaft 6, which in turn drives a gear reduction means 7, which in turn drives the drive sleeve 8 within the housing H.

A first stage impeller 10 is fixed to the sleeve 8 and driven thereby to form a low speed pump or impeller. In contrast, a second stage impeller 12 is fixed to and driven by the shaft 6 to form the high speed pump or impeller. The outer ends of the impellers are "free" or unsupported by a surrounding ring, and their ends are tapered rearwardly to define an impeller periphery which complements and is located adjacent to the internal shape of the housing in which it is mounted. (DX–97, p. 3). Moreover, the speed of the second stage impeller is greater than the speed of the first stage impeller, and the cross-sectional area of the impeller housing decreases in a direction approaching the discharge end. The patent application emphasizes that this combination, *i.e.*, (1) the speed of the second stage impeller being greater than the first stage impeller, and (2) the impeller housing decreasing toward the discharge end, results in a very highly desirable high speed pumping unit with a correspondingly high pressure rise through the unit. (DX–97, p. 3, lines 1–5).

July 4, 1967
G. R. ASCHAUER
3,328,961
MULTIPLE STAGE, HYDRAULIC JET PROPULSION
APPARATUS FOR WATER CRAFT
Filed Oct. 13, 1965

Finally, fixed stator blades 14 are secured within the housing and are located behind the first stage impeller 10, and the hub 14A of these blades forms a support for the sleeve bearing 14B where the rear end of the drive sleeve 8 is rotatably mounted. Fixed stator blades 15 are fixed within the housing and directly behind the second stage impeller while the central hub 15A of these blades contains a sleeve bearing 15B which rotatably supports the rear end of drive shaft 6. These stator blades

718

act to "straighten out" the flow of water after it leaves the impellers, that is, they reduce the circular movement or spin of the water and direct it axially rearwardly. (DX–97, p. 4) The housing closely surrounds and complements the peripheral shape of the impellers. (DX–97, p. 4, lines 21–22).

The '961 patent contains ten claims which read as follows:

1. A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising,

a housing having a forward intake portion for receiving water and a rearward discharge portion for discharging water rearwardly of the stern of the craft,

and said housing having a rearwardly converging portion, a first stage impeller mounted within said converging portion for being rotationally driven,

a second stage impeller mounted within said converging portion and located rearwardly of and of smaller diameter than said first stage impeller and in co-axial alignment therewith,

said housing closely surrounding said impellers in complementary converging relationship therewith, the flow rate of the water through the first stage impeller being the same as that through said second stage impeller,

and means for rotationally driving said second stage impeller faster than said first stage impeller.

2. A unit as defined in claim 1 including stator blades fixed within said converging portion of said housing,

and located between said impellers,

and also rearwardly of said second stage impeller for straightening out the flow of water.

3. A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising,

a housing having an inlet flush with the bottom of said craft for receiving water,

and a rearwardly and also an upwardly inclined forward portion extending from said inlet,

said housing having an intermediate portion which converges rearwardly, and a rear discharge portion for discharging water rearwardly of the stern of the craft,

a first stage impeller and a second stage impeller both mounted within said converging portion for being rotationally driven,

said second stage impeller located rearwardly of and of smaller diameter than said first stage impeller and in co-axial alignment therewith,

said housing closely surrounding said impellers in complementary converging relationship therewith,

the flow rate of the water through the first stage impeller being the same as that through said second stage impeller,

and means for rotationally driving said second stage impeller faster than said first stage impeller.

4. A unit as defined in claim 3 including stator blades fixed within said converging housing portion and located rearwardly of each of said impellers.

5. A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising,

a housing having an inlet flush with the bottom of said craft for receiving water,

and a forward portion extending rearwardly and upwardly from said inlet,

said housing also having a rearwardly converging portion, and a rear discharge portion,

a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle,

a first stage impeller and a second stage impeller both mounted within said converging portion for being rotationally driven,

said second stage impeller located rearwardly of and of smaller diameter than said first stage impeller and in co-axial alignment therewith,

stator blades fixed within said converging housing portion and located rearwardly of each of said impellers,

said housing closely surrounding said impellers in complementary converging relationship therewith,

the flow rate of the water through the first stage impeller being the same as that through said second stage impeller,

and means including an engine and gear reduction unit for rotationally driving said second stage impeller faster than said first stage impeller.

6. A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising,

a housing having a forward intake portion for receiving water and a rearward discharge portion for discharging water rearwardly of the stern of the craft,

a first stage impeller mounted within said housing for being rotationally driven,

a second stage impeller mounted within said housing and located rearwardly of said first stage impeller and in co-axial relationship therewith,

said housing closely surrounding said impellers in complementary relationship therewith,

the flow rate of the water through the first stage impeller being the same as that through said second stage impeller,

and means for rotationally driving said second stage impeller faster than first stage impeller.

7. A unit as defined in claim 6 including stator blades fixed within said housing and located between said impellers,

and other stator blades located rearwardly of said second stage impeller for straightening out the flow of water.

8. A unit as defined in claim 6 further characterized in that said housing has an inlet in the bottom of said craft,

and also a rearwardly and upwardly inclined forward portion extending from said inlet.

9. A unit as defined in claim 8 including stator blades fixed within said housing and located rearwardly of each of said impellers.

10. The propulsion unit as defined in claim 9 including a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle,

and said means for driving said impellers includes an engine and gear reduction unit.

The Patent and Trademark Office cited four patents and one printed publication during the prosecution of the '961 application: (1) Cake, U.S. Letters Patent No. 1,316,139; (2) Omohundro, U.S. Letters Patent No. 2,981,464; (3) Hamilton, U.S. Letters Patent No. 3,083,529; (4) Eaton, U.S. Letters Patent No. 3,143,857; and (5) *Yachting Magazine*, November 1979, Vol. 106, No. 5.

The '526 patent, entitled "Multiple-Stage, Hydraulic Jet Propulsion Apparatus for Water Craft" was filed on March 1, 1967, on Application Serial No. 619,763, and issued October 15, 1968. Thus, the applications of both the '961 patent and the '526 patent were co-pending during the months of March, April, May, June, and during the first four days of July of 1967.

### THE '526 PATENT

The '526 patent is entitled "Multi-Stage, Hydraulic Jet Propulsion Apparatus for Water Craft", filed March 1, 1967, and issued October 15, 1968. Thus, the '526 patent, the later patent by patentee Aschauer, was filed four months before the issuance of the '961 patent, and therefore was co-pending with the '961 patent application for a period of four months. The abstract of disclosure of the '526 patent reads as follows: "Hydraulic jet propulsion apparatus for waterborne craft having multiple stages of different type pumps operating at different speed." In its specifications under the title of "cross-reference", the patentee states "The present invention is in the nature of an improvement over my co-pending U.S. Patent Application Serial No. 495,640 filed October 13, 1965, which is now Patent No. 3,328,961 (the '961 patent) and entitled "Multiple Stage Hydraulic Jet Propulsion Apparatus for Water Craft."

In summarizing his invention in the specifications, the patentee states:

The present invention provides a multi-stage apparatus of the above type in which the *first stage pump is of the axial flow type* and acts as a supercharger pump; the *second stage pump is of the mixed-flow pump* and which constitutes the main pump for the apparatus and develops the great majority of the horsepower; in addition, the *second stage pump is driven at a higher speed than the first stage pump.* It is thus possible to utilize a slower speed, lower horsepower first stage pump for the supercharging or "packing" of water into the main second stage pump which in turn utilizes a higher allowable specific speed, resulting in a particularly efficient marine jet.

This combination of an axial flow pump feeding, that is, supercharging, a subsequent mixed-flow type of pump, with the latter mixed-flow pump turning at a considerably higher speed, provides a particularly efficient unit capable of using the slower speed and lower horsepower pump to initially pack the second stage, main pump of higher specific speed.

The '526 patent contains six claims and one drawing, reproduced on a following page for easy reference.

The six claims of the '526 patent are as follows:

(1) A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising a housing having a forward intake portion and a rearward discharge portion for discharging rearwardly of the stern of the craft; a first stage, axial flow pump in said housing; a second stage, mixed flow pump in said housing and located rearwardly of said first stage pump for receiving water therefrom; straightening vanes located rearwardly of each of said first and second stage pumps; and means for rotationally driving said pumps and said second stage pump faster than said first stage pump.

(2) A unit as defined in claim 1 further characterized in that said forward intake portion is of the diffusing type and has an inlet side and a discharge side, said inlet side being of smaller cross-sectional area than said discharge side.

(3) The unit as set forth in claim 1 further characterized in that said housing is of substantially cylindrical shape from the inlet side of said first stage pump to the inlet side of said second stage pump, and the said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump, and then said housing converges rearwardly at its discharge portion.

(4) The propulsion unit described in claim 1 further characterized in that said means for rotationally driving said pumps includes an engine and gear reduction unit, said pumps being in co-axial alignment and driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven.

(5) The propulsion unit described in claim 3 further characterized in that said means for rotationally driving said pumps includes an engine and gear reduction unit, said pumps being in co-axial alignment and driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven.

(6) A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising a water-conveying housing having a forward intake portion and a rearward, restricted discharge portion for discharging rearwardly of the stern of the craft; said forward intake portion has an inlet side and a discharge side, said inlet side being of smaller cross-sectional area than said discharge side; a first stage, axial flow pump in said housing; a second stage, mixed flow pump in said housing and located rearwardly of said first stage pump for receiving water therefrom; said housing being of substantially cylindrical shape from the inlet side of said first stage pump to the inlet side of said second stage pump, and the said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump and then said housing converges rearwardly at its discharge portion;

straightening vanes located rearwardly of each of said first and second stage pumps; and means for rotationally driving said pumps and said second stage pump faster than said first stage pump, said means for rotationally driving said pumps includes an engine and gear reduction unit, said pumps being in co-axial alignment and driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven.

The specifications of the '526 patent describe a hydraulic jet propulsion apparatus for waterborne craft in which the pumps of the different stages are of different types and operate at different speeds. The specification adds that the first stage pump is of the axial flow type and acts as a supercharger, while the second stage pump is of the mixed flow type and constitutes the main pump for the apparatus, developing the greater majority of the horsepower. Moreover, the second stage pump is driven at a higher speed than the first stage pump. The specification stresses that the combination of a first stage axial flow pump, with a subsequent second stage mixed flow type pump, with the second stage mixed flow pump revolving at a substantially higher speed, creates a particularly efficient hydraulic jet propulsion pump for a waterborne craft. The '526 patent contains one drawing which is a longitudinal, cross-sectional view through a portion of a water craft embodying an apparatus of the present invention, with parts shown in section or broken away for clarity of drawings.

The drawing depicts a propulsion unit with a housing mounted with the forward end of its intake portion 1 flush with the bottom 2 of the water craft C and rearward, a restricted end 3 of the housing extending through the stern of the craft.

An intake grill 1g is depicted below the hull of the craft to prevent the ingestion of rocks. The forward intake portion 1 of the housing is of the diffusing type in which the water is diffused as it approaches the first pump, thereby decreasing its velocity and subsequently decreasing its pressure too.[1] A nozzle end extends rearwardly beyond the stern for receiving the stream of water from the housing in the boat and discharges it to propel, steer or reverse the boat.

A power plant V drives a lay shaft 5a which in turn drives a shaft 6 through a gear reduction unit 7. More specifically, the reduction unit through its gears 7a and 7b, drives the shaft 6 and through its gears 7c and 7d drives the sleeve 8 which is fixed by a key 8a to the gear 7d.

As noted earlier, there is a first stage pump 10 which is of the axial flow type, and is fixed to sleeve 8, and is driven thereby to form a relatively low speed pump or inducer which acts to supercharge or "pack" the water into a second stage pump 12. The first stage axial flow pump forces the water in a generally axial direction, with a minimum of water straightening being required. The main diameter of impeller pump 10 is indicated by the dotted line 11, the point of discharge being at the rear of the blade, as at 11a. The second stage impeller pump 12 is fixed to, and driven by, the shaft 6 to form the main, high speed pump of the apparatus. Its main diameter is indicated by the broken line 13. The second stage pump 12 is of the mixed flow type and operates at a higher speed than the first stage pump. The second stage pump, *i.e.*, the mixed-flow pump, delivers the greater majority of horsepower in this multi-stage, hydraulic jet propulsion apparatus for water craft.

---

**1.** See the '526 patent, col. 2, lines 69–72, wherein the patentee states that with a decreasing velocity of water there is an increase of pressure, *viz.*, ". . . [t]hereby decreasing its velocity and *increasing* its pressure." The court believes that is a typographical error on the part of the patentee since it is a well-known scientific law that when the velocity of a liquid is decreased in any hollow cylinder or tubular conveyance, all other parameters remaining the same, a decrease in pressure results, instead of an increase.

722

INVENTOR:
GEO. R. ASCHAUER
BY:
James C. Mim
ATTORNEY

Finally, thick straightening vanes are provided behind each of the impeller pumps for straightening out or relieving the spin of the water as it leaves each pump. For example, vanes 14 are secured within the housing and are located behind the first stage pump 10. These vanes are fastened together at their radially inner ends by the hub 14a which also forms a support for bearings 14b and 14c which rotationally support, respectively, the sleeve 8 and

drive shaft 6. The discharge portion 19 of the housing also has a series of straightening vanes 20 which act to receive the water from the second stage pump and reduce the circular movement or spin of the water.

The Patent and Trademark Office cited four patents during the prosecution of the '526 patent application: (1) Eich, U.S. Letters Patent No. 1,402,059; (2) Stallman, U.S. Letters Patent No. 3,082,732; (3) Hamilton, U.S. Letters Patent No. 3,233,-573; and (4) Brill, U.S. Letters Patent No. 3,269,111.

## THE ACCUSED DEVICE

*The Propulsion Pumps of the SES 100A*

Two classes of devices are accused of infringement. The first class is the propulsion pumps used in the experimental surface effect ship known as the SES 100A. The SES 100A was an experimental test craft built by the SES division of the Aerojet General Corporation (SES Division, Aerojet) for the Joint Surface Effect Ship Project Office (JSESPO) of the Department of Commerce Maritime Administration and the Department of Navy under contract MA-4677. (DX-35, Stakee Tr.S.-1151, 1237a, Schlappi, Tr.S.-687-691, 709). The two propulsion pumps and one spare required by the SES 100A were designed and built by the Liquid Rocket Division of Aerojet (Aerojet, Sacramento) under a subcontract for that purpose.

The SES 100A is a vessel with a platform that contains the operator's cab, and wherein two side walls are attached to the bottom of the platform and curtains are connected to the side walls to form an air bubble chamber. The vessel somewhat resembles a catamaran. Large fans create an air bubble in the space between the side wall and curtains which support the vessel on a cushion of air. (DX-37a, Aschauer Tr.S.-100-102, 670-672). The SES 100A propulsion pumps are part of a propulsion system which is comprised inlets, conduits, pumps, and nozzles, with one system located in each sidewall. (PX-41, DX-37a, Aschauer Tr.S.-101-102, Cuthbert Tr.W.-1730). The inlets were originally ram in-

lets in pods projecting from the sidewall, but are believed to have been changed between the initial construction and ultimate destruction of the SES 100A craft. (DX-37a, Schlappi Tr.S.-749-750, 883, Stakee Tr. S.-1225). Plaintiff did not introduce evidence on the construction of the inlet at any time. (Aschauer Tr.S.-103, 105).

Each SES 100A propulsion pump has a complex curvaceous housing which has a single intake conduit preceding the pump elements. (PX-41; DX-85). A housing generally follows and is defined by the shape and function of the enclosed pump elements. (PX-41; Schlappi Tr.S.-764-765). The water entering the propulsion pump flows through a constant diameter passage from the interface of the propulsion pump housing with the intake system of the ship to the beginning of the first stage impeller. (Schlappi Tr.S.-751). The water flows through the propulsion pump in a passage defined by the outer housing in a hub located in the center of the propulsion pump. (PX-41). The first stage impeller has a number of blades which have a constant tip diameter causing the housing surrounding the first stage impeller to be cylindrical, but the hub diameter of the first stage impeller increases in a curved shape similar to a mixed-flow impeller causing the water passage through the first stage to have an increasing smaller volume. (Schlappi Tr.S.-764, 782). The blade height decreases from the inlet to the outlet of the first stage pump. The water flow through the first stage impeller is generally of the mixed-flow type because of the shape of the hub. (Schlappi Tr.S.-764, 782). It is the rotation of the impeller and the force exerted by the blades which moves the water. (Schlappi Tr.S.-783). Such an impeller with a cylindrical tip diameter and increasing hub diameter is known as an "inducer." (Schlappi Tr.S.-764, 782). An inducer is a high performance, high technology impeller specifically selected to meet the performance requirements of the propulsion pumps that operate under conditions in which an axial flow pump could not satisfactorily perform.

(Schlappi Tr.S.–787–788). After the water leaves the first stage impeller, it enters the first stage stator. In the area of the stator, both the outer diameter of the housing and the diameter of the hub decrease in order to maintain a constant velocity of the water flowing from the discharge of the first stage impeller to the entrance of the second stage impeller. (Schlappi Tr.S.–764–765). The housing and hub narrow to a constriction or neck located between the first and second stage impeller. (Schlappi Tr.S.–765, Brandau Tr.W.–137–138). A nipple or take-off is located in this neck to remove approximately one percent of the water flow for use in engine coolant and other purposes. (PX–41; DX–85; Schlappi Tr.S.–753–754, 765, 855, 990–992).

The beginning of the second stage impeller is located at the neck of the housing. (Schlappi Tr.S.–765). The second stage impeller is a mixed flow impeller with a tip diameter and hub diameter increasing from the inlet to the outlet of the impeller. (Schlappi Tr.S.–765). The water flows outwardly at approximately a 45 degree angle through the second stage impeller and is discharged into the second stage stator. (Schlappi Tr.S.–765–766). The second stage is somewhat spherical in shape. (PX–41). The second stage stator is located at the maximum diameter of the second stage housing. (PX–41). Water is then discharged from the second stage stator into the nozzle. (PX–41). Finally, the maximum diameter of the second stage housing is smaller than the maximum diameter of the first stage housing. (Schlappi Tr.S.–766; PX–41).

*The Pumps of the PHM*

The second class of accused devices is the pumps used in the foilborne propulsion system of the hydrofoil, missile carrying, Navy patrol vessel, designated PHM (hereinafter PHM). Within six years prior to the filing of this case, the Navy had received delivery of at least one PHM propulsion pump. The PHM vessels were built for the Navy by Boeing Corporation (hereinafter Boeing) under Contract No. N0024–72–C–0244 or similar contracts. The foilborne propulsion pumps for the PHM were built for Boeing by Aerojet Sacramento.

The PHM type vessel, one of which is named Pegasus and another Hercules, is over 100 feet long and carries a crew of 21 officers and enlisted men. (Stipulation; Brandau Tr.W.–129). The PHM vessel has two separate and distinct propulsion systems: (1) a hullborne system which propels the craft when it is moving on its hull as a waterborne vessel, and (2) a foilborne system which propels the vessel when it is "flying" on its hydrofoil wings. (PX–40; Cuthbert Tr.W.–1705). When the PHM vessel is in the flying mode, the bottom of the hull of the vessel is about 12 feet above the water. The only portion of the PHM vessel in the water is the hydrofoil wing and struts which are appended to the craft. (Cuthbert Tr.W.–1696, 1698). At this time, the vessel is functioning not as a water craft that depends on water buoyancy to remain afloat, but rather as a hydrofoil, in the flying mode, supported by the same forces which permit an aircraft to remain aloft. (Cuthbert Tr.W.–1698, 1711–1713).

When a PHM vessel is in the foilborne mode, water is taken into its propulsion system through two ram inlets located in pods in the leading edge of the hydrofoil wing. (DX–26, Davis Tr.W.–419, Cuthbert Tr.W.–1699). The water entering each ram inlet is conducted upwards approximately 20 feet through a conduit in the strut which changes several times in shape, direction and cross-sectional area. (DX–26; Cuthbert Tr.W.–1710). The water flow from each strut merges at a "Y" intersection before it is conducted into the first stage impeller. (PX–51a; PX–58; DX–26; Davis Tr.W.–408–409, 424, Cuthbert Tr.W.–1723–1724). Compared to the SES 100A pump, the PHM pump is much larger and differs in the blade angles, the shape of its second stage, and other details not material to the consideration of the issues of infringement. For the purposes of the instant case, the operative portions of the SES 100A and PHM pumps, except for the water take-off point, can be considered the same. (PX–52a; Schlappi Tr.S.–773–774). A represen-

tation of the PHM pump as marked at trial is clearly seen in PX–52a. For easy reference, it is reproduced on the following page.

Defendant has asserted a host of defenses to plaintiff's action, specifically: (1) invalidity; (2) noninfringement; (3) anticipation; (4) new matter; (5) section 184 and 185 violations; (6) statute of limitations; (7) section 102(b) public use; (8) obviousness-type double patenting; (9) section 102(b), on sale; (10) section 102(a); and (11) section 102(f). Since no findings of fact, however, have been proposed with respect to sections 102(b) on sale, 102(a), and 102(f), nor has defendant covered these issues in its post-trial brief, defendant is deemed to have waived these defenses. *Bendix Corp. v. United States,* 600 F.2d 1364, 186 U.S. P.Q. 289, 291, 220 Ct.Cl. 507 (Ct.Cl.1975).[2]

**2.** *In Bendix Corp. v. United States,* 600 F.2d 1364, 186 U.S.P.Q. 289, 291, 220 Ct.Cl. 507 (Ct.Cl. 1975), the court in a patent case, held that defendant waived any of its defenses it had earlier asserted during pre-trial proceedings and even through the trial on the merits, if it did not address those patent defenses in its proposed post-trial findings of fact or its post-trial brief. In pertinent part the court stated: "In its pleadings, and up to and through trial, defendant steadfastly contended that all of the claims in issue were invalid. In support of these contentions, defendant had asserted twenty-nine prior art patents and seven publications, identified six individuals as prior inventors of the claimed subject matter, and four individuals as having knowledge of a prior use or sale. As noted previously, some of these defenses were dismissed for lack of evidence at the conclusion of defendant's case. Now it appears that defendant has dropped all of the defenses based on prior art or prior work of others, proposing no findings and making no argument regarding any of them. As a consequence, those defenses are deemed to be abandoned, and findings regarding the scope and content of the prior art, the differences between the prior art and the claimed subject matter and the level of skill in the pertinent art have not been made (by defendant)." (citing *Tektronix Inc. v. United States,* 195 Ct.Cl. 53, 60, 445 F.2d 323, 327, 170 U.S.P.Q. 100, 165 U.S.P.Q. 394–95 (1971) (other citations and footnote omitted)).

This same waiver rule in patent law cases was also applied by the Court of Claims in *Lockheed Aircraft Corp. v. United States,* 193 U.S.P.Q. 449, 452 (Ct.Cl.1977), wherein the court said: "Defendant has asserted a host of defenses to plaintiff's action, specifically: invalidity, noninfringement, license and misuse. Since no findings of fact have been proposed with respect to the misuse defense and defendant has not addressed misuse in its brief, defendant is deemed to have abandoned its assertion of misuse. (citing *Bendix Corp. v. United States,* 600 F.2d 1364, 186 U.S.P.Q. 289, 220 Ct.Cl. 507 (Ct.Cl.1975); *Grover v. United States,* 200 Ct.Cl. 337, 354 (1973)).

726

## Validity

It is now clear beyond peradventure that: (1) the presumption of validity is never annihilated, destroyed, or even weakened, regardless of what facts are in the record, *e.g.*, even with the introduction of prior art more pertinent than that considered by the examiner; (2) it is clearly a statutory procedural device which assigns to the party asserting invalidity the burden of proving invalidity; and (3) the burden of persuasion is, and always remains, on the party asserting invalidity. *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1574–75, 221 U.S.P.Q. 929, 930–31 (Fed.Cir. 1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534, 218 U.S.P.Q. 871, 875–76 (Fed.Cir.1983); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 220 U.S.P.Q. 193 (Fed.Cir.1983); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 220 U.S.P.Q. 97 (Fed.Cir.1983); *Stevenson v. International Trade Commission,* 612 F.2d 546, 551, 204 U.S.P.Q. 276, 281 (CCPA 1979); *Solder Removal Co. v. International Trade Commission,* 582 F.2d 628, 632–33, 199 U.S.P.Q. 129, 132–33 (CCPA 1978).

As eloquently explicated by Chief Judge Markey in *Stratoflex,* 713 F.2d at 1534:

> The presumption, like all legal presumptions, is a procedural device, not substantive law. It does require the decisionmaker to employ a decisional approach that starts with acceptance of the patent claims as valid and that looks to the challenger for proof of the contrary. Thus the party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima-facie case, but the burden of persuasion on the merits remains with that party until final decision. The party supporting validity has no initial burden to prove validity, having been given a procedural advantage requiring that he come forward after a prima-facie case of invalidity has been made. With all the evidence in, the trial court must determine whether the party on which the statute imposes the burden of persuasion has carried that burden.

> Introduction of more pertinent prior art than that considered by the examiner does not, therefore, "weaken" or "destroy" the presumption. Nor does such introduction "shift" the basic burden of persuasion (emphasis added). The presumption continues its procedural burden assigning throughout the trial. Such introduction can, of course, facilitate the validity challenger's carrying of that burden. It would require one supporting validity to come forward with countervailing evidence, as would the introduction of any evidence tending to establish invalidity. In the end, the question of whether all the evidence establishes that the validity challenger so carried his burden as to have persuaded the decisionmaker that the patent can no longer be accepted as valid (footnote omitted).

The applicable statute, 35 U.S.C. § 282 (1982), in relevant part, reads as follows:

> A patent shall be presumed *valid.* Each claim of a patent (whether in independent [or] dependent ... form) shall be presumed valid independently of the validity of other claims; dependent ... claims shall be presumed valid even though dependent upon an invalid claim. *The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity* (emphasis added).

■ If that burden is not successfully carried by the party asserting invalidity, the trial court need only so state. It need not once more declare a patent "valid", which was and still is valid, because the burden of proof of invalidity was not carried by the asserting party. *Stratoflex,* 713 F.2d at 1534, n. 3 (citing 35 U.S.C. § 282 (1982)).

■ Moreover, in averring invalidity, defendant has the burden of explicating invalidity through clear and convincing evidence, as opposed to merely the "preponderance of the evidence". *SSIH Equipment, S.A. v. International Trade Commission,* 718 F.2d 365, 375, 218 U.S.P.Q. 678, 687 (Fed.Cir.1983); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361,

219 U.S.P.Q. 473, 480 (Fed.Cir.1983); *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 228 U.S.P.Q. 90 (Fed.Cir.1985). For example, the Federal Circuit opined in *Panduit Corp. v. Dennison Manufacturing Co.*, 774 F.2d 1082, 1096, 227 U.S.P.Q. 337 (Fed. Cir.1985), *vacated and remanded,* —— U.S. ——, 106 S.Ct. 1578, 89 L.Ed.2d 817, 229 U.S.P.Q. 478 (1986): "The statute mandating a presumption of validity, 35 U.S.C. § 282, places the burden of proving facts compelling a conclusion of invalidity on the party asserting invalidity. This court has said the burden of proving facts compelling a conclusion of patent invalidity *must be carried by clear and convincing evidence.*" "The role of the court is to determine whether the validity challenger carried that burden." (citing *SSIH Equipment, S.A. v. International Trade Commission*, 718 F.2d 365, 375, 218 U.S.P.Q. 678, 687 (Fed.Cir.1983) (emphasis added)).

## ANTICIPATION

■ Anticipation, of course, requires the claimed subject matter to be identically disclosed or described in a prior art before a section 102 rejection is appropriate. *In re Arkley*, 455 F.2d 586, 172 U.S.P.Q. 524 (CCPA 1982). Moreover, arguments that the alleged anticipatory prior art is "nonanalogous art" or "teaches away from the invention" or is not recognized as solving the problem solved by the claimed invention, is not "germaine" [germane] to a rejection under section 102. *In re Self*, 671 F.2d 1344, 1350–51, 213 U.S.P.Q. 1, 7 (CCPA 1982). Therefore, if the claims of a patent are held to be invalid because they are anticipated by a single piece of prior art under section 102, evidence having to do with the level of ordinary skill in the art and the related objective criteria which the Supreme Court had so clearly enunciated in the *Graham v. John Deere* trilogy, simply do not apply. They need neither be introduced or considered; and they may not be used by way of arguing the validity of the patent. It is only when the attack on the claims of the patent is based on its obviousness over the prior art, that is, two or more pieces of prior art, that the level of ordinary skill in the art becomes critical and the other objective considerations come into significant play. *Patent Law Perspectives*, Vol. I, § 2.2(2), Matthew Bender, 1983. Thus, DX–11, the Italian patent, can anticipate claim 1 of the '961 patent, without having to qualify as analogous prior art. The pertinent statute is 35 U.S.C. § 102(b) (1982) which states in part: "[A] person shall be entitled to a patent unless ... the invention was *patented* or described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States...." While DX–11, the Italian patent, does not have to qualify as analogous art, we find nevertheless, that it is "analogous" prior art, since it discloses a new configuration for screws or propellers on a ship to produce greater forward thrust to it, while also resolving the problems of cavitation. DX–11, p. 3, lines 16–23.

■ When we analyze the elements of claim 6 of the '961 patent, via an anticipation claim chart, it can be clearly seen that each element of claim 6 of the '961 patent reads on the Italian patent. See *infra*.

ANTICIPATION CLAIM CHART FOR
CLAIM 6 OF THE '961 PATENT

| Claim 6 (Elements) | Support in '961 Specification | Corresponding Elements In Italian Patent |
|---|---|---|
| A multi-stage hydraulic jet propulsion unit for waterborne craft comprising | This invention relates generally to hydraulic jet propulsion apparatus for waterborne craft, and more specifically, to multiple stage jets of this type. An object of the present invention is to provide a particularly efficient, multi-stage, hydraulic jet propulsion apparatus for waterborne craft. | Figure 1 of the Italian patent (the sole drawing) shows a multi-stage (two propellers) propulsion unit for a waterborne craft. |
| 1. a housing (H) having a forward in- | Referring now to the drawings, the propulsion unit with a housing is mounted with | Figure 1 of the Italian patent shows a housing having a forward intake for re- |

ANTICIPATION CLAIM CHART FOR
CLAIM 6 OF THE '961 PATENT

| Claim 6 (Elements) | Support in '961 Specification | Corresponding Elements In Italian Patent |
|---|---|---|
| take portion (1) for receiving water and a rearward discharge portion (3) for discharging water rearwardly of the stern of the craft | intake 1 flush with the bottom 2 of the watercraft C and the discharge end of the housing extends through the stern 4 of the craft in accordance with conventional practice. (Col. 2, lines 7–11.) | ceiving water, and a rearward discharge portion for discharging water rearwardly of the stern. |
| 2. a first stage impeller (10) mounted within said housing (H) for being rotationally driven, | A first stage impeller (10) is fixed to the sleeve 8 and driven thereby to form a low speed pump or impeller. (Col. 2, lines 22–23.)<br><br>It will be noted, however, that subsequent portions of the housing as it extends rearwardly from the intake side 19 of the first stage impeller may converge or decrease in cross-sectional area until it is rearward of the last impeller. (Col. 2, lines 51–55.)<br><br>The outer ends of the impellers are "free" or unsupported by a surrounding ring, and these ends are tapered rearwardly to define an impeller periphery which complements and is located closely adjacent to the internal shape of the housing in which they are mounted, as will appear. (Col. 2, lines 26–31.) See also Figure 1, the sole figure. | Figure 1 of the Italian patent, the sole drawing, shows a first stage impeller (propeller, screw or speed-phase propeller) mounted with a housing (called a hollow shaft) for being rotationally driven. (Page 3, English translation, lines 2, 11, 18 and 20.) |
| 3. a second stage impeller (12) mounted within said housing (H) and located rearwardly of said first stage impeller (10) and in co-axial alignment therewith, | A second stage impeller (12) is fixed to and driven by the shaft 6 to form the high speed pump or impeller.<br><br>The outer ends of the impellers are "free" or "unsupported by a surrounding ring", and these ends are tapered rearwardly to define an impeller periphery which complements and is located closely adjacent to the internal shape of the housing in which they are mounted, as will appear. (Col. 2, lines 24–31.)<br>It will be noted, however, that subsequent portions of the housing as it extends rearwardly from the intake side 19 of the first stage impeller may converge or decrease in cross-sectional area until it is rearward of the last impeller. (Col. 2, lines 51–55.) | Figure 1 of the Italian patent shows a second stage impeller (called a propeller, screw or a speed-phase propeller) mounted within said housing, (called a hollow shaft), located rearwardly of said first stage impeller and in co-axial alignment therewith. (Page 3, English translation, lines 2, 3, 4, 7, 8 and 18.) |
| 4. said housing (H) closely surrounding said impellers (10, 12) in complementary relationship therewith. | The second impeller 12 may be of smaller diameter than the first stage impeller 10 and as previously mentioned both have a rearwardly converging or frusto-conical periphery formed by the ends of their blades. (Col. 2, lines 45–48.)<br>The housing closely surrounds and complements the peripheral shape of the impellers. (Col. 2, lines 57–58.) | Figure 1 of the Italian patent (the sole drawing) shows its housing closely surrounding its two impellers (called propellers, or screws or speed-phase propellers) in complementary relationship therewith. |
| 5. The flow rate of the water through the first stage impeller (10) being the | These stators act to "straighten out" the flow of water after it leaves the impellers, that is, they reduce the circular movement or spin of the water and direct it rearward- | Figure 1 of the Italian patent shows that its housing has no stators. Since there are no stators, and therefore nothing to impede the flow of water, the flow rate through |

ANTICIPATION CLAIM CHART FOR
CLAIM 6 OF THE '961 PATENT

| Claim 6 (Elements) | Support in '961 Specification | Corresponding Elements In Italian Patent |
| --- | --- | --- |
| same as that through the second stage impeller (12) and, | ly. (Since the stators merely "straighten out" the flow of water, and do not impede the flow of water in the housing, the flow rate of the water through the first stage impeller (10) must be the same as that through the second stage impeller (12). | the first stage impeller must be exactly the same as the flow rate through the second stage impeller. |
| 6. Means (5, 6, 7, 8, 14a, 14b, 15a, 15b) for rotationally driving said second stage impeller (12) faster than said first stage impeller (10). | In accordance with the present invention, the RPM speed of the second stage impeller is greater than the first stage and furthermore the cross-sectional area of the impeller housing decreases in a direction approaching the discharge end. (Col. 2, lines 1–5.) | Two screws (1) and (2) with different diameters, dove-tailed (fitted) on two co-axial shafts (4) and (5), the latter of which is hollow and both of which can revolve at different RPMs. (Page 3, lines 2–4 of the English translation.) |
| | A power plant 5 drives the shaft 6 and a gear reduction means 7 is also driven from the shaft 6 and it in turn drives the drive sleeve 8 within the housing H. A first stage impeller 10 is fixed to the sleeve 8 and driven thereby to form a low speed pump or impeller. A second stage impeller 12 is fixed to and driven by the shaft 6 to form the high speed pump or impeller. (Col. 2, lines 18–25.) | The power furnished by the motor (8) is taken from the output shaft of the reducer (7) and is transmitted to the shafts (4) and (5) by the gear torques (6) which have a different transmission ratio precisely in order to give us a different number of RPMs on the two shafts. (Page 3, lines 5–8, in the English translation.) |
| | More specifically, it is an object of the present invention to provide a multi-stage apparatus of the above-type in which the second stage impeller is driven faster than the first stage impeller and the housing which surrounds the impeller converges towards the discharge end thereof. The result is a particularly efficient propulsion unit. (Col. 1, lines 16–21.) | It then envelops the screw (2) with the smaller diameter which however revolves at a larger RPM, which gives us the further speed increase. (Page 3, lines 11–13, English translation.) The "speed-phase propeller" involved in this invention is characterized by several screws operating in series and dove-tailed on co-axial shafts which can revolve at different RPMs. (Claim 1, page 4 of the English translation.) Figure 1 of the Italian patent, the sole figure, also depicts the two co-axial shafts (4) and (5), the latter of which (5) is hollow and both of which can revolve at different RPMs. |

Support in the record for the chart can be found in the direct testimony of Dr. A. Douglas Carmichael, defendant's expert witness. (Carmichael Tr.W.–1226–1234). Dr. Carmichael is a fulltime professor of power engineering in the Department of Ocean Engineering at the Massachusetts Institute of Technology (Carmichael Tr.W.–806). He began teaching at MIT in 1970 and from 1964–70 was a research fellow in turbomachinery at Imperial College of Science and Technology in London. His resume, detailing his career, is DX–89. He is a member of the Society of Navy Architects and Marine Engineers. (Carmichael Tr.W.–839).

*Obviousness*

The applicable statute is, of course, 35 U.S.C. § 103 (Supp. II 1984):

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvi-

ous at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

Some of the more significant words mandated in this statute which delimit the obviousness issue are that we must: (1) determine what *"would have been obvious"*, as opposed to *"is obvious"* as some courts have been prone to do; (2) address the subject matter as a *whole*, as opposed to selecting individual elements; determining their individual obviousness; and holding the entire invention obvious; and (3) discuss the obviousness of the claimed "invention" rather than the obviousness of the patent. *See Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 221 U.S.P.Q. 649 (Fed.Cir.1984).

This court and one of its predecessors have cautioned against the use of hindsight:

It is difficult but necessary that the decisionmaker *forgot what he or she has been taught at trial about the claimed invention and cast the mind back to the time the invention was made* (often as here many years), to occupy the mind of one skilled in the art who is presented only with the references, and who is normally guided by the then-accepted wisdom in the art (emphasis added). *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553, 220 U.S.P.Q. 303, 313 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 172 (1984).

Therefore, it is absolutely imperative for a court to transport itself back in time to when the claimed inventions were made in 1965–1967 and determine obviousness from the perspective of one having ordinary skill in the art to which the subject matter pertains, having only the prior art references before him and unaided by the teachings of the patents in suit.

It is now clear beyond cavil that it is not permissible to first ascertain factually what the inventors did and then view the prior art in such a manner as to select from the random facts of that art only those which may be modified and then utilized to reconstruct the claimed invention. *Interconnect Planning Corp. v. Feil* 774 F.2d 1132, 1139–43, 227 U.S.P.Q. 543 (Fed.Cir. 1985); *Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005, 1012, 217 U.S.P.Q. 193, 199 (Fed.Cir.1983). This second principle was succinctly stated by the Federal Circuit in *Orthopedic*, 702 F.2d at 1012, as follows:

The available art shows each of the elements of the claims in suit. Armed with this information would it then be nonobvious to this person of ordinary skill in the art to coordinate these elements in the same manner as the claims in suit? The difficulty which attaches to all honest attempts to answer this question can be attributed to the strong temptation to rely on hindsight while undertaking this evaluation. It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law.

The touchstone case that sets the guidelines for a correct obviousness determination, is *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 U.S.P.Q. 459, 467 (1966), wherein the Supreme Court explicated:

While the ultimate question of patent validity is one of law, ... the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and con-

tent of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy (citations omitted).

Thus, under the *Graham* analysis, a three part determination is set forth: (1) the scope and content of the prior art; (2) differences between the prior art and the claim at issue; and (3) the level of skill in the pertinent art. In addition, the Federal Circuit has added a fourth consideration to the above three part analogy—that of secondary considerations or additional evidence, which may serve as indicia of nonobviousness. *In re Sernaker,* 702 F.2d 989, 996, 217 U.S.P.Q. 1, 7 (Fed.Cir.1983); *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 218 U.S.P.Q. 865 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Pursuant to *Sernaker* and *Environmental Designs,* it could be argued that the Graham analysis has now been amended to create a four pronged approach, rather than a three pronged approach, to the question of obviousness. Indeed, a four pronged method of analysis was succinctly summarized by the Federal Circuit in *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 228 U.S.P.Q. 90, 97 (Fed.Cir.1985):

Obviousness under 35 U.S.C. § 103 is a question of law based on the underlying factual inquiries set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17, [86 S.Ct. 693–94, 15 L.Ed.2d 545] 148 U.S.P.Q. 459, 467 (1966): (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) objective evidence of secondary considerations. *See e.g., Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1575, 222 U.S.P.Q. 744, 746 (Fed.Cir.1984), *cert. denied,* [—— U.S. ——] 105 S.Ct. 2138 [85 L.Ed.2d 496] (1985).

*Analogous or Nonanalogous Prior Art*

The cases in the federal appellate and district courts holding art to be either "analogous" or "nonanalogous" are legion. Nonanalogous prior art, as the term is generally used in patent law, means art too remote to be treated as "prior art". *In re Sovish,* 769 F.2d 738, 741, 226 U.S.P.Q. 771 (Fed.Cir.1985). The determination that a reference is from nonanalogous art, and therefore too remote to be considered prior art, is a two pronged question. First, the court must decide if the reference is within the field of the inventor's endeavor. If not, the court must determine whether the reference is reasonably pertinent to the particular problem with which the inventor was involved. *In re Pagliaro,* 657 F.2d 1219, 1224, 210 U.S.P.Q. 888 (CCPA 1981). For example, in *Shelcore, Inc. v. Durham Industries, Inc.,* 745 F.2d 621, 625, 223 U.S. P.Q. 584 (Fed.Cir.1984), the court stated:

Even were we to adopt Shelcore's argument, that these references are not within the field of the inventor's endeavor, which we do not, the problem presented and overcome by the invention is basically the same: to permit the child to position his or her body in the same general orientation relative to the play surface or toy with his or her legs extending under the toy. Thus, the solutions disclosed in Kamlay and Wells are "reasonably pertinent to the particular problem with which the inventor was involved" (footnote omitted).

In speaking to the latter question, *i.e.,* whether or not the problem presented and overcome by the reference is basically the same as the problem presented and overcome by the inventor, the Court of Customs and Patent Appeals has said "the test as to whether two references are from

nonanalogous arts is whether one seeking to solve a problem with respect to the embodiment of a reference in one art would be apt to seek the solution to said problem in the other art." *In re Shapleigh* 248 F.2d 96, 102, 115 U.S.P.Q. 129 (CCPA 1957); *see also In re Wilson*, 439 F.2d 216, 219, 169 U.S.P.Q. 307 (CCPA 1971) (one with ordinary skill in art seeking to improve a dolly for transporting and displaying bakery goods would look to features of other collapsible metal structures, including collapsible newspaper racks); *In re Antle*, 444 F.2d 1168, 1171–72, 170 U.S.P.Q. 285 (CCPA 1971) (inventor presumed to have the "ability to select and utilize knowledge from other arts reasonably pertinent to his particular problem which would be expected of a man of ordinary skill in the art to which the subject matter pertains."); *In re Cademartori*, 397 F.2d 992, 158 U.S.P.Q. 261 (CCPA 1968) (claim for paint roller for rough surfaces; reference patent intended for cleaning purposes is relevant since it concerns a clearly common problem—the failure of sponge to conform itself to surface); *In re Application of Warner*, 379 F.2d 1011, 1014, 154 U.S.P.Q. 173 (CCPA 1967) (claim for cosmetic lip liner with multiple colored materials with graduated increase in density towards center to provide contrasting colors and constant sharp edge; patents on crayons are relevant since "those of ordinary skill in the cosmetic pencil art, faced with the problem of maintaining a point on such a pencil, would be aware of or reasonably turn to the crayon art for the solution to the problem), *cert. denied*, 389 U.S. 1057, 88 S.Ct. 811, 19 L.Ed.2d 857, *reh. denied*, 390 U.S. 1000, 88 S.Ct. 1201, 20 L.Ed.2d 101 (1968); *In re VanWanderham*, 378 F.2d 981, 154 U.S.P.Q. 20 (CCPA 1967); *In re Miller*, 311 F.2d 955, 959, 136 U.S.P.Q. 205 (CCPA 1963) ("one skilled in the blow molding plastic bottle producing art [would] seek a solution to the problem of maintaining uniform thickness of the substance by searching for an answer in the blow molding glass bottle producing art").

Moreover, the trend clearly is to widen the scope of prior art that can be con-

sidered pertinent. *Weather Engineering Corp. of America v. United States*, 222 Ct.Cl. 322, 614 F.2d 281, 286–87, 208 U.S. P.Q. 939 (1980) (patents relating to airborne delivery and fusing systems are analogous art to invention in cloud seeding; "the days when inventions relating to locks are only made by locksmiths are past us. In today's world, technological breakthroughs which result from the *cross-fertilization of minds trained in different disciplines is common.* Thus, it is unrealistic to assume or demand that the cloud seeder confine his reading to the Journal of Weather Modification.... Human knowledge cannot be compartmentalized or pigeonholed, and the courts have recognized this in evaluating the relevancy of art that comes before them in a 35 U.S.C. § 103 context") (emphasis supplied).

In the instant case, defendant asserts that the field of the inventor's endeavor, *i.e.*, the subject matter of the '961 and '526 patents, generally relates to the field of fluid mechanics which includes turbomachinery. More specifically, the turbomachineries concerned are those turbomachineries known as pumps. Even more specifically, defendant states that these pumps are propulsion pumps which generate thrust as a result of energy put into the water by the rotation of pump impellers. Thus, defendant explains, performance of these propulsion pumps relies on the performance of their inlets, the ducting, their nozzles, and their impellers, all operating together.

As a fall-back position, defendant asserts that, even if turbomachinery propulsion pumps in general may not totally fall within the field of the inventor's endeavors, they are reasonably pertinent to the particular problem with which the inventor was involved, *i.e.*, the problem of cavitation. Cavitation is the formation of vapor bubbles in a liquid, usually resulting from the reduction in pressure, tending to reduce the performance of a pump by creating a cavity which has the deleterious effect of damaging the blade surface of an impeller.

Plaintiff adversatively argues that the field of the inventor's endeavor is specifically and more narrowly confined solely to "waterjet propulsion systems for waterborne craft". Plaintiff's Proposed Findings of Fact, p. 1. Plaintiff explains that these waterjet propulsion systems for waterborne craft, are particularly useful in propelling ships, such as hydrofoils, or surface effect ships, which operate at high speeds with their hulls partly or totally lifted from the water surface. A waterjet propulsion system for waterborne craft, therefore, according to plaintiff, is a device that is located mostly within the hull of a ship. Plaintiff explicates analogous prior art that must therefore of necessity contain three basic elements: (1) an intake duct that inducts fluid from outside the ship's hull; (2) a pump for transmitting energy to this fluid; and (3) an exhaust duct and nozzle that guide the jet fluid back out of the hull. Plaintiff, however, does not contest defendant's assertion that the particular problem with which the instant inventor was involved was the problem of cavitation in a pump. Indeed, inventor Aschauer himself states in his '526 patent "with the velocity of water jets ahead of the first pump reduced, the pressure is greater in this area, and it is this pressure increase ahead of the first pump which is effective in *reducing cavitation.*" '526 patent, col. 2, lines 46–50.

We agree, however, with the defendant's assertion that the instant inventor's field of endeavor is, in general, the area of turbomachinery pumps, and at the very least, the area of propulsion pumps dealing with ships. (Carmichael Tr.W.–836–838; 883; 1326–27) (Brandau Tr.W.–309–313; 332–333; 379–80; 389) (Schlappi Tr.S.–804–805). Moreover, turbomachinery pumps, in general, would still qualify as analogous prior art because they face the same problems of cavitation as do the instant water jet propulsion pumps covered by the claims in the '526 and '961 patents. (Brown Tr.W.–2160)

*Scope and Content of the Prior Art*

Pursuant to the above discussion regarding analogous prior art, we find that the prior art in the instant case should be generally limited to turbomachinery propulsion pumps used to propel a ship through water. This is particularly true, since this area of scientific endeavor must deal with the problem of cavitation. The wide spectrum that the problem of cavitation covers in the world of pumps, however, was demonstrated by the following colloquy between plaintiff's witness, Mr. Perry H. Brown and defendant's counsel, on cross-examination:

MR. SPEVACK: You say you are a member of the American Society of Mechanical Engineers; is that correct?

ANSWER: Yes.

MR. SPEVACK: Do you serve on any particular committees on the American Society of Mechanical Engineers?

ANSWER: I served on local committees in the Los Angeles section, Fluid Machinery Division, Yes.

MR. SPEVACK: Have you ever attended any—or member of the same American Society of Mechanical Committees, if you know, the other people—well, first of all, do you know who the other committee members are on the committee that you are a member of?

ANSWER: Of course.

MR. SPEVACK: I should tell on the side, on some of the bar associations, the committees get so big that you don't always even know exactly who.

ANSWER: These are not like this.

MR. SPEVACK: Are they meeting type where you meet or is it correspondence type where you correspond for a committee meeting?

ANSWER: Well, the ones I was referring to have been types that we've met in a local area and that's why you would know everybody on it.

MR. SPEVACK: The meetings that you attend, are they dealing with cavitation problems?

ANSWER: Yes, quite often.

MR. SPEVACK: And what type of equipment?

ANSWER: Could be in any type of equipment, anything from large pumps

like the Grand Coulee pumps or Metropolitan Aquaduct pumps from California, to rocket inducer pumps.

(Brown Tr.W.–2159–60)

The inventor Aschauer, in the instant case, was therefore charged, at the time of the invention, with knowledge of all the relevant prior art. *Kimberly-Clark v. Johnson & Johnson*, 745 F.2d 1437, 1454, 223 U.S.P.Q. 603, 614 (Fed.Cir.1984). The prior art, in the instant case, included turbomachinery propulsion pumps dealing with ships, or water pumps dealing with the problem of cavitation. The inventor Aschauer was therefore presumed to have knowledge also of "those arts reasonably pertinent to the particular problem [*i.e.*, cavitation] with which the inventor was involved." *In re Wood*, 599 F.2d 1032, 1036, 202 U.S.P.Q. 171, 174 (CCPA 1979) (citing *In re Antle*, 444 F.2d at 1171–72, 170 U.S.P.Q. at 287–88).

Defendant avers that all the claims of the '961 patent are obvious in view of the prior art. In advancing its theory that the claims of the '961 patent and the '526 patent are obvious in view of the prior art, defendant first focuses its attention on claim 6 of the '961 patent, the broadest claim of the '961 patent. Defendant's Requested Finding of Fact and Conclusions of Law, p. 49. Defendant argues, alternatively, that even if claim 6 of the '961 patent were read so narrowly as to cover only hydraulic propulsion devices where both the pump and ducting were inside the vessel, a reading we believe would be erroneous, the subject matter as a whole would still have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the turbomachinery propulsion art as related to ships, from Italian patent DX–11, in view of Jensen, DX–4. Defendant explicates that the Italian patent, DX–11, teaches that all the elements of a ship's propulsion pump are mounted outside the hull of a ship, such as in a structure known as a pump jet. Jensen, however, clearly teaches that such a pump jet can also be located inside a hull.

For example, on page 2, column 2, starting at line 83, Jensen teaches:

According to Figure 5, the apparatus is mounted *inside the ship's hull*. The pump stator or housing 5 is fitted into an opening in the rear portion 15 of the hull, only the tubes 4 extending outside, and the foremost end of the housing is connected to an inlet tubing or funnel 16, which is provided with a branch having a stuffing box 17 through which the shaft 8 passes into the funnel.

Thus, *Jensen*, DX–4, discloses a hydraulic propulsion arrangement for ships, and further teaches that this hydraulic propulsion arrangement may be utilized both completely outside the hull of the ship (see Fig. 4 of Jensen), or completely inside the hull of the ship (Fig. 5 of Jensen). Defendant also adduces several other prior art patents not considered by the PTO: (1) Harris, DX–1, which teaches that one or more co-axial screw propellers may be utilized within the body of the hull of a vessel below the water line (see Figs. 3, 4 of the patent); (2) Stallman, DX–7, entitled "Water Jet Motor For Boats", which teaches that a waterjet propulsion unit entirely within the hull of a vessel wherein the water enters through the inlet at the bottom of the hull of the vessel 51 passes through a first stage impeller section 55, through a first stage stator section 60, then through a second stage impeller section 56, through a second stage stator section 61, and then is discharged through nozzle 64 above the water line (see Fig. 7 of the Stallman patent); (3) Gongwer, DX–9, entitled "Jet Propulsion Device For Water Vehicle", which also teaches one skilled in the art that the jet propulsion device may be encased within the hull of the ship (see Fig. 1 of the Gongwer patent); and (4) Eaton, DX–22, cited by the PTO, which also discloses that the jet propulsion device on a waterborne craft may be within the hull of the ship (see Fig. 1 of the Eaton patent).

We agree with defendant's assertion, that claim 6 of the '961 patent, even if it were to be read so narrowly as to cover only those hydraulic propulsion devices

wherein both the pump and ducting are inside the vessel, would still be obvious from the Italian patent, DX–11, in view of Jensen, DX–4 (*see* Fig. 5), or in view of Gongwer, DX–9 (see Fig. 1) or particularly in view of Stallman, DX–7, (see Fig. 7). Defendant's Proposed Finding of Fact Number 96.

Defendant further asserts that the other claims of the '961 patent merely recite, in increasing detail, specific features or elements that have been known to be used for that same purpose in the prior art propulsion pumps. Defendant maintains further, that each of these added features or elements performs its known function in a known manner to give a known result. For instance, defendant contends that claim 7 of the '961 patent, which is dependent upon claim 6, merely adds the additional limitation that stators must be located between and behind each stage to straighten out the flow of the water. The use of stators in a multi-stage hydraulic jet propulsion unit for waterborne craft to straighten out the flow of water, according to defendant, has been known since at least the teachings of Harris (DX–1) which patent issued during the Civil War. Defendant also explicates that stators are disclosed for the same purpose in numerous other water jet propulsion patents, including but not limited to, Hamilton (DX–18), Eaton (DX–22), and the references cited by the Examiner. Plaintiff also admits that stators are taught by the prior art reference cited by the PTO, "*Yachting Magazine*", November, 1959", Ct.–1, page 71, Figure 1. *See also* "Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, sheet 5 of its Appendix, filed November 16, 1979, per Trial Judge Browne. Moreover, in the same sheet 5, plaintiff admits that stators are taught within the cylindrical housings of the Hamilton patent entitled "Hydraulic Jet Propulsion Apparatus for Waterborne Craft" (DX–18), and also in the Eaton patent entitled "Combined Forward and Reverse Steering Device for Jet Propelled Aquatic Vehicles", (DX–22).

Since plaintiff has admitted that the prior art November 1959 article in the *Yachting Magazine* disclosed or taught stator blades that were fixed within said housing and located between said impellers and other stator blades located rearwardly of said second stage impeller for straightening out the flow of water, we find that claim 7 which merely adds stator blades to claim 6 (which we earlier found fully anticipated by the Italian patent, DX–11), would have been obvious at the time the invention was made to a person having ordinary skill in the art, *i.e.*, a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships. For easier reference, Figure 1, which appeared in the November 1959 issue of *Yachting Magazine*, is reproduced below:

Fig. 1. The Hamilton-Buehler jet unit is based upon an axial-flow pump. The nozzle projects through the transom

Insofar as claim 8 of the '961 patent is concerned, another claim which depends on claim 6, defendant asserts that its two limitations, *i.e.*, a housing that has an inlet in the bottom of its craft, and a housing which has a rearwardly and upwardly inclined forward portion extending from said inlet, do not redeem claim 6 from being anticipated or at least obvious, since these two additional limitations are not only disclosed by the prior art, but work in a known way to achieve a known result. Defendant explicates that such an inlet structure in the bottom of a waterborne craft was disclosed by Hamilton (DX–18), Eaton (DX–22), Jensen (DX–4), Stallman (DX–7, see Fig. 7), and Gongwer (DX–16, page 451), and therefore would have been obvious at the time the invention was made to a person having ordinary skill in the art of turbomachinery propulsion pumps dealing with ships.

Plaintiff indeed admits that the two additional limitations added to claim 6 by claim 8, *i.e.*, "said housing has an inlet in the bottom of said craft", and "also a rearwardly and upwardly inclined forward portion extending from said inlet", are disclosed or taught by two prior art patents, and one prior art publication, all of which were before the Patent Office. These are: (1) the Hamilton patent (DX–18) entitled "Hydraulic Jet Propulsion Apparatus for Waterborne Craft"; (2) the Eaton patent, (DX–22) entitled "Combined Forward and Reverse Steering Device for Jet Propelled Aquatic Vehicles", and (3) the *Yachting Magazine*, November 1959, (Ct.–1), Figure 1, *supra*. See sheet 5 of the Appendix of Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979 per Trial Judge Browne.

Because plaintiff has admitted that the two limitations added by claim 8 of the '961 patent were disclosed by three of the PTO's prior art citations to be used in the same manner to achieve the same result, namely: Hamilton (DX–18); Eaton (DX–22); and the *Yachting Magazine*, November 1959, (Ct.–1), we find that the subject matter as a whole of claim 8 would have been obvious at the time the invention was made to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships.

Insofar as claim 9 is concerned, a claim which is dependent on claim 8, claim 9 repeats the same limitation set forth in earlier claim 7, *i.e.*, "stator blades fixed within said housing and located rearwardly of each of said impellers". As noted earlier, plaintiff admits that stator blades fixed within said housing and located rearwardly of each of said impellers is taught by

PTO's prior art reference, the *Yachting Magazine*, November 1959, page 71. See Figure 1, *supra*. Thus, for the same reasons we found that claim 7 with its additional stator blade limitation did not redeem the obviousness of claim 6, we find that the added limitation in claim 9 does not redeem the obviousness of claim 8. In other words, we find that the subject matter as a whole of claim 9 would have been obvious at the time the invention was made to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships. See sheet 5 of the Appendix of Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979, per Trial Judge Browne.

Defendant asserts that claim 10, which is dependent on claim 9, merely adds two well-known limitations in the prior art to the propulsion unit as defined in claim 9: (1) a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle and (2) said means for driving said impellers includes an engine and gear reduction unit. Defendant contends that the same use of nozzles on water jet propulsion pumps for the same purpose is taught by Jensen (DX–4), Stallman (DX–7), the Italian patent (DX–11), and the references cited by the Examiner in Hamilton (DX–18), and in Eaton (DX–22). Defendant also avers that the second limitation, a means for driving said impellers, which includes an engine and gear reduction unit, is taught by the Italian patent (DX–11) as well as the Westgard patent (DX–5).

Plaintiff admits that a nozzle connected to said discharge portion whereby said housing discharges the water into said nozzle is disclosed or taught by Hamilton (DX–18), disclosed and taught by Eaton (DX–22), and disclosed and taught by the *Yachting Magazine* of November, 1959. Plaintiff also admits that the means for driving said impellers which includes an engine and gear reduction unit is taught by Westgard (DX–5). *See* sheet 5 of the Appendix of Plaintiff's Response to Defendant's Motion

to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979, per Trial Judge Browne.

In view of plaintiff's admittance that the two limitations added by claim 10 were disclosed in the prior art for the identical purpose, we hold that the subject matter as a whole in claim 10 would have been obvious at the time the invention was made to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships.

In regard to claims 1–5 of the '961 patent, defendant asserts that they recite the same litany of elements as claims 6–10, with the additional limitation that the housing converges in the downstream direction. Defendant adds that despite this limitation obviously requiring the second stage impeller to be smaller than the first stage impeller, this additional feature is also recited by the patentee as an additional limitation. Defendant maintains that the Italian patent (DX–11) discloses both of these features in a propulsion pump for ships and that Westgard (DX–5) discloses the same elements for pumps in general. Defendant explains that the Italian pump (DX–11) converges rearwardly and therefore the second stage impeller is smaller in diameter than the first stage impeller. Finally, defendant concludes that the shape of the housing and the size of the impellers do not add patentable significance to the prior obvious propulsion units disclosed in claims 6–10 of the '961 patent. Defendant then concludes that claims 1–10 of the '961 patent are obvious from the Italian patent alone or in view of any one of or combination of Jensen (DX–4), Harris (DX–1), Stallman (DX–7), Westgard (DX–5) or the references cited by the PTO.

In analyzing claim 1 of the '961 patent, the sole additional limitation added by claim 1 that was not found within claims 6–10 of the '961 patent, is "said housing having a rearwardly converging portion". Plaintiff admits that the Italian patent (DX–11) teaches "a housing having a rearwardly converging portion" but argues

that the Italian patent (DX–11) is nonanalogous prior art. Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, sheet 1, filed November 16, 1979, per Trial Judge Browne. Plaintiff appears to base its argument on the proposition that the Italian patent does not teach an "impeller", but rather only discloses a propeller in a tube. Plaintiff further argues that the housing disclosed in the Italian patent is not a jet propulsion unit housing. Plaintiff advances the novel theory that the Italian patent, DX–11, is nonanalogous art because it does not depict a true waterjet propulsion system for waterborne craft, *i.e.*, it does not eject its water above the level of the ocean.

Plaintiff's arguments are unavailing. To begin with, nowhere in the claims of the '961 patent, claims which have been very broadly written, is there an element or restriction that the water or fluid discharging from the rearward portion of the housing after passing the second stage impeller and stator blades must be emitted above the water line. Moreover, even in the plaintiff's proposed findings of fact concerning this issue, plaintiff patently avoids mentioning the restriction that the water exiting the housing must exit above the water line. For instance in plaintiff's Proposed Findings of Fact Number 4, plaintiff states in part:

> a waterjet propulsion system for waterborne craft is a device which is located mostly within the hull of a ship. Therefore, it must, of necessity, have three basic elements: (1) an intake duct which inducts fluid from outside the ship's hull; (2) a pump for transmitting energy to this fluid; and (3) an exhaust duct and nozzle which guide the jet of fluid back out of the hull. (Plaintiff's Proposed Findings of Fact No. 4).

In regard to plaintiff's argument that the Italian patent does not teach an "impeller", we cite McGraw-Hill, *Dictionary of Scientific and Technical Terms*, (2d ed. 1978), which defines an "impeller", in mechanical engineering, to be a *"rotating member of a turbine*, blower, fan, axial or centrifugal pump, or mixing apparatus" (emphasis supplied). A "pump", according to McGraw-Hill, in mechanical engineering, is a "machine that draws a fluid into itself through an entrance port, and forces that fluid out through an exhaust port." A "propeller", according to McGraw-Hill, in mechanical engineering is a "bladed device that rotates on a shaft to produce a useful thrust in the direction of the shaft axis."

In studying the claims of the Italian patent, we notice that claim 3 of the Italian patent actually claims a *rotating member of a turbine*, the exact same type of language which McGraw-Hill defines as an "impeller". Claim 3 of the Italian patent reads: "This 'speed-phase propeller' can work in an open current, like normal marine propellers, or it can be *placed in a tube, like the propeller turbines*, to make sure that the current will be guided by the walls" (emphasis added). Thus, if one were to utilize the teaching of the Italian patent whereby the rotating member, or propeller, was the rotating member of a turbine, that rotating member in a turbine, according to McGraw-Hill, is correctly called an "impeller". If one were then to substitute the term "impeller" interchangeably with "screws" in the first paragraph of the specifications of the Italian patent, we would have a teaching of almost exactly, if not exactly, plaintiff's invention: "The object of this invention, illustrated in plate I, essentially consists of two (impellers) (1, 2) with different diameters, dovetailed [fitted] on two co-axial shafts (4, 5), the latter of which is hollow and both of which can revolve at different RMP (sic)." As a matter of fact, plate I of the Italian patent, the sole drawing, teaches two impellers rotating at different speeds, as one way to solve the cavitation problem. (DX–11, line 22, page 3.) Moreover, McGraw-Hill, defines "propeller cavitation" in mechanical engineering as the "formation of vapor-filled and air-filled bubbles or cavities in water at or on the surface of a rotating propeller, occurring when the pressure falls below the vapor pressure of water." McGraw-Hill also defines a "pro-

peller pump" as an "axial flow pump". And it defines an "axial flow pump", in mechanical engineering, as a "pump having an axial flow or propeller-type impeller, used when maximum capacity and minimum head are desired." Thus, an "axial flow pump" is also known as a "propeller pump".[3] For the reasons discussed above, particularly in view of the fact that in mechanical engineering, a rotating propeller in a turbine is known in the art as a "impeller", thus obviating plaintiff's argument that the Italian patent would not teach a mechanical engineer having ordinary skill in the turbomachinery propulsion art regarding ships that a propeller in a turbine can be considered to be an impeller, we find that the Italian patent (DX–11) is analogous art and that plaintiff's countervailing arguments appear to be *ipse dixit.*

Claim 2 of the '961 patent is dependent upon claim 1 and merely adds the well-known prior art stator blades to be used in the same manner to achieve the same result for which stator blades were used by mechanical engineers in the turbomachinery propulsion art dealing with ships years before the filing date of the '961 patent. Moreover, plaintiff admits that stator blades were indeed taught and disclosed for the same use in the prior art. *"Yachting Magazine,"* November 1959 issue. *See* Figure 1, *supra,* Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979, per Trial Judge Browne, sheet 5. We therefore find that the subject matter as a whole in claim 2 of the '961 patent would have been obvious at the time the invention was made to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships.

Claim 3 of the '961 patent again merely adds the limitation that the intermediate portion of the housing converges rearwardly with the result that both the first and second stage impellers must be mounted in this converging portion wherein the second stage impeller, which must of course, be of smaller diameter than the first stage impeller, is located rearwardly of the first stage impeller, and in co-axial alignment therewith. Again, plaintiff admits that the Italian patent does disclose a housing that converges but rationalizes that the Italian patent is nonanalogous art, because it merely discloses a first and second stage *propeller* in a converging housing wherein the second *propeller* is of smaller diameter than the first stage propeller, and rearward of the first stage propeller, and co-axially aligned, however, but does not disclose the use of impellers. Once more, we find that argument unpersuasive. As discussed *supra,* McGraw-Hill states that in the mechanical engineering art a propeller is a bladed device that rotates on a shaft to produce a useful thrust in the direction of the shaft axis. Moreover, such a rotating member in a turbine is known in the art as an impeller. Therefore, the Italian patent teaches a first stage impeller, and a second stage impeller, both mounted within a converging housing for being rotationally driven, wherein said second stage impeller is located rearwardly of and of smaller diameter than first stage impeller, and in co-axial alignment therewith. We therefore find that the subject matter as a whole claimed by claim 3 of the '961 patent, would have been obvious at the time the invention was made to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships. See Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979, per Trial Judge Browne, sheet 1. *See also* the sole drawing in the Italian patent (DX–11), *supra.*

Claim 4 of the '961 patent, which is dependent on claim 3, once more merely adds the limitation regarding stator blades: "Stator blades fixed within said converging housing portion and located rearwardly of each of said impellers." Basically, claim 4

---

**3.** Claim 1 of the '526 patent later discussed, claims a first stage impeller wherein the first

stage impeller is a first stage axial flow pump.

is almost identical to claim 2 and claim 7 of the '961 patent. Defendant argues that stator blades are taught and disclosed by the prior art cited by the PTO, *Yachting Magazine,* November 1959. In particular, defendant adverts our attention to Figure 1 of the *Yachting Magazine, supra,* wherein stator blades are depicted immediately following each impeller and located rearwardly of each impeller in order to straighten the flow of water. Plaintiff admits that stator blades are disclosed and taught in the *Yachting Magazine,* November 1959, prior art reference, in regard to claim 7 of the '961 patent which reads: "A unit as defined in claim 6 including stator blades fixed within said housing and located between said impellers and other stator blades located rearwardly of said second stage impeller for straightening out the flow of water." See Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979, per Trial Judge Browne, sheet 5, claim 7. In regard to claim 4 of the '961 patent, plaintiff offers the astounding proposition that despite the fact that the prior art reference *Yachting Magazine,* November 1959, does indeed disclose stator blades fixed within a housing and located between said impellers and other stator blades locating rearwardly of said second stage impeller for straightening out the flow of the water, it does not teach the use of stator blades when used in the same circumstance because the housing in claim 4 is converging rather than cylindrical. Again, we find this argument unpersuasive. A converging housing is clearly taught by the Italian patent (DX–11), see its sole drawing, *supra,* and it would be clear to a mechanical engineer that stator blades could be used to straighten out the flow of water from a first stage impeller and a second stage impeller in a converging housing as well as in a cylindrical housing, particularly where both impellers are on co-axial shafts. We therefore find that the subject matter as a whole in claim 4 would have been obvious at the time the invention was made to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art regarding ships.

Insofar as claim 5 of the '961 patent, an independent claim, is concerned, it differs from claim 4 solely by the addition of the following limitation: "a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle." Defendant argues that such a nozzle used for the same purpose and in the same manner is disclosed by three prior art references, all three before the PTO: (1) *Hamilton,* the '529 patent, entitled "Hydraulic Jet Propulsion Apparatus for Waterborne Craft", (2) *Eaton,* the '857 patent, entitled "Combined Forward and Reverse Steering Device for Jet Propelled Aquatic Vehicles", and (3) *Yachting Magazine,* November 1959. Plaintiff acknowledges and admits that these three prior art references do indeed disclose "a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle" for the same purpose and in the same manner. See Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80, filed November 16, 1979, per Trial Judge Browne, sheet 3. Since plaintiff has admitted that this limitation, *i.e.,* the nozzle connected to the discharge end, used for steering the waterborne craft, was disclosed by three prior art references, used in the same manner to perform the same result, we find that the subject matter as a whole in claim 5 would have been obvious at the time of the invention to a mechanical engineer having ordinary skill in the turbomachinery propulsion pump art dealing with ships.

*Claims 6–10 of the '961 Patent Invalid Because of New Matter*

Defendant asserts that claims 6–10 of the '961 patent are invalid because they are not supported by the original disclosure of the '961 patent, but rather are dependent on new matter. The relevant statutes regarding new matter are as follows:

35 U.S.C. § 112 (1982): Specification.

The specification shall contain a written description of the invention, and of the manner and process of making and

using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventory of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of the structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 132 (1982)—Notice of Rejection; Reexamination

Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Commissioner shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. *No amendment shall introduce new matter into the disclosure of the invention* (emphasis added).

The following patent regulations are relevant in regard to new matter:

37 C.F.R. § 1.53 (1985): Serial Number, Filing Date, and Completion of Application.

(a) Any application for a patent received in the Patent and Trademark Office will be assigned a serial number for identification purposes.

(b) The filing date of an application for patent is the day on which (1) a specification containing a description pursuant to § 1.71 and at least one claim pursuant to § 1.75 and (2) any drawing required by § 1.81(a) are filed in the Patent and Trademark Office in the name of the actual inventor or inventors as required by § 1.41. *No new matter may be introduced into an application after its filing date (§ 1.118)* (emphasis added).

37 C.F.R. § 1.118 (1985): Amendment of Disclosure.

(a) No amendment shall introduce *new matter* into the *disclosure* of an application after the filing date of the application (§ 1.53(b)) (emphasis supplied). All amendments to the *specification*, including the *claims*, and the *drawings* filed after the filing date of the application must conform to at least one of them as it was at the time of the filing of the application (Emphasis supplied). Matter not found in either, involving a departure from or an addition to the original disclosure, cannot be added to the application after its filing date even though supported by an oath or declaration in accordance with § 1.63 or § 1.67 filed after the filing date of the application.

(b) If it is determined that an amendment filed after the filing date of the application introduces new matter, claims containing new matter will be rejected and deletion of the new matter in the specification and drawings will be required even if the amendment is accompanied by an oath or declaration in accordance with § 1.63 or § 1.67.

In reading the prosecution history of the '961 patent, one can see that in September 21, 1966, the patentee amended its specifications and added claims 6–10. (DX–97, pp. 10–12, entitled "Amendment Before Initial Application"). In reading independent claim 6 of the '961 patent, which reads as follows:

A multi-stage hydraulic jet propulsion unit for waterborne craft comprising

a housing having

a forward intake portion for receiving water and

a rearward discharge portion for discharging water rearwardly of the stern of the craft,

a first stage impeller mounted within said housing for being rotationally driven,

a second stage impeller mounted within said housing and located rearwardly of said first stage impeller and in co-axial (alignment) therewith,

said housing closely surrounding said impellers in complementary relationship therewith,

the flow rate of the water through the first stage impeller being the same as that through said second stage impeller and,

means for rotationally driving said second stage impeller faster than said first stage impeller.

It is clear beyond peradventure that claim 6 is not restricted to either a converging housing or to locating the first or second stage impellers in the converging portion of the housing, as is claim 1. (DX–97; Ct.–100). Defendant contends that because claim 6 cannot be supported within the meaning of 35 U.S.C. § 112 by the original specifications, that added claim 6 and its dependent claims 7–10, as well as the amendments to the specifications made contemporaneously with the addition of claims 6–10, introduced new matter and should be struck. In particular, defendant asserts that the patentee's September 21, 1966, amendment either *deleted words* or phrases of limitation from the original specifications or changed other words and phrases so as to remove limitations inherent in the original words or phrases. Defendant further contends that at the time claim 6 was added by this amendment, patentee also amended the specifications to provide the needed support for the new claims 6–10. Moreover, defendant contends that without the broadening by the patentee of the specification at this time, the specifications would have not supported the new broadened claims 6–10. Defendant further avers that this amendment altering the broadening of the specifications and adding new claims 6–10 changed the basic concept of the invention so as to include non converging housing shapes used in combination with different impellers. Defendant also asserts that this concept was not encompassed within the original application filed by the patentee. The patentee, according to defendant, explicitly stated that he wanted to avoid the problems associated with a cylindrical housing containing both impellers.[4] Yet, defendant asserts, the language used in the amended specifications would include a cylindrical housing. The particular line adverted to by defendant in the prosecution history is, "prior art propulsion units have of course used multiple stages but (on the other hand) these stages have been of the *same size* and speed as one another." Thus, defendant argues, the patentee in trying to distinguish his invention from the prior art has stated that his invention is different from the prior art—and the patentee has characterized the prior art in saying that while the prior art has multiple stages, these multiple stages (of impellers) have

---

**4.** Defendant cites DX–97, page 2, lines 16–17 in support of this contention.

been of the same size. Defendant explicates that when the first and second stage impellers are of the same size, then *ipso facto* the cylindrical housing around those impellers are the same size and therefore the entire housing of these particular pump jets would be of the same size and therefore cylindrical.

Moreover, defendant points out that the patentee, in attempting to distinguish his invention over the prior art and to convince the Patent Office that his invention had intrinsic higher efficiency, stated in the prosecution history "in accordance with the present invention, the RPM speed of the second stage impeller is greater than the first stage impeller and furthermore the *cross-section area of the impeller housing decreases* in a direction approaching the discharge end. *This results in a high speed pumping unit with a correspondingly high pressure rise through the unit.*" Defendant argues, therefore, that the patentee has equated the necessity of having a decrease cross-sectional area at the discharge end with the highly desirable result obtained, of high speed pumping in the second stage impeller with a corresponding high pressure rise through the unit. This of course results, defendant explicates, in water being ejected out of the unit at a higher velocity and, therefore, pursuant to Newton's first law causes, the waterborne craft to move through the water at a very high speed.[5] Defendant concludes its argument by stating that once the patentee, having used this argument to distinguish its invention from the prior art, he should be now estopped from either arguing that his claims be read so broadly as to cover just the opposite type of housing, that is, the type of housing wherein the impeller housing *increases* in a direction approaching the discharge end, and also should be estopped from subsequently adding new claims which allow the impeller housing to *increase* in a direction approaching the discharge end. Moreover, defendant concludes that the patentee should not have been able to strike out or delete those

words in its prosecution history (while adding the much broader claims 6–10 which allowed the impeller housing to increase in a direction approaching the discharge end) thereby substantially broadening the specifications in order to support the newly-added broad claims 6–10 with a housing that was "rearwardly converging". And that it was almost one year later, that the inventor finalized a second design with a housing that diverged in the second stage, and that the patent attorney then attempted to add new claims 6–10 of the '961 patent along with simultaneously changing the scope of the specification to support those new claims which allowed the housing to diverge.

Plaintiff countervails that the amendments to the specification, made by the patentee, which deleted the language in the specification that limited the impeller housing whereby it decreased in cross-sectional diameter in a direction approaching the discharge end, were unnecessary amendments. (Gholz Tr.O.–215). Plaintiff asserts, therefore, that the amendments merely clarified or made definite what was expressly or inherently disclosed in the original application or what conformed the specification to matters originally disclosed in the drawings or claims. Plaintiff cites *In re Oda*, 443 F.2d 1200, 170 U.S.P.Q. 268 (CCPA 1971) and *In re Peters*, 723 F.2d 891, 221 U.S.P.Q. 952 (Fed.Cir.1983), in support of its contentions. Plaintiff's Response to Defendant's New Matter Element Chart, filed by leave of judge, September 18, 1985. Plaintiff's arguments are unpersuasive.

In addressing the issue of new matter, the general rule, as simply stated in the concluding sentence of 35 U.S.C. § 132, is that: "no amendment shall introduce new matter into the disclosure of the invention."

37 C.F.R. § 1.118 (1985), quoted above, expands this basic rule excluding new matter and sets forth the general guideline. 37 C.F.R. § 1.118 (1985) expressly refers to

5. Defendant cites DX–97, page 3, lines 1–5.

the specification, including the claims and the drawing. Although not specifically part of either the drawing or specification, the original claims in a patent application constitute a part of the "disclosure of the invention" within the meaning of 35 U.S.C. § 132. *See MPEP* § 608.01(1).

"New matter", that is, matter involving a departure from or an addition to the original disclosure (specification, drawings or claims) may only be added by the filing of a continuation-in-part application. *See Triax Co. v. Hartman Metal Fabricators, Inc.*, 479 F.2d 951, 956–57, 178 U.S. P.Q. 142 (2d Cir.), *cert. denied*, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740 (1973); *In re Wright*, 343 F.2d 761, 767, 145 U.S. P.Q. 182 (CCPA 1965); *Technicon Instruments Corp. v. Cole Instruments, Inc.*, 255 F.Supp. 630, 150 U.S.P.Q. 227 (N.D.Ill. 1966), *aff'd*, 385 F.2d 391, 155 U.S.P.Q. 369 (7th Cir.1967). Thus, the prohibition of "new matter" is a corollary to the rules regarding the filing of a complete application as a prima facie date of invention and of constructive reduction to practice.

When the patent examiner is faced with a new matter, pursuant to MPEP 706.-03(*o*), where the subject matter not disclosed (in the specifications, in the claims or in the drawings) in the original application is attempted to be added in the specifications and a claim directed thereto, such claim is rejected on the grounds that it recites elements without support in the original disclosure (in the specifications, in the claims, or in the drawings), under 35 U.S.C. § 112, first paragraph, *In re Rasmussen*, 650 F.2d 1212, 211 U.S.P.Q. 323 (CCPA 1981). Moreover, the MPEP rule warns the patent examiner to be on the alert to detect new matter. It states that 35 U.S.C. § 132 should be employed as a basis for objection to amendments to the abstract, specifications, or drawings, attempting when the patentee is attempting to add new disclosure to that originally disclosed on filing.

MPEP 608.04(a) also addresses new matter, that is, matter not in the original specification, claims, or drawings. It states that matter not in the original specification, claims, or drawings, is usually new matter. Depending upon circumstances such as the adequacy of the original disclosure, the addition of inherent characteristics such as chemical or physical properties, a new structural formula or a new use may be new matter. *See Ex parte VanderWal*, 1956 C.D. 11, 705 Off. Gaz. Pat. Office 5 (Physical Properties); *Ex parte Fox*, 1960 C.D. 28; 7761 Off. Gaz. Pat. Office 906 (New Formula); and *Ex parte Ayres and Scott*, 108 U.S.P.Q. 444 (Pat. Office Bd. App.1956) (New Use).

In the instant case, patentee subsequently amended its original application by altering the specification deleting the restrictive language therein which had specifically limited the impeller housing to having a cross-sectional area which decreased in a direction approaching the discharge end, to language which would allow just the opposite, that is, an impeller housing increasing in a direction approaching the discharge end. In addition, patentee at the same time added broader claims 6–10 which included this concept, basically changing the narrow concept of the earlier disclosed invention to a much broader concept covering later discovered designs. *See*, for instance, DX–42, wherein patentee's attorney, in a letter to patentee, states "I have proposed an amendment in this application [DX–97, p. 10] which consists ... of more claims to cover your latest design...."

As noted earlier, patentee, in an attempt to distinguish his invention from the prior art, sought to impress the patent examiner by arguing that because the cross-sectional area of its impeller housing decreased in the direction of the discharge end, that this physical criteria resulted in a "high-speed pumping unit with a correspondingly high-pressure rise through the unit." (DX–97, p. 3, lines 1–5.) The court, of course, recognizes that pursuant to Newton's first law of physics, that the faster the water is ejected from a propulsion pump in a waterborne craft, the faster the waterborne craft will move in the water. One does not have to argue the point, that the faster a water-

jet pump is able to move a ship through the water, the more advantage that waterjet pump would have over other competing waterjet pumps.

In its subsequent amendment, however, patentee then, in order to support its broadened claims 6–10, which did not require that the "impeller housing decrease in a direction approaching the discharge end", deleted that language in the original specifications which required that the "impeller housing decrease in a direction approaching the discharge end." As can be seen by the following paragraphs hereunder, taken from the prosecution history of the file wrapper, wherein the bracketed words represent the original specification disclosure, and the underlined words represent amendment, it can be readily seen that the patentee substantially enlarged the scope of his specification to support the much broader claims 6–10 in violation of 35 U.S.C. § 132:

> The outer ends of the impellers are "free" or unsupported by a surrounding ring, and these ends are tapered rearwardly to define an impeller periphery which complements and is located closely adjacent to the internal shape of the [rearwardly converging] housing in which they are mounted as will appear.
>
> The second impeller 12 [is] *may be* of smaller diameter than the first stage impeller 10 and as previously mentioned, both have a rearwardly converging or

frusto-conical periphery formed by the ends of their blades.

The rearwardly and upwardly inclined housing inlet portion 18 may be of generally constant cross-sectional area in a rearward direction. It will be noted, however, that subsequent portions of the housing as it extends rearwardly from the intake side 19 of the first stage impeller [converges or decreases] *may converge or decrease* in cross-sectional area until it is rearward of the last impeller. *The housing then converges up to the discharge end 3 of the unit.*

As one can readily see by the changes made by the patentee to the specification, the specifications were substantially enlarged to accommodate the broadened claims that were added, that is, claims 6–10 of the '961 patent. DX–42. The court has searched long and hard to find any language in either the original objects, specifications, claims, or in the sole drawing, which even hints that the impeller housing should *increase* in a direction approaching the discharge end. There is no hint *intrinsically* or *extrinsically* that this should be the case. See the New Matter Element Chart on the following pages that set forth the court's analysis of the original disclosure of the element whereby the "impeller housing decreases in a direction approaching the discharge end", versus the substantial change, that is the direct opposite in configuration allowed by claim 6–10.

NEW MATTER ELEMENT CHART ('961 Patent)

| Element | Set Forth in "Original" Objects | Shown in "Original" Drawings | Discussed in "Original" Specifications | Set Forth In "Original" Claims |
|---|---|---|---|---|
| Claim 1 (Original) Said housing having a rearwardly converging portion (DX–97, p. 6) | Yes, DX–97, p. 3, lines 3–5: "[T]he cross-sectional area of the impeller housing decreases in a direction approaching the discharge end" (emphasis supplied). This results in a high speed pumping unit with a cor- | Yes, DX–97, p. 9, see Figure 1 | Yes, DX–97, p. 3, lines 23–25: "The outer ends of the impellers are 'free' or unsupported by a surrounding ring, and these ends are tapered rearwardly to define an impeller periphery which complements and is located closely adjacent to the internal shape of the rearwardly converging housing" (emphasis supplied). | Yes, Claims 1–5: Claim 1: ". . . said housing having a rearwardly converging portion." Claim 2: "A unit defined in claim 1 . . .". Claim 3: ". . . said housing having an intermediate portion which converges rearwardly . . ." Claim 4: "A unit as defined in claim 3 . . .". Claim 5: "said housing also having a rearwardly converging portion . . .". |

NEW MATTER ELEMENT CHART ('961 Patent)

| Element | Set Forth in "Original" Objects | Shown in "Original" Drawings | Discussed in "Original" Specifications | Set Forth In "Original" Claims |
|---|---|---|---|---|
| | responding high pressure rise through the unit. | | | |
| A first stage impeller mounted within said converging portion (DX–97, p. 6) | Yes, DX–97, p. 3, lines 1–5: "[T]he RPM speed of the second stage impeller is greater than the first stage and furthermore the cross-sectional area of the impeller decreases in a direction approaching the discharge end." (emphasis supplied). | Yes, DX–97, p. 9, see Figure 1 | Yes, DX–97, lines 18–19, 22–26; p. 4, lines 12–14: "A first stage impeller 10 is fixed to the sleeve 8 and driven thereby to form a low speed pump or impeller." "The outer ends of the impeller are 'free' or unsupported by a surrounding ring, and these ends are tapered rearwardly to define an impeller periphery which complements and is located closely adjacent to the internal shape of the rearwardly converging housing in which they are mounted." (emphasis supplied). "The second impeller is of smaller diameter than the first stage impeller 10 and as previously mentioned, both have a rearwardly converging or frusto-conical periphery formed by the ends of their blades." (emphasis supplied). | Yes, Claims 1–5: Claim 1: "[A] first stage impeller mounted within said converging portion for being rotationally driven . . .". Claim 2: "A unit defined in claim 1." Claim 3: "[A] first stage impeller . . . mounted within said converging portion for being rotationally driven . . .". Claim 4: "A unit as defined in claim 3 . . .". Claim 5: "[A] first stage impeller . . . mounted within said converging portion for being rotationally driven . . .". |
| Claim 6 (added by amendment) which claim is not restricted to a converging housing. | No | No | No. Added by subsequent amendment filed Sept. 21, 1966. DX–97, pp. 10–12; DX–97, p. 4, lines 17–20. "[T]he housing as it extends rearwardly from the intake side 19 of the first stage impeller [converges or decreases] may converge or decrease in cross-sectional area until it is rearward of the last impeller . . .". (The bracketed words were deleted, removing limitation of a "converging housing.") | No. Added by amendment filed Sept. 21, 1966. DX–97, pp. 10–12. |

Moreover, there was evidence in the record to support the assertion that the patentee's intent was to broaden the specifications of the '961 application by a subsequent amendment to support a new later-found concept. *See* DX–42–45.

In support of its contentions, plaintiff cites *In re Oda*, 443 F.2d 1200, 170 U.S. P.Q. 268 (CCPA 1971), and states that "in *Oda*, the specification as filed mentioned 'ferrous oxide' in two places. In the reissue application, *Oda, et al.* sought to change the phrase 'ferrous oxide' to the more generic phrase 'reducing agent'." The board affirmed a rejection based on the contention that the replacement of the phrase 'ferrous oxide' by the broader phrase 'reducing agent' was new matter, but the court reversed. Using this case as an example, plaintiff argues that, even without broadening its specifications, it should have been able to broaden its claims

as it did in adding claims 6–10 since its original disclosure supports the broadened claims.

Plaintiff's argument is unavailing. The *In re Oda* case can be distinguished since, in *Oda,* the term "reducing agent" was already disclosed in the original specifications. *See* Plaintiff's Response to Defendant's New Matter Element Chart, filed by leave of judge September 18, 1985. In the instant case, contrariwise, the broadened language which would have allowed a "impeller housing *increasing* in a direction approaching the discharge end" never appeared in the specifications. Nor does this court find that it appeared intrinsically; it did not appear intrinsically because the patentee himself used this particular facet of his invention, *i.e.,* "the impeller housing *decreases* in a direction approaching the discharge end", to achieve the highly-desirable result of "a high-speed pumping unit with a correspondingly high-pressure rise through the unit", thereby giving a ship the ability to travel at a high velocity. In order to view the new matter issue in proper perspective, the following colloquy which occurred at the oral argument held on September 19, 1985, is pertinent:

THE COURT: Alright. At this portion of the oral argument, we are to turn to the new matter issue. The new matter issue is covered in the numbered sections, both in the statute and in the rules, and the statute 132 states:

Whenever, on examination, any claim for patent is rejected or any objection or requirement made, the Commissioner shall notify the applicant thereof stating the reasons for such rejection or objection or requirement, together with such information references as may be helpful in judging the propriety of continuing the prosecution of his application.

And, if, after receiving such notice, the applicant persists in his claim for a patent with or without amendment, the application shall be re-examined. No amendments shall introduce new matter into the disclosure of the invention.

That's in 35 U.S.C. § 132. 37 C.F.R. 1.118 says:

No amendment shall introduce new matter into the disclosure of an application after the filing date of that application. All amendments to the specification, including the claims, and the drawings filed after the date of the application must conform to at least one of them.

The antecedent to "them" is either the specification, the claims, or drawings, as it was at the time of the filing of the application.

In addition, the court's understanding of the working definition of the term "new matter" is disclosure material which is either required to support the claim or which would support new claims not set forth explicitly, implicitly, inherently or intrinsically in an application as of its effective filing date.

Now, the three questions the court has—will pose to the parties are these:

1. Where in the original disclosure—well, first of all, to set the premises, the defendant asserts that claims 6–10 of the '961 patent are invalid because new matter was added to the original disclosure in violation of 132 and in violation of C.F.R. 1.118.

The three questions are this:

1. First, where, in the original disclosure of the '961 patent application, *i.e.,* the original specifications, drawings or claims of the '961 patent application, does the patentee disclose that the "subsequent portions of the housing as it extends rearedly [sic] from the intake side of 19 of the first impeller does *not* have to converge or decrease in cross-sectional area ... until it is wearward [sic] of the last impeller?"

2. Where, in the original disclosure of the '961 patent application, *i.e.,* the original specifications, drawings, or claims of the '961 patent application, did the patentee disclose that ... the first stage impeller need not be mounted ... within a converging portion of the housing?

3. The same question again. Where, in the original disclosure of the '961 patent

application, *i.e.*, the original specifications, drawings, or claims of the '961 patent application, did the patentee disclose that the second stage impeller need not be mounted in a converging portion of the housing?

It's quite apparent by reading the original disclosure that these ideas are not there. So, it would appear that if they are there, they were there implicitly or intrinsically, and I would presume that's what the plaintiff is asserting. Otherwise, I want to see exactly in black and white where it is there.

(Tr.O.–92–95.)

\* \* \* \* \* \*

THE COURT: It's the court's understanding that the—if you look at DX–97, that the first—the original disclosure would be the first—

MR. SPEVACK: Nine pages.

THE COURT: —Seven, eight, first nine pages, which would include only five claims.

\* \* \* \* \* \*

THE COURT: So that any new matter which ... [appears on] page ten [or thereafter] ... must be supported by either the drawing, the specifications, or the claims prior to page ten.

MR. SPEVACK: That is correct, your Honor.

THE COURT: In other words, some place from page[s] 1–9.

MR. SPEVACK: That is correct, your Honor.

\* \* \* \* \* \*

THE COURT: And, if it's not explicitly supported there, it at least has to be implicitly supported there.

MR. SPEVACK: Could be inherent language, could be enactment within the meaning of the words in there.

(Tr.O.–97–98.)

\* \* \* \* \* \*

(Tr.O.–111–114.)

THE COURT: We're ready for plaintiff. Please address, first, before you go into

additional arguments where—let's take them one at a time, page 3, DX–97, where ... [in] the original disclosure, and either the specifications, claims, or the drawings, within pages 1–9, [is the language] to support the housing not having to be rearwardedly [sic] converging?

\* \* \* \* \* \*

MR. MILLER: I recognize that the court is interested in hearing my answer to that question. I must respectfully submit, however, that it may not be the proper question.

\* \* \* \* \* \*

THE COURT: Now, in claim 6, you have a claim added, which is not restricted to converging housing.

MR. MILLER: That's correct.

THE COURT: What support do you have for that, either in the original disclosure, in either the specifications, the claims or the drawings?

MR. MILLER: The specification does not say that it has to be rearwardly converging.

THE COURT: Where in the specifications does it not say it has to be rearwardly converging?

MR. MILLER: It says that it is rearwardly converging. It does not say that it must be rearwardly converging. If the specification as originally filed had said the housing must be rearwardly converging then yes, I would concede that there's a point to be made because by changing "must be" to "may be" is changing what is mandatory —.

THE COURT: Where does it say *"may be"* in page 3? (emphasis added).

MR. MILLER: *It doesn't say "may be" there.* (emphasis added).

THE COURT: So, why are you using the example *"may be"* if it doesn't say it? (emphasis added).

MR. MILLER: Well, the *"may be"* was added by amendment, sir. (emphasis added).

THE COURT: Where—on page 3, where is the word *"may be"*? (emphasis added).

MR. MILLER: On page 3?

THE COURT: Yes. DX–97.

MR. MILLER: I guess that's not added on page 3. It's added on page 4.

\* \* \* \* \* \*

MR. MILLER: The amendment—well, on page 3, the amendment eliminated the language *"rearwardly converging."* (emphasis added).

THE COURT: Okay. What—by what right do you have to eliminate that language to make it broader, when you don't have support in the original disclosure? You see, it's the court's understanding that you can change a specification if the drawings or the claims, as originally disclosed, have disclosed that point.

So, you can change the specifications to conform to that which was disclosed, [in] the drawings or the claims.

MR. MILLER: Well, then, I must respectfully disagree with the court's understanding.

\* \* \* \* \* \*

THE COURT: What's your definition of new matter?

MR. MILLER: What is my definition of new matter? In the context of this case?

THE COURT: No. In the context of any case. Tell me whether you agree with this statement or not: "Where the definition of a term added to the specification by amendment under rule 312 is *not consistent* with the use of that term in the application as filed, it ... [constitutes] new matter within the meaning of Section 35 U.S.C. 132, and must be disregarded in construing the scope of the patent claims." (emphasis added).

Do you agree with that statement, sir?

MR. MILLER: I don't think it's inconsistent.

\* \* \* \* \* \*

THE COURT: Alright. Now that statement says, again, by the way, that's [the] *Dresser Industries* case, it says: "where

the definition of a term added to the specification by amendment under rule 312 is not consistent with that term in the application as filed, it constitutes new matter within the meaning of 35 U.S.C. 132 and must be disregarded in construing the scope of the patent claims."

Now, the key essence of that statement is that [the new matter must not be] inconsistent with the use of the [original] term in the application. Now, where in the application—where in the disclosure's original file [first nine pages of DX–97] does it talk about [the] housing [and] that [it] does not have to be rearwardedly [sic] converging?

MR. MILLER: It is not necessary for the specification as originally filed to say that the housing does not have to be rearwardly converging.

THE COURT: Even though the drawings and the—

MR. MILLER: That is correct, sir.

THE COURT: —claims *nowhere suggest, either implicitly or intrinsically, that the housing does not have to be rearwardedly [sic] converging?* (emphasis added).

MR. MILLER: Yes, sir. [It is not necessary.]

THE COURT: And, even if the specifications do not suggest either intrinsically or implicitly that the housing does not have to be rearwardly ... converging?

MR. MILLER: ... Yes, sir. [It is unnecessary.]

\* \* \* \* \* \*

MR. MILLER: *In re Peters*, sir. The Federal Circuit, .... reversed a rejection of all claims under 35 U.S.C. 112 and 251, stating that the rejection, and I quote, 'erroneously confined *Peters* to the specific embodiment disclosed in the original patent.' Now that's 723 F.2d 891, 221 U.S. P.Q. at 953, which, in turn, relied on *In re Rasmussen*, 650 F.2d 1212, 1215.

THE COURT: The *In re Peters* case, sir, that you quote, says that if the broadened claim had been submitted originally, the broadened claims would have been sup-

ported by the original disclosure. That's what the *In re Peters* case says.

MR. MILLER: And, that's what we're saying exists here.

THE COURT: And, you're asserting that your broader claim, even if submitted originally, would have been supported by your original disclosure?

MR. MILLER: Yes, sir.

THE COURT: Where in your original disclosure does it support the broader claims of your housing not having to be rearwardedly [sic] converging?

MR. MILLER: Your Honor's question assumes that the specification must have had some language that said, at the time that it was filed—

THE COURT: Originally disclosed.

MR. MILLER: Originally disclosed—

THE COURT: Right.

MR. MILLER: —that the housing may converge, may not converge, can diverge, can do anything.

THE COURT: Or, implicitly, which I assume you're arguing, that the housing does not have to converge. Is that what you're arguing?

MR. MILLER: Well, I—

THE COURT: Or, are you arguing explicitly?

MR. MILLER: No, I'm not arguing explicitly.

THE COURT: So, you must be arguing implicitly?

MR. MILLER: The problem I'm having is I'm not sure it has to be either.

THE COURT: It doesn't have to be explicit, and . . .

MR. MILLER: And, it doesn't have to be implicit as long as—

THE COURT: Doesn't even have to be implicit. [?]

MR. MILLER: —*[as] long as it's not inconsistent* (emphasis added).

 * * * * * *

THE COURT: I've . . . a note here [in] *In re Peters*, you see, it says, "Because the

broadened claim[s] sought by the reissue application are supported by the original disclosure. . . ."

So, if you're going to . . . have your case fall . . . [within] *In re Peters*, you've got to prove to the court that your broadened claims are supported by the original disclosure. That's the issue.

(Tr. O.–119)

As can be seen by the above colloquy, plaintiff admits that the new broadened claim language in claims 6–10 which read on a housing that is not converging in shape toward the rearward end, must not be *inconsistent* with the housing as disclosed in the original disclosure, *i.e.*, pages 1–9 of DX–97. Plaintiff's position is, of course, that the broadened claim language in its claims 6–10 of the '961 patent which allows both a cylindrical-type housing or a housing that is *diffusing* toward the rearward end, is not inconsistent with the housing originally disclosed by the patentee in the first nine pages of the patent application as seen in DX–97. Plaintiff's arguments are unavailing.

We agree with plaintiff's counsel, that the issue before this court is whether or not the broadened claim housing in claims 6–10 of the '961 patent, which covers or reads on cylindrical-type housings as well as diffused housings, *i.e.*, housings whose diameters enlarge rearwardly, is inconsistent with the "rearwardly converging housing" described in the original disclosure, *i.e.*, pages 1–9 of DX–97. We find it is inconsistent.

The Court of Claims said the following in *Dresser Industries, Inc. v. United States*, 193 Ct.Cl. 140, 432 F.2d 787, 792 (1970):

 The word "section" was used many times in the patent specification and claims, as filed; and it is clear from the disclosure read as a whole, and in view of the description of the various embodiments of the invention, that "section" was intended to refer to physically discrete portions of the follower bars which bear against the gasket. Thus, if the follower bar comprises three pieces, the

coupling has three "sections", etc. Accordingly, *the definition* of *"section"* added to the specification by amendment under Rule 312 *is not consistent ·with the use of that term in the application as filed; and it constitutes "new matter"* within the meaning of 35 U.S.C. § 132 and must be disregarded in construing the scope and meaning of the claims (*citing Mackey Radio & Telegraph Co. v. Radio Corp. of America,* 306 U.S. 86, 59 S.Ct. 427, 83 L.Ed.2d 506 (1939) (emphasis added) (footnote omitted).

Turning to the patentee's original disclosure, on page 2 of DX–97, the patentee attempts to distinguish his invention from the prior art stating that while the prior art propulsion units have used multiple stages as his invention does, those multiple stages have always been of the *same size* as one another. Patentee stated to this effect: "Prior art propulsion units have of course used multiple stages but these stages have been of the *same size* and speed as one another." (Emphasis supplied). As should be readily discerned by a mechanical engineer having ordinary skill in the turbomachinery propulsion pumps used to propel ships, that when the first and second stage impellers are of the same size, *a priori,* the outside housing of that water jet pump would have the same diameter and therefore be cylindrical with respect to each other. Patentee, therefore, has made a point of distinguishing his "rearwardly converging housing" in his original claims 1–5 from prior art propulsion units, which while also having multiple stages of impellers, have impellers of the same size, and *a priori,* have outside housings of the same diameter, and therefore the same size. Moreover, to emphasize the distinction and the uniqueness of his invention, the patentee stressed that this "cross-sectional area of the impeller housing decreases in a direction approaching the discharge end" results in a high speed pumping unit with a correspondingly *"high pressure rise through the unit"* (emphasis added). A mechanical engineer with ordinary skill in the turbomachinery propulsion pumps used

to propel ships would quickly discern that the high pressure rise would allow the water to be discharged with greater velocity at the discharge nozzle end allowing the ship to be propelled at a much greater speed than otherwise available.

Thus, the patentee has made, in its original disclosure ·on pages 2–3 of DX–97, three distinct points to the PTO to distinguish his invention from the prior art: (1) his invention differs from the prior art multi-stage hydraulic jet propulsion units because his multi-stage impellers are not of the same size, while the prior art multi-stage impellers are of the same size; and (2) because the patentee's second stage impeller moves at a faster speed than the first stage impeller and (3) because the housing around the second stage impeller is decreasing in a direction approaching the discharge end; patentee's invention therefore results "in a high speed pumping unit with a correspondingly high speed rise through the unit." DX–97, page 3. Once having taken this position, that is, having defined and argued these particular distinctions over the prior art which covered cylindrical housings, and once having argued the particular advantage of his invention created by the "rearwardly converging housing" (DX–97, p. 3, line 25), that is, creating a "high pressure rise through the unit", and *a priori,* a high velocity jet stream emitted from the nozzle to impart a higher speed to the forward speed to the ship than was otherwise available in the past, patentee should not be allowed, in added claims 6–10, to depart from his advantageous "rearwardly converging housing" to now claim a housing which can either be rearwardly diffusing, cylindrical, or rearwardly converging. This particular type of estoppel was addressed by the CCPA in *Coleco Industries v. International Trade Commission,* 573 F.2d 1247, 1257 (CCPA 1978), wherein the court stated:

> [A]s a general ·proposition, the legal issue is whether an estoppel arises in the prosecution history from *arguments not directed specifically to examiner's cited*

*references but directed to a reference cited by applicant* (emphasis added).

\* \* \* \* \* \*

We are in the position of enunciating a rule broader than the traditional "file wrapper" estoppel doctrine. A patentee having *argued* a narrow construction for his claims before the United States Patent and Trademark Office (PTO) should be precluded from arguing a broader construction for the purposes of infringement. We believe this to be a sound legal proposition which comports with the rationale underlying the traditional doctrine of "file wrapper" estoppel, *that once a broader scope of interpretation for a claim is disclaimed by an applicant before the PTO, he is not* entitled to reinstate the broader scope. The Supreme Court applied this rationale in *Exhibit Supply Co. v. Ace Patents Corp.* [315 U.S. 126, 62 S.Ct. 513, 86 L.Ed.2d 736 (1942)] (emphasis added).

As stated in *In re Kaslow,* 707 F.2d 1366, 1375, 217 U.S.P.Q. 1089 (Fed.Cir.1983):

The test for determining compliance with the written description requirement is whether the disclosure of the application as originally filed reasonably conveys to the artisan that the inventor had possession at the time of the later claimed subject matter ... (citations omitted).

We find that, because plaintiff argued so strongly, to distinguish his invention from the prior art, that his invention was distinguished because: (1) his impeller housing had to "decrease in a direction approaching the discharge end"; and (2) this resulted in "high speed pumping unit with correspondingly high pressure rise throughout the unit", the first point distinguishing his invention from that of the prior art that had cylindrical housing, that plaintiff cannot now, through subsequent amendments 6–10, take the *inconsistent* position, whereby plaintiff's impeller housing now can either converge, be the same, or diverge, in a direction approaching the discharge end. We find further, that plaintiff should be estopped, within the meaning of 35 U.S.C. § 132, rule 312, and 35 U.S.C. § 112, from using this latter inconsistent definition of its housing. *See Dresser Industries, Inc.,* 432 F.2d at 793.

Finally, plaintiff argues that *In re Peters,* 723 F.2d 891, 221 U.S.P.Q. 952 (Fed. Cir.1983) supports its argument in the instant case. The colloquy below sheds light upon plaintiff's argument:

MR. GHOLZ: In the Peters patent *the specification was never broadened* to support in the sense that the defendant argues support is necessary. (Emphasis added).

THE COURT: Yes, *but in your case*—in this case, *the specifications were broadened.* (Emphasis added).

MR. GHOLZ: They were, but they didn't have to be.

THE COURT: Well, who said they didn't have to be?

\* \* \* \* \* \*

THE COURT: Who asserted that it didn't have to be in this case?

\* \* \* \* \* \*

THE COURT: Then why did the ... patentee do it?

MR. GHOLZ: Well, that I don't know.

Plaintiff's arguments are again unpersuasive. The *In re Peters* case can be easily distinguished from the facts before us. In the *In re Peters* case, the broadened claims merely omitted an *unnecessary limitation* that had restricted one element of the invention to the exact and *non critical shape* disclosed in the original patent. Contrariwise, in the instant case, patentee underscored the advantage of his invention having a "rearwardly converging housing" because this both: (1) distinguished it from the cylindrical-type housings already present in the prior art; and (2) gave the advantageous result of "a high speed pumping unit with a correspondingly high pressure rise through the unit," *a priori,* effectuating a high speed discharge of jet water causing the ship to be capable of maximum forward speed. Thus, plaintiff's "rearwardly converging housing"

was touted to the PTO as a cardinal element of his invention. In contradiction, the broadened claims in the *In re Peters* case omitted an "unnecessary limitation" and a "non critical shape". In plaintiff's original disclosure, on the other hand, the housing shape, toward the rearward end in the original disclosure, *i.e.*, pages 2–3 of DX–97, was argued by patentee to be highly critical.

We therefore find, that independent claim 6 of the '961 patent, along with its dependent claims 7, 8, 9 and 10, are not valid pursuant to 35 U.S.C. § 132, 37 C.F.R. § 1.53(b) (1985) and 37 C.F.R. § 1.118 (1985).

*Sections 184 and 185 Asserted Violations*

Section 184 of Title 35 of the United States Code, entitled "Filing of Application in a Foreign Country", reads as follows:

Except when authorized by a license obtained from the Commissioner, a person shall not file or cause or authorize to be filed in any foreign country prior to six months after filing in the United States an application for patent or for the registration of a utility model, industrial design, or model in respect of an invention made in this country. A license shall not be granted with respect to an invention subject to an order issued by the Commissioner pursuant to section 181 of this title without the concurrence of the head of the departments and the chief officers of the agencies who cause the order to be issued. *The license may be granted retroactively where an application has been inadvertently filed abroad and the application does not disclose an invention within the scope of section 181 of this title* (emphasis supplied).

The term "application" when used in this chapter includes applications and any modifications, *amendments,* or supplements thereto, or divisions thereof (emphasis supplied).

Section 185 entitled "Patent Barred for Filing Without License" reads as follows:

Notwithstanding any other provisions of law any person, and his successors, assigns, or legal representatives, shall not receive a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring the license prescribed in section 184 of this title, have made, or consented to or assisted another's making application in a foreign country for a patent or for the registration of a utility model, industrial design, or model in respect of the invention. *A United States patent issued to such person, his successors, assigns, or legal representatives, shall be invalid* (emphasis supplied).

Defendant asserts that because the patentee's amendment before initial application was filed on September 21, 1966, (DX–97, p. 10), pursuant to 35 U.S.C. § 184, the patentee was precluded from filing its amendment in a foreign country prior to six months after September 21, 1966, *i.e.*, patentee was precluded from filing its amendment in a foreign country before March 21, 1967, unless authorization by a license was obtained from the Commissioner of Patents. The following colloquy sheds further light on defendant's position:

THE COURT: So that within six months of that time [September 21, 1966 to March 21, 1966] the application should not have [been] filed, including the amendment abroad?

MR. SPEVACK: That's correct, your Honor.

THE COURT: And when was it filed abroad?

MR. SPEVACK: If we turn to the letter, Defendant's Exhibit 49, it begins the cycle. The actual application abroad is Defendant's Exhibit 52, and I believe the dates for filing stamped on it is September 29, 1966.

THE COURT: So, just a few days later, it was filed abroad?

MR. SPEVACK: Far away from [the] close ... [of] six months.

THE COURT: Alright.

MR. SPEVACK: We're talking 10 days. Now, this all starts with Defendant's Ex-

hibit 49 which is a letter from the British associate of September 15, 1966.

\* \* \* \* \* \*

In the first two paragraphs, it goes along to suggest a broader claim which is set forth about two-thirds of the way down the page—and bridging the page, as paragraph—we also note that your claim 1 states that the two impellers are mounted within a converging portion of the housing. That is there is only one converging portion—we are on page 2 now, and wondered whether it would be practical to have a straight nonconverging portion in the housing between the two impellers.

MR. SPEVACK: There is a slight risk that your claim 1 might be construed as not covering such an arrangement, but we believe that the claim could be more likely construed to mean that the housing around the two impellers was generally converging.

This slight risk could, however, be removed from deleting the reference to the housing altogether, which is a suggestion of what basically came about.

If we turn now to Defendant's Exhibit 50, we have a responsive letter, and it states:

"Since the US case was filed,"—and, I am reading from the second paragraph, "the client has changed the design so that the second impeller is not of smaller diameter than the first impeller, and the housing does not converge in the area of the impellers, but only at the extreme end of the housing."

Your proposed claim would therefore cover such a modification." ...

"I am also enclosing a copy of pages 2, 3, and 4 of the specification of which I have made certain deletions which were rather limiting as far as the improved design was concerned."

\* \* \* \* \* \*

"—With your letter of 20th September. We also revised the introduction to bring it into line with British practice and add-

ed an omnibus claim directed to the arrangement shown in the drawing."

Tr. O.–170–173

Because patentee filed its foreign amendment in Britain without waiting the required six months required by section 184 defendant asserts that pursuant to section 185, the *"patent* issued to such person, his successors, assigns, or legal representatives *shall be invalid"* (emphasis added). Moreover, defendant asserts that if the PTO had been fully informed by plaintiff of all the relevant facts, *e.g.,* DX–42, 43, 44, 45, 47, 48, 49, 50, 51, 51 and 53, it would have found that plaintiff's amendment to its foreign application would have constituted new matter pursuant to sections 184 and 185. Tr. O.–176–177. Defendant never articulates these charges in terms of "fraud on the patent and trade·mark office," however, and therefore, we do not address that issue.

Plaintiff's countervailing argument is that pursuant to 35 U.S.C. § 184, the last sentence of the first paragraph, plaintiff did not attempt to obtain a retroactive license to file its *amendment* in Britain, and that plaintiff had inadvertently filed its amendment in Britain prior to the six-month period.

The following colloquy will shed further light upon plaintiff's arguments:

THE COURT: ... [Y]ou didn't wait six months to file the foreign application pursuant to—

MR. MILLER: Oh, yes, we did.

THE COURT: Oh, you ·did wait six months?

MR. MILLER: Oh, clearly. The British application—we waited the 6 months. This entire defense centers around Mr. Spevack's objection to the fact that when we *amended the* United States *application* we did the same amendment overseas *and didn't wait six months to make that amendment.*

THE COURT: Were you supposed to wait six months?

MR. MILLER: We say, no, and we also contend vis-a-vis Plaintiff's Exhibit 81 that the United States Patent Office

agreed with us. They said the record before this office shows that the subject matter in question was added to—it's an obvious typo—to an application filed abroad is what they meant—and the U.S. examiner did not deny entry of the subject matter as constituting new matter. Tr. O.–180–181

In examining plaintiff's contentions, we see that in its *"REQUEST FOR RETRO-ACTIVE LICENSE UNDER 35 U.S.C. 184,"* dated September 15, 1981, plaintiff states:

On or about August 15, 1966, Mr. Nilles authorized the filing of the application in England. On September 20, 1966, Mr. Nilles filed a preliminary amendment at the U.S. Patent Office rewording the specification, and submitting new additional *Claims 6–10 which were broader than the* originally filed *claims 1–5.*

On the same date, *the broader claims* and *reworded specification* were sent to the British associate attorney who had been authorized to file the case in England. On September 29, 1966, the *broader claims* and *reworded specification* were filed in England.

Through inadvertency, no license to file abroad the broader claims and reworded specification was requested at any time (emphasis added).

PX–80, p. 1–2

On January 6, 1982, plaintiff received a letter back from the PTO dismissing without prejudice its petition for a retroactive license, stating in pertinent part:

The record before this office shows that the subject matter in question was added to filed [application] abroad, and that the U.S. examiner did not deny entry of the subject matter as constituting new matter. In view of such entry, the subject matter is deemed to be directed to the same invention as the original application, and therefore does not re-

quire a separate license. The security group has not made any determination, separate from the entry of the subject matter, as to whether a license is required ... or as to whether there has been a showing of inadvertence.

Accordingly, the petition is dismissed without prejudice. (PX–81).

The court notes that plaintiff applied for a retroactive license, to allow it to file an amendment to its patent application in a foreign country (Britain) within six months of its original foreign filing date, *more than 15 years* later. Plaintiff did not cite any case law that addressed the allowability of filing for a retroactive license for foreign filing under 35 U.S.C. § 184—some 15 years after it should have been filed. Defendant having, however, not countervailed this point, this court need not address that point. Nevertheless, we must address the issue of new matter. Having already found new matter in claims 6–10 of the '961 patent, certain consequences and effects arise. Pursuant to 35 U.S.C. § 185, which states in pertinent part: "A United States patent issued to such person, his successors, assigns, or legal representatives *shall be invalid."*

In assessing the asserted violations of sections 184 and 185, the court is keenly sensitive to the draconian effect a section 184 or 185 violation has on the patentee, *i.e.,* the entire patent must be held invalid.[6] Having earlier found that new matter existed in the broader claims 6 through 10 of the '961 patent, however, the court is constrained, *a priori*, to find a violation of section 184. This decision is made somewhat easier, however, by virtue of the fact that when the PTO decided that a retroactive license was unnecessary, it apparently did not have all the relevant evidence before it, *e.g.,* DX–42, DX–43, DX–44, DX–45, DX–47, DX–48, DX–49, DX–50, DX–51, and

---

**6.** The draconian effects of sections 184 and 185 violations, whereby the entire patent must be held invalid, has apparently been recognized by Congress. Two bills in the 98th Congress sought to ameliorate this draconian effect, *i.e.,* Senate Bill 1535, entitled "A Bill To Amend Title

35 U.S. Code to Increase the Effectiveness of the Patent Law and for Other Purposes," and H.R. 4524, entitled "A Bill to Amend Title 35. U.S. Code to Clarify Certain Provisions Relating to Filing of Patent Applications in Foreign Countries."

DX–42. There is language in these exhibits, when read as a whole, which should have suggested a new matter issue to the PTO, *e.g.*, in DX–42:

I have prepared an *amendment* in this application which consists primarily in the addition of more claims *to cover your latest design* as shown in your print DX500–010.

The *specification has also been amended* slightly and in a few instances so as *to remove any specific or pointed references to a continuous converging housing* (emphasis added). In studying this evidence, which apparently was not before the Patent Office when plaintiff's counsel filed for its request for retroactive license under 35 U.S.C. § 184, fourteen years after the patent had already issued, we find a common thread in each of these documents, which when woven together, forms an ineluctable denouement creating, within the prudent mind, a "new matter" issue. For instance, in DX–43, plaintiff's patent counsel states, "there are only two independent type claims in this patent, (the Hamilton patent) both of which have the limitation that the forward portion of the rear passage means 'converging continuously from said inlet to its junction with the aft portion', this limitation is not found in your design, that is, *in your new design* —." In DX–44, plaintiff's patent counsel states "as you know we are trying to *obtain broad claims* in that first application *which would* also cover this present improvement" (emphasis supplied). In DX–45, plaintiff's patent counsel states, "I believe we should *proceed with the filing of a second application on your new jet* which has now been completed. These new claims would be directed to a multi-stage jet which has two stages, the first stage being an axial flow pump, and the second stage being a mixed flow pump which rotates faster than the first stage" (emphasis supplied). In DX–47, plaintiff's patent counsel states, *"claim 6 is the broadest of the claims* in this case and also *would cover your new jet* application *device—"* (emphasis sup-

plied). In DX–48, plaintiff's patent counsel states "as you know, *claims 6 through 10 are particularly broad* and also *cover the new proposed jet* application which you are reviewing at the present time" (emphasis supplied). In DX–50, plaintiff's patent counsel states *"since the U.S. case was filed, the client has changed the design* so that the smaller impeller is not of smaller diameter than the first impeller, and the housing does not converge in the area of the impellers but only at the extreme end of the housing.... *I am also enclosing* a copy of pages two, three, and four of *the specification on which I have made* certain *deletions which were* rather *limiting* (limitations) as far as the improved design is concerned" (emphasis added).

The following colloquy will shed light upon plaintiff's position:

THE COURT: Do you have any case law that says that the term amendment there in [section] 184 means an amendment with new matter?

MR. MILLER: ... Mr. Spevack's brief on page 50 says, "for the purposes of this discussion, we will interpret an amendment or modification to mean a change that makes substantive changes such as adding an additional concept or data as opposed to an amendment which meely makes grammatical or typographical changes."

And then Mr. Spevack cites *In re Gaertner.* Now my point is that we did not send something overseas that makes substantive changes. It was directed to the same invention. Thus, even by Mr. Spevack's interpretation, it would be perfectly acceptable, because it did not make substantive changes.

*Now if it did make substantive changes, such as by* way of example *adding new matter, then that is a horse of a different color.*

THE COURT: Is the change of the design a substantive change?

MR. MILLER: Are we talking in the abstract?

THE COURT: No, we are talking about this case.

MR. MILLER: Where was the design change?

THE COURT: Just a change of the design. It does not say [where in] DX–50. It says that [the] client has changed the design. So the second impeller is not of smaller diameter than the first impeller, and the housing does not converge in the area of the impellers, but only at the extreme end of the housing.

MR. MILLER: Yes. And all that it is explaining to the foreign associate that we are now going to have a claim that is generic enough to cover both.

THE COURT: Is that a substantive change of the design?

MR. MILLER: ... We are talking about the '961 patent here. *That was a change.* I do not know, I mean it was an improvement. Ultimately, it became its own patent (emphasis added).

TR.O.–187–188.

Plaintiff asserts that, pursuant to its September 5, 1981 request for retroactive license, which was made 14 years after the '961 patent was issued, and pursuant to the PTO's dismissing its petition for a retroactive license in January of 1982, that under *Torin Corp. v. Philips Industries, Inc.,* 89 F.R.D. 346, 212 U.S.P.Q. 503 (W.D. S.D. Ohio 1981) this court is precluded from holding the patent invalid pursuant to 35 U.S.C. § 185. Plaintiff quotes the language from the *Torin Corp.* case, 89 F.R.D. at 350, "that the grant of a retroactive license *at any time* cures the patent's invalidating defect *as of the date of the foreign filing to which the license is directed.*" (quoting *Minnesota Mining and Manufacturing Co. v. Norton Co., 366 F.2d 238, 242 (6th Cir.1966), cert. denied,* 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967) (emphasis in original)). We disagree with plaintiff's contention that the case before us is fully subsumed within the *Torin Corp.* decision. In *Torin Corp.,* the retroactive license was actually granted; in the instant case, no retroactive license was ever granted. Here, plaintiff's petition for a retroactive license was dismissed without prejudice. PX–81. In dismissing plaintiff's petition without prejudice, the PTO stated "the security group has not made any determination, separate from the entry of the subject matter, as to whether a license is required (see *In Re Gaertner,* 604 F.2d 1348, 202 U.S.P.Q. at 721) or as to whether there has been a show of inadvertence." Therefore, the instant case can be distinguished from the *Torin Corp.* case, in that the condition precedent in the *Torin Corp.* doctrine, *i.e.,* the retroactive license, was never granted in the instant case. While plaintiff emphasizes the fact that the original U.S. examiner did not deny the entry of the subject matter as constituting new matter, the PTO did not reconsider this original decision, but merely reiterated what had occurred in the past. If the PTO had reconsidered this issue while being fully informed of all the relevant evidence relating to the new matter issue, *e.g.,* DX–42, DX–43, DX–44, DX–45, DX–47, DX–48, DX–49, DX–50, DX–51, and DX–52, and then had issued a retroactive license, plaintiff would have had a much stronger argument pursuant to the *Torin Corp.* decision.

In explicating the legislative background of the 35 U.S.C. §§ 184 and 185, the *Gaertner* court stated:

The purpose of those statutes being to prevent exportation of information potentially detrimental to the security of our country, Congress intended that strict compliance be paramount to the interests of the individual inventor (citations omitted).

\* \* \* \* \* \*

Congress clearly denied applicants the right to determine for themselves whether a particular disclosure was detrimental to national security, in providing that applications must be licensed for foreign filing must have been on file as a U.S. application for the requisite six month period. The second paragraph of section 184 extends those requirements to any *modification, amendment,* supplement or division of the foreign application which results in the *disclosure of "new"*

*information. Likewise, any modification,* amendment, supplement or division adding information to a previously filed U.S. application would reactivate the requirements of sections 184 and 185 with respect to filing abroad an application disclosing the added information (emphasis added). *In Re Application of Gaertner,* 604 F.2d 1348, 1351, 1352, 202 U.S. P.Q. 714 (CCPA 1979).

■ It is therefore clear beyond peradventure, that the patentee had a duty to obtain a license from the Commissioner of Patents when it filed its modification and amendments to its British application prior to the requisite six month waiting period after filing a corresponding modification and amendment in its U.S. patent application. Now, over 14 years later, patentee has petitioned the PTO for a retroactive license under 35 U.S.C. § 184. PX-80. In its request for retroactive license, patentee stated:

> On or about August 15, 1966, Mr. Nilles authorized the filing of the application in England. On September 20, 1966, Mr. Nilles filed a preliminary amendment at the U.S. Patent Office *rewording the specification,* and submitting additional new claims 6 to 10 which were broader than the original filed claims 1 to 5.
>
> On the same date, the broader claims and *reworded specification* were sent to the British associate attorney who had been authorized to file the case in England. On September 29, 1966, the broader claims and *reworded specification* were filed in England. Through inadvertency, no license to file abroad the broader claims and *reworded specification* was requested at any time (emphasis supplied).

Thus patentee should have obtained a license from the PTO prior to September 29, 1966, in order to file his broader claims and reworded specification in England. Patentee asserts that he was guilty of no inadvertence in regard to his filing abroad the broader claims and reworded specification without a license. The PTO, responded to the patentee on January 6, 1982,

merely summarizing what the examiner had done in the past without freshly reconsidering the matter, added that "the security group has not made any determination, separate from the entry of the subject matter, as to whether a license is required (*Gaertner,* 644 F.2d at 1352–53, 202 U.S.P.Q. at 721) or as to whether there has been a showing of inadvertence. Accordingly, the petition is dismissed without prejudice." Therefore, the PTO did not determine whether or not plaintiff's premature filing of its modification and amendments abroad were done through inadvertence.

Because *In re Gaertner* holds that sections 184 and 185 must be strictly construed, pursuant to legislative history; because patentee's 14–year subsequent request for a retroactive license circumvents and frustrates the purpose of the law, *i.e.,* once information potentially detrimental to the security of our country has been disclosed to a foreign country for a period of 14 years, any damage to be done to the United States has already been done; and because the PTO did not grant a retroactive license nor determine that patentee's foreign filing was made through inadvertence; and because the court did find that patentee's broader claims 6 through 10 and broader specification filed prematurely abroad did contain new matter; the court is constrained to find violations of sections 184 and 185.

*Statute of Limitations*

The instant petition was filed on November 21, 1978, and was initially referred to former Trial Judge Francis C. Browne. Pursuant to the first paragraph of 28 U.S.C. § 2501, "Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Six years earlier than November 21, 1978, is November 21, 1972. Therefore, if plaintiff's action had accrued earlier than November 21, 1972, plaintiff would have been barred, via the statute of limitations of this Court, from bringing a suit in the United States Claims Court. Put more precisely, in terms of the facts in

this case, if the Government had ownership of what is covered by the claims of the two patents before us, prior to November 21, 1972, then plaintiff's filing of its petition in this court on November 21, 1978, would be too late, pursuant to the statute of limitations. 28 U.S.C. § 2501.

Defendant contends that the evidence in the instant case demonstrates that the Government had possession of what is covered by the claims of the two patents, the '961 patent and '526 patent, before November 21, 1972. The issue is, of course, did the Government have possession of a water jet covered by the claims of the '961 or '526 patent before November 21, 1972?

In examining the contract itself, we note that the contractor was Aerojet General Corporation, SES Division, 9200 East Flayer Drive, El Monte, California, 91734, and that the contract's effective date was January 10, 1969, and its expiration date was January 9, 1972. DX–35. Page 53 of this exhibit is entitled "Technical Statement of Work—100–ton waterjet-driven SES Test Craft System Program." In its introductory paragraph it states:

> The statement of work describes the effort to be accomplished in accordance with the contract program specifications referenced in section 2.000, for the *design, construction, tests and support* of a 100–ton class waterjet-driven SES Test Craft. The Contractor shall provide at least the Test Craft and its associated operating, support and evaluation systems, subsystems, components and ancillary equipment. The work is divided into four distinct phases (see 3.000).

> The goal of the program in accordance with the aforementioned specifications is to produce a Test Craft in the 100–ton class capable of the calm water maximum speed of 80–100 knots and Brequet calm water range of 1500 nautical miles with a payload of ten short tons. It should be capable of safe operation in sea state III. To facilitate demonstration of its performance, including at least: speed, control effectiveness, stability, structural integrity, propulsion oper-

ation and efficiency, lift and seal system operation, and shall be instrumented for the collection of data for evaluation of these characteristics. DX–35 at p. 53.

Page 42 of DX–35, paragraph (c) entitled "Title" states:

> Title to all property furnished by the Government shall remain in the Government. Title to all property purchased by the Contractor for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to invest to the Government upon delivery of such property by the Vendor. Title to other property, the cost of which is reimbursable to the contractor under the contract shall pass to invest to the Government upon (i) issuance for use of such property in the performance of this contract or (ii) commencement of processing or use of such property in the performance of this Contract, or (iii) reimbursement of costs thereof by the Government in whole or in part, whichever first occurs. DX–35 at p. 42.

More specifically, the statute of limitations' issue may be stated: Were the waterjet pumps covered by the claims of the '961 and '526 patents, as a complete workable unit, delivered dockside at Tacoma, Washington, prior to November 21, 1972? The following colloquy paraphrases this issue:

MR. SPEVACK: So the delivery of the pump dockside before November 1972 eliminates any claim that does not include the entire ship's system.

THE COURT: Alright, so it is the delivery of the integral pump in a complete workable unit.

MR. SPEVACK: That is correct. Actually, in this case, all three pumps.

Defendant asserts that the evidence demonstrates that the water pumps covered by the claims of the 961 and 526 patent, as a complete workable integral unit, were delivered dockside at Tacoma, Washington in 1971, *i.e.*, therefore, prior to November 21, 1972. Defendant relies upon the testimony of Mr. Stakee, Mr. Schlappi, and DX–32

entitled "100–Ton SES Waterjet Test Craft Program Monthly Progress Report; Period: 20 February through 19 March 1971," AGC Report No. SES–E–C002–27, dated March 30, 1971.

Contract No. MA–4677 was a cost-plus-incentive fee contract, entitled "Design, Construction, Tests and Support of a 100–ton class waterjet-driven surface effect ship test craft," issued by the Maritime Administration, awarded to the Aerojet General Corporation, SES Division, 9200 East Flair Drive, El Monte, California, with an effective date of January 10, 1969, and an expiration date of January 9, 1972. DX–35, p. 1. Pursuant to this document, the Government received title to each part of the 100–ton class waterjet-driven surface effect ship test craft no later than the date manufacture was complete, and in fact, received title to each part therein delivered to the construction site by the supplier or subcontractor at the date of delivery. DX–35 p. 42, ¶ (c); Stakee Tr.S.–1191–92; Stakee Tr.S.–1234–35; Petersen Tr.W.–712–13. The waterjet pumps for the SES 100–A, however, were designed, built, and tested by the Aerojet General Corporation, Sacramento Division. Schlappi Tr. S.–821–22; Schlappi Tr.S.–827–28; Schlappi Tr.S.–832–33; Schlappi Tr.S.–839–40; Stakee Tr. S.–1208 and Aerojet Waterjet pump for the SES 100A ship was shipped to and received by the SES Division at Tacoma, Washington no later than March 30, 1971. The following colloquy corroborates the fact that at least one of the accused waterjet pumps in question was delivered to the SES Division at Tacoma, Washington prior to March 30, 1971:

MR. SPEVACK: Do you know whether the pump was actually delivered to the ship?

MR. PETERSEN: Oh, yes. That I do.

\* \* \* \* \* \*

MR. PETERSEN: .... I was in Tacoma (Washington) on or about the time when the pumps were delivered on dock.

THE COURT: Of your own knowledge.

MR. PETERSEN: Yes. It was in the spring of the year.

\* \* \* \* \* \*

MR. SPEVACK: Lacking exhibit 32(a) actually here in the courtroom, I am going to hand you a substitute copy for the moment, and I ask you do you recognize defendant's exhibit 32(a) which bears a cover sheet which states that it is a 100–ton SES waterjet test craft program, monthly progress report for the period 20 February through 19 March 1971, dated 30 March 1971.

MR. PETERSEN: I recognize it. Yes.

MR. SPEVACK: I would like to direct your attention—how do you recognize it?

MR. PETERSEN: It is one of the documents which was prepared by Aerojet General each month—a monthly progress report.

MR. SPEVACK: Did you receive these documents—

MR. PETERSEN: Yes.

MR. SPEVACK: —In the normal course of your responsibilities?

MR. PETERSEN: Yes.

MR. SPEVACK: I would like to direct your attention specifically to page 16, paragraph C as in cats, and I ask does that refresh your recollection at all as to when the pumps were delivered to the dock as you testified earlier that you recollect that they were?

MR. PETERSON: 1971. I now recognize it. It was in the spring. It was March, April and it states that it was in March 1971. I do recall seeing the pumps.

Petersen Tr.W.–745–747.

The evidence showed that there were two aerojet waterjet SES 100A pumps delivered prior to March 30, 1971, and that a third pump was delivered shortly thereafter. The following colloquy buttresses this finding of fact:

MR. SPEVACK: .... Now, in a document that we marked for identification as defendant's exhibit 68, there was a reference to three pumps. In this doc-

ument, defendant's exhibit 32, there is a reference to two pumps being delivered. How many pumps, if you know, did the SES 100A actually need to propel?

MR. SCHLAPPI: The craft required two. The contract required ... a third, spare pump, a complete unit the same as the first two that were put on a ship.

MR. SPEVACK: What was the time relationship between the delivery of these three pumps, if you recollect?

MR. SCHLAPPI: They were all built in sequence and tested in sequence. Of course, the greater push was on the first two to meet the delivery and to get them on the ship, but the three units were tested in just a very short order—within a week or two of each other.

The test, itself, took only a day. I don't know the exact time sequence, the total number of days, or whether there was a day between the three tests, but all three tests, it is my belief, were tested within a one-week period, and torn down and shipped, inspected, put together, and shipped.

The third pump was shipped a slight time later, separately from the first two.

Schlappi Tr.S.–843–44.

Moreover, DX–32, which was a monthly progress report on the 100–ton SES waterjet test craft program dated March 30, 1971, stated in relevant part:

> During the past month the two production waterjet pumps were tested and shipped to Tacoma and back-to-back and four-square testing of the transmission gear boxes was completed at Western Gear and these are being readied for shipment to the shipyard. With turbine engines already at Tacoma, the only remaining mechanical system components are the lift-fans and the waterjet inlets. (p. 2 of DX–32)

> The pump-drive gear boxes were received from Sier Bath early in March 1971. The final assembly of the two pumps (for the SES 100A) *was* accomplished and the production checkout tests completed on each unit. Both pumps *were delivered* to the shipyard during

the week of 15 March 1971. (p. 16 of DX–32)

Plaintiff was silent on this issue in its post-trial brief and proposed findings of fact. We find the evidence adduced by defendant to be persuasive that at least two Aerojet waterjet SES 100A pumps were delivered in workable condition dockside in Tacoma, Washington, prior to March 30, 1971.

Moreover, after the Aerojet waterjet SES 100A pumps were delivered dockside in Tacoma, Washington, prior to March 30, 1971. They were subsequently installed into the SES 100A testcraft in late summer or early fall of 1971. The entire pump system became operational and was operative in a SES 100A ship, at least, iin the early part of 1972.

The following colloquy buttresses this finding of fact:

MR. SPEVACK: Do you know how long after the pumps were delivered in March of 1971 that they were installed into the 100A?

MR. STAKEE: Oh, I would guess that the pumps weren't installed until probably October.

 * * * * * *

MR. SPEVACK: All right. Remember—not on a probable basis, but more exact basis—what time of year it was?

MR. STAKEE: Probably in the fall; late summer, early fall.

MR. SPEVACK: Did you ever see these (Aerojet waterjet SES 100A) pumps operate?

MR. STAKEE: Yes, sir.

MR. SPEVACK: Did you ever seem them propel the ship?

MR. STAKEE: Yes, sir.

MR. SPEVACK: Do you have any recollection of when the first time you saw them operate was? And let's just amplify my last question: I'm referring to the SES 100A do you understand that?

MR. STAKEE: Yes.

MR. SPEVACK: Now, my pending question is: Do you recollect when you first

saw the (SES) 100A (ship) propelled by these pumps?

MR. STAKEE: I believe it was in the early part of 1972.

Stakee Tr.S.–1177–1178.

Testimony by Mr. Petersen, who was the Chief of Systems in the SES program office of the Maritime Administration, the Department of Commerce, corroborated this particular time period in the following colloquy:

MR. SPEVACK: Do you know whether those pumps that were delivered as shown in this report in March of 1971 were actually installed into the SES 100A (ship)?

MR. PETERSEN: Yes, they were.

MR. SPEVACK: Did you physically view that installation?

MR. PETERSEN: Parts of it.

Petersen Tr.W.–749–750.

The SES 100A ship was completely assembled and operational, containing two Aerojet waterjet pumps, by the time of the "mission readiness inspection" which took place on August 8, 9, and 10, 1972. The following testimony by Mr. Petersen, the Chief of Systems in the SES program office of the Maritime Administration, of the Department of Commerce, corroborates this fact:

MR. SPEVACK: When you went to this mission readiness inspection, did you recollect whether the SES 100A (ship) was in the water?

MR. PETERSEN: Yes.

MR. SPEVACK: Do you recollect whether it operated under its own power?

MR. PETERSEN: Yes.

MR. SPEVACK: Did it?

MR. PETERSEN: Yes.

Petersen Tr.W.–727.

Testimony by Mr. Stakee also confirmed this fact:

MR. SPEVACK: Did you take part in this mission readiness inspection?

MR. STAKEE: Yes, sir.

MR. SPEVACK: What were your responsibilities during the mission readiness inspection?

MR. STAKEE: Well, first of all, to define the performance that existed on the craft during the builders' trials, which was the first part of this subsistence performance. This was to define how well the fans, *pumps*, engines, gear box, mechanical components function[ed].

MR. SPEVACK: Does your name appear on the program as one of the participants?

MR. STAKEE: Yes, sir.

MR. SPEVACK: Did you actually participate?

MR. STAKEE: Yes, sir.

MR. SPEVACK: Did you have a copy of this document at that time?

MR. STAKEE: Yes, sir.

MR. SPEVACK: Looking at the document, (DX–38) does it assist you at all in recollecting the specific time when the mission readiness inspection was?

MR. STAKEE: Well, the document says it was August 8, 1972.

MR. SPEVACK: Would that aid, do you have a present recollection that it was in August of 1972?

MR. STAKEE: I can't argue with it.

\* \* \* \* \* \*

MR. SPEVACK: Now, you said before that you had seen the (SES 100A) craft operate.

MR. STAKEE: Yes, sir.

MR. SPEVACK: On the (Aerojet waterjet) pumps?

MR. STAKEE: Yes, sir.

MR. SPEVACK: Before or after this date?

MR. STAKEE: Before.

Stakee Tr.S.–1188–91 (emphasis supplied).

The testimonial evidence adduced by Stakee and Petersen, together with the mission readiness inspection agenda report, dated August 8, 9, 10, 1972, DX–38, when viewed as a whole, strongly supports the finding that the Aerojet waterjet SES 100A pumps were completely installed in the SES 100A ship and were indeed operational before the "mission readiness inspection" which took place on August 8, 9, and 10,

1972. The Aerojet waterjet pumps were manufactured for the benefit of the United States, and *a priori*, the United States took title to the Aerojet waterjet SES 100A pumps assembled and integrally and functionally a part of the SES 100A ship prior to August 8, 9, and 10, 1972, and therefore more than six years before the instant suit was filed in the United States Court of Claims on November 21, 1978.

*Public Use: 35 U.S.C. § 102(b)*

Section 102(b) reads in pertinent part, "A person shall be entitled to a patent unless the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...." The '961 patent application was filed on October 13, 1965, and *a priori* the critical date is October 13, 1964, *i.e.*, the waterjets covered by the claims of the '961 patent must not have been in public use in this country prior to October 13, 1964. Defendant asserts that prior to this critical date, October 13, 1964, plaintiff's invention as covered by the claims of the '961 and the '526 patent, were in public use in this country. More specifically, defendant asserts that Aerojet-Sacramento had used two stage, two speed pump designs to suppress cavitation for more than one year before the filing of the patents in suit. Defendant contends that as early as 1951, Aerojet wrote by arguing that the early Aerojet studies in the 1950's were merely technical studies concerned with concepts and that no particular species of waterjets were produced that fully met the limitations and claims of the '961 and the '526 patents.

■ When one scrutinizes the testimonial evidence adduced by defendant in asserting the public use of an invention covered by the claims of the '526 and the '961 patent, it is clear beyond cavil that defendant has not borne its burden. For instance, many of the references cited by defendant in its proposed post-trial findings of fact No. 67, *e.g.*, Banerian Tr.W.–466, 482, 489, and 501, do not even speak of waterjets for waterborne crafts as required by the claims in the '961 and '526 patents, but

rather address themselves to *rocket engines*. The following colloquy substantiates this fact:

MR. SPEVACK: Let's return to defendant's exhibit 29 for a moment. You said just before this long colloquy that you built only the inducers. You actually built hardware for the inducer; correct?

MR. BANERIAN: Yes.

MR. SPEVACK: You're proposing on page two here for a two-state [two-stage], two-speed pump unit. Didn't you build and assemble the entire unit for test purposes?

MR. BANERIAN: If we only—we only built components that we considered needing investigation. Those things which are within engineering standard to assemble. Standards and convention to assemble and put together was not considered an uncertainty. We worked on areas particular in research studies, areas of uncertainty to reduce the risk elements associated with that component. There was no need to built (build) a whole system unless we were building a *rocket engine*, and we did.

We built *rocket engines* that had inducers in them way back then.

Banerian Tr.W.–481–82 (emphasis supplied).

We find, therefore, that the inventions covered by the claims of the '961 and the '526 patents were not in public use more than one year before the filing of the patent in suits, *i.e.*, not earlier than October 13, 1964. We further find that defendant has not borne its burden of proof in regard to its assertion that the claims of the '961 and the '526 patents are invalid because of public use in this country more than one year prior to the date of application for patent in the United States pursuant to 35 U.S.C. § 102(b).

### OBVIOUSNESS: THE '526 PATENT

■ Defendant asserts that the six claims of the '526 patent are obvious in view of the prior art. Defendant's post-trial proposed findings of fact 104. The six

claims of the '526 patent, broken down into separate elements labeled alphabetically, reads as follows:

*Claim 1*

A. A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising

B. A housing having

C. A forward intake portion and

D. A rearward discharge portion for discharging rearwardly of the stern of the craft

E. A first stage axial flow pump in said housing

F. A second stage mixed flow pump in said housing

G. Locating rearwardly of said first stage pump for receiving water therefrom

H. Straightening vanes located rearwardly of each of said first and second stage pumps

Element I means for rotationally driving said pumps and said second stage pump faster than said first stage pump.

*Claim 2*

A unit as defined in claim 1 further characterized in that:

J. Said forward portion is of the diffusing type and

K. Has an inlet and a discharge side, said inlet side being of smaller cross-sectional area than said discharge side

*Claim 3*

The unit as set forth in Claim 1 further characterized in that:

L. Said housing is of substantially cylindrical shape from the inlet side of said first stage pump to the inlet side of said second stage pump, and

N. Then said housing converges rearwardly at its discharge portion.

*Claim 4*

The propulsion unit described in Claim 1 further characterized in that said means for rotationally driving said pumps includes:

O. An engine and gear reduction unit

P. Said pumps being in co-axial alignment and

Q. Driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven.

*Claim 5*

Same as Claim 4 but dependent on Claim 3.

*Claim 6*

A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising

R. A water-conveying housing having

S. A forward intake portion and

T. A rearward, restricted discharge portion for discharging rearwardly of the stern of the craft; said forward intake portion has

U. An inlet side and

V. A discharge side

W. Said inlet side being of smaller cross-sectional area than said discharge side;

X. A first stage, actual flow pump in said housing;

Y. A second stage, mixed pump in said housing and located rearwardly of said first stage pump for receiving water therefrom;

Z. Said housing being substantially cylindrical in shape from the inlet side of first said stage pump to the inlet side of said second stage pump and

AA. The said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump

BB. Then said housing converges rearwardly at its discharge portion;

CC. Straightening vanes located rearwardly of each of said first and second stage pumps; and

DD. Means for rotationally driving said pumps and said second stage pump faster than said first stage pump, said means for rotationally driving said pumps includes:

EE. An engine and gear and reduction unit

FF. Said pumps being in co-axial alignment and driven by a sleeve and a shaft

GG. Said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven. Ct.–100.

Defendant asserts that all the claims of the '526 patent are obvious in view of the prior art, *i.e.*, the subject matter as a whole would have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the the turbomachinery propulsion pump art as related to ships. Insofar as claim 1 of the '526 patent is concerned, defendant asserts that each element of that claim is taught or disclosed in the prior art. In regard to limitation A, "a multi-stage hydraulic jet propulsion unit for waterborne craft comprising", defendant asserts this limitation is taught by *Harris*, a 1863 patent (DX–1); *Stallman*, a 1963 patent, (DX–7); *Brill*, a 1966 patent (DX–8); *Gongwer*, a 1966 patent (DX–9); *Hamilton*, a 1963 patent (DX–18); *Eaton*, a 1964 patent, (DX–22); and *Portici*, a 1961 Italian patent (DX–11). In regard to limitation B and C, "a housing having a forward intake portion", defendant asserts this limitation is taught by: *Harris*, the 1863 patent (DX–1); *Jensen*, the 1924 patent (DX–4); *Stallman*, the 1963 patent (DX–7); *Gongwer*, the 1966 patent (DX–9); *Hamilton*, the 1963 patent (DX–18); *Eaton*, the 1964 patent (DX–22); and *Portici*, the 1961 Italian patent (DX–11). In regard to limitation D, "a rearward discharge portion for discharging rearwardly of the stern of the craft" defendant asserts that this limitation is taught by all the patents listed above for limitations "B" and "C". In regard to limitation E, "a first stage axial flow pump in said housing", defendant asserts this limitation is taught by *Harris* the 1863 patent (DX–1), *Gongwer*, the 1966 patent (DX–9); *Hamilton*, the 1963 patent (DX–18); *Eaton*, the 1964 patent (DX–22); and *Portici*, the 1961 Italian patent (DX–11). In regard to limitations F and G, "a second stage, mixed-flow pump in said housing and located rearwardly of said first stage pump for receiving water therefrom," defendant asserts this limitation is taught by *Stallman*, the 1963 patent (DX–7). In regard to limitation H, "straightening vanes located rearwardly of each of said first and second stage pumps", defendant asserts this limitation is taught by: *Harris*, the 1863 patent (DX–1); *Stallman*, the 1963 patent (DX–7); *Hamilton*, the 1963 patent (DX–18); and *Eaton*, the 1964 patent (DX–22). In regard to limitation I, "means for rotationally driving said pumps and said second stage pump faster than said first stage pump", defendant asserts that this limitation is taught by the 1961 patent, (DX–6); and by *Portici*, the 1961 Italian patent (DX–11).

In "Plaintiff's Response to Defendant's Motion to Compel Answers to Defendant's Interrogatories 75–80", filed November 16, 1979, plaintiff admits that limitation "A", "a multi-stage hydraulic jet propulsion unit for waterborne craft comprising" is taught and disclosed by *Hamilton*, the 1963 patent (DX–18); is also disclosed by *Eaton*, the 1964 patent (DX–22); and is also disclosed by the *Yachting Magazine* the 1959 printed publication (DX–12). Plaintiff further admits that limitation "B" and "C" are disclosed by *Hamilton*, *Eaton*, and the *Yachting Magazine*, herein above mentioned, and that limitation "D", "a rearward discharge portion for discharging rearwardly of the stern of the craft", is also disclosed by the above three references, *i.e.*, *Hamilton*, *Eaton*, and the *Yachting Magazine*. Plaintiff further admits that limitation "E" "a first stage axial flow pump in said housing", is also disclosed in *Hamilton*, *Eaton*, and the *Yachting Magazine*. Plaintiff contends, however, that limitations F and G, "a second stage mixed flow pump located in said housing located rearwardly of said first stage pump for receiving water therefrom" is not disclosed by any prior art references. Insofar as limitation H is concerned, "straightening vanes located rearwardly of each of said first and second stage pumps", plaintiff admits that *Hamilton* and *Eaton* both disclose that "guide vanes follow each pump" and that the *Yachting Magazine* publication teaches that "stators follow each pump". In regard to element "I", "and

means for rotationally driving said pumps and said second stage pump faster than said first stage pump", plaintiff admits that the *Westgard* 1929 patent (DX–5) discloses a two speed drive for a first and second stage pump. Plaintiff argues, however, that the Italian patent does not teach element I, because the Italian patent, using plaintiff's restrictive definition of a water pump (the water must be ejected above the surface of the water line), does not even contain a pump.

We find plaintiff's arguments unpersuasive. Rather, we agree with defendant that limitations F and G, "a second stage mixed-flow pump in said housing located rearwardly of said first stage pump for receiving water therefrom" is taught by *Stallman,* the 1963 patent (DX–7). In column 5, lines 3 through 10, of the *Stallman* patent, the specification teaches "a pure centrifugal pump (radial flow) provides high H with low C. A propeller pump (axial flow) provides low H with high Q. The latter for jet pump use, must be multistaged, to provide sufficient pressure for reasonable boat speed. The present invention employs a mixed-flow propeller which utilizes a combination of the characteristics of centrifugal and propeller-type impellers. Figure 7 shows certain of the aforementioned features applied to an in-board motorboat." Moreover, the *Levy* 1965 printed publication (DX–17), teaches that when one uses a two stage two speed pump to suppress cavitation in a water jet-type pump, the first stage should be of the axial-flow type and the second stage should be of the mixed flow type: "an inducer-pump stage of the *axial flow type,* may be *required* (for suppression of cavitation) in those cases where the *main pump is* of the *mixed flow* ..." See Figure 1. DX–17 at page 16. We find, therefore, that *Levy* (DX–17) alone or in combination with *Stallman* teaches limitation "F" and "G". We find further that straightening vanes located rearwardly of each of said first and second stage pumps are taught by *Hamilton* and *Eaton,* where they are called "guide vanes", and by the 1959 *Yachting Magazine* printed publication which discloses the use of stators following each im-

peller, DX–12, at 71, See Figure 1. Finally, insofar as limitation I is concerned, "means for rotationally driving said pumps and said second stage pump faster than said first stage pump" we find this limitation specifically taught by the *Portici* 1961 Italian patent (DX–11):

> The object of this invention, illustrated in plate I, essentially consists of two screws (impellers) ... with different diameters, dove-tailed [fitted] on two co-axial shafts ... the latter of which is hollow and both of which can revolve at different rmp's (rpm's).

> * * * * * *

> With the smaller diameter (impeller) which however, revolves at a larger rmp, which gives us the further speed increase.

DX–11, p. 3 of 5, lines 2 to 4; lines 12 to 13.

In regard to claim 1 and its limitations A through I, the court finds all the limitations disclosed in the prior art as set forth, and finds that the subject matter as a whole would have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the turbomachinery propulsion pump art as related to ships.

Claim 2 of the '526 patent has two basic limitations, and is dependent upon claim 1. Its first limitation is, for the sake of discussion, labeled "J", and reads "second forward portion is of the diffusing type and", while it's second limitation labeled "K", reads "has an inlet and a discharge side, said inlet side being of smaller cross-sectional area cross-sectional area then said discharge side". Defendant asserts that the use of a diffusing inlet was well known in the prior art at the time the '526 patent was filed and cites the 1966 *Gongwer* patent (DX–9) and the 1962 *Gongwer* printed publication (DX–16) defendant further cites the 1947 *Wislicenus* textbook (DX–30), that assertedly describes the structure and the purpose of a diffusing inlet. Plaintiff countervails that neither limitation "J" nor limitation "K" is disclosed by any prior art.

We again find plaintiff's arguments unpersuasive. In examining the *Gongwer*

1962 printed publication (DX–16), we find specific teaching on diffusion inlets:

> In general, the design of *waterjet scoops* is similar to that for aircraft scoops. Cavitation and free dash surface effects provide a crude analogy with compressibility effects in air ... scoops may be of the straight ram, flush, and vane lattice types as shown in figure two.
>
> \* \* \* \* \* \*
>
> It is usually desirable to have fifty to seventy-five percent external *diffusion* since this type of diffusion is loss free, provided the external burble is not produced. It can be seen that the angle of attack of the diffuser lips can vary widely as the speed ratio changes and therefore the intake should be carefully rounded to suppress, stall, and/or cavitation over as wide a range as possible.

DX–16 at page 450 (emphasis added).

We also note that on page 451 of DX–16, figure 2, shows a ram or leading-edge scoop for a waterjet propulsion craft with a diffused inlet. We find, therefore, that the subject matter as a whole covered by claim 2 of the '526 patent would have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the turbomachinery propulsion art as related to ships.

Claim 3 of the '526 patent is dependent on claim 1 and has two major limitations: Limitation "L" which reads "said housing is of substantially cylindrical shape from the inlet side of said first stage pump to the inlet side of said second stage pump"; and limitation "N" which reads "then said housing converges rearwardly at its discharge portion". Defendant asserts that the prior art discloses a wide variety of housing shapes for two stage pumps. Moreover, defendant contends that selecting a particular shape is merely "routine expedient". Plaintiff avers that these two limitations, limitations "L" and "N" are not disclosed by any of the prior art.

In studying the prior art, we note that both the *Stallman* 1963 patent (DX–7) and the *Portici* 1961 Italian patent (DX–11) disclose one or more of these limitations. More specifically, figure 7 of the *Stallman* patent discloses a housing which is substantially cylindrical in shape from the inlet side of the first stage pump to the inlet side of the second stage pump and also has a housing which converges rearwardly at its discharge portion. In addition, the *Portici* Italian 1961 patent, in its only drawing, discloses a housing that converges rearwardly at its discharge portion. In view of the two above prior art references disclosing limitations "L" and "N" of claim 3, we find that the subject matter as a whole of claim 3 of the '526 patent would have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the turbomachinery propulsion pump art as related to ships.

Claims 4 and 5 of the '526 patent, both have the identical three following limitations: Limitation "O", which reads: "an engine and gear reduction unit; limitation "P", which reads: "said pumps being in co-axial alignment"; and limitation "Q", which reads: "driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven". Claim 4 is dependent upon claim 1, whereas claim 5 is dependent upon claim 3. Defendant asserts that such structural arrangements for driving multi-stage, multi-speed pumps are well known in the prior art from at least *Westgard* (DX–5) and the 1961 Italian patent (DX–11). Plaintiff countervails by arguing that no prior art discloses these three limitations.

■ In reviewing the 1929 *Westgard* patent (DX–5), we make the following findings: (1) it is analogous prior art because it would be reasonable for a mechanical engineer with ordinary skill in the turbomachinery propulsion pump art as related to ships to seek answers from patents that deal with water pumps;[7] 2) that *Westgard*

---

7. In evaluating obviousness, the hypothetical person or ordinary skill in the pertinent art is presumed to have the ability to select and utilize knowledge from other arts reasonably pertinent

teaches pumps or impellers in co-axial alignment; (3) that *Westgard* teaches the use of gear reduction units for driving co-axial shafts at different speeds. Some of the pertinent language of the *Westgard* patent reads as follows:

A further and more specific object of the invention is to provide in a construction of this character, a *multi-stage impeller* organization in which the impellers of the different stages are arranged in series and *are co-axial* and the driving mechanism therefore is disposed at one end of the completing structure.

Within the casing, this shaft is mounted in bearings 27 supported from the walls of the casing and has secured thereto a series of gears 28, 29, and 30 of different sizes. The gear casing is provided with a second set of bearings 31, 32, and 33 receiving respectively solid shaft 34 and hollow shafts 35 and 36. These shafts have secured thereto gears 37, 38, and 39 meshing with the gears 28, 29, and 30. It will be *noted that* these *shafts* will be *driven at different speeds,* the shaft 34 rotating at the highest speed.

DX–5, column 1, lines 15–20, column 2, lines 60–74 (emphasis added).

* * * * * *

In examining the *Portici* Italian patent, we find that it teaches: (1) the use of two pumps in co-axial alignment; (2) that it teaches the use of a sleeve and a shaft and a gear reduction unit; and (3) that it teaches turning the screws or impellers at different rpm's. Portions of the pertinent language from the Italian patent reads as follows:

The object of this invention, illustrated in plate I, essentially consists of two screws (impellers) one and two with different diameters dove-tailed [fitted] on two co-axial shafts four and five, the latters of which is hollow and both of

to the particular problem to which the claimed invention is directed. *Cable Electric Products,*

which can revolve at different rmp's [rpm's].

* * * * * *

The fluid current, on reaching the steamship's poop [stern] which is indicated in a cross section in plate I, penetrates the tube three, envelops the screw one which has a larger diameter revolving with the *hollow shaft,* and is accelerated [by it]; it then envelopes the screw two with a smaller diameter which however revolves at a larger rpm, which gives us the further speed increase.

DX–11 at p. 3 (emphasis added).

The sole drawing in the Italian patent also depicts co-axial shafts and a gear reduction unit as well as an engine. We find that the limitations "O", "P", and "Q" are taught by *Westgard* alone and taught by the Italian patent alone. In view of these findings, we find that the subject matter as a whole, in claim 4 and 5 of the '526 patent, would have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the turbomachinery propulsion pump art as related to ships.

Claim 6 is an independent claim and contains sixteen limitations. For the sake of convenience, these limitations have been labeled "R", "S", "T", "U", "V", "W", "X", "Y", "Z", "AA", "BB", "CC", "DD", "EE", "FF", and "G". *See* Ct.–100. The limitations read as follows: Limitation "R" reads: "a water conveying housing having; limitation "S", reads as follows: "a forward intake portion and"; limitation "T", reads as follows: "a rearward, restricted discharge portion for discharging rearwardly of the stern of the craft; said forward intake portion has"; limitation "U", reads as follows: "an inlet side and"; limitation "V", reads as follows: "a discharge side"; limitation "W", reads as follows: "said inlet side being a smaller cross-sectional area than said discharge side"; limitation "X" reads as follows: "a first stage, axial flow pump in said housing"; limitation "Y", reads as follows: "a second stage, mixed pump in said housing and

*Inc., v. Genmark et. al.,* 770 F.2d 1015, 1025, 226 U.S.P.Q. 881 (Fed.Cir.1985).

located rearwardly of said first said stage pump for receiving water therefrom"; limitation "Z", reads as follows: "said housing being substantially cylindrical in shape from the inlet side of said first stage pump to the inlet side of said second stage pump and"; limitation "AA", reads as follows: "the said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump and"; limitation "BB", reads as follows: "then said housing converges rearwardly at its discharge portion"; limitation "CC", reads as follows: "straightening vanes located rearwardly of each of said first and second stage pumps"; and limitation "DD", reads as follows: "means for rotationally driving said pumps and said second stage pump faster than said first stage pump, said means for rotationally driving said pumps includes"; limitation "EE", reads as follows: "an engine and gear reduction unit"; limitation "FF", reads as follows: "said pumps being in co-axial alignment and driven by a sleeve and a shaft"; and limitation "GG", reads as follows: "said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven." Defendant asserts that claim 6 of the '526 patent is nothing more than a combination of all the elements of claims 1 to 4, and is redundant with claim 5. For those reasons, defendant asserts that claim 6 is obvious. Plaintiff, generally characterizes defendant's arguments as misleading and conclusionary. Plaintiff's Objections to Defendant's Requested Findings of Fact and Conclusions of Law, Finding Number 109.

In examining the limitations in claim 6 and the prior art, we find that each of the limitations in claim 6 is disclosed or taught by a prior art patent or printed publication. Limitation "R" and "S" which reads: "a water-conveying housing having a forward intake portion" is taught by the *Portici* 1961 Italian patent (DX–11), as well as by the *Harris* patent (DX–1), the *Jensen* patent (DX–4), the *Stallman* patent (DX–7), the *Gongwer* patent, (DX–9), the *Hamilton* patent (DX–18), and the *Eaton* patent, (DX–22). Limitation "T" which reads: "a

rearward, restricted discharge portion for discharging rearwardly of the stern of the craft" is again taught by the Italian patent (DX–11), as well as by *Harris, Jensen, Stallman, Gongwer, Hamilton,* and *Eaton,* mentioned herein above for limitations "R" and "S". Limitations "U", "V", which reads as follows: "an inlet side and a discharge side", again is disclosed by the Italian patent (DX–11), as well as by *Harris, Jensen, Stallman, Gongwer, Hamilton,* and *Eaton, supra.* Limitation "W", which reads "said inlet side being of smaller cross-sectional area than said discharge side", is taught by the *Gongwer* patent (DX–9), and particularly by figure 1 therein. Limitation "X", which reads: "a first stage axial flow pump in said housing" is taught by the Italian patent (DX–11), as well as by the *Gongwer* patent (DX–9), the *Harris* patent (DX–1), the *Hamilton* patent (DX–18), and the *Eaton* patent (DX–22). Limitation "Y", which reads: "a second stage mixed flow pump in said housing and located rearwardly of said first stage pump for receiving water therefrom" is taught by the *Stallman* patent (DX–7). See, particularly figure 7 of the *Stallman* patent, and column 5, lines 3 through 10, which discuss a second stage mixed flow pump. Limitation "Z", which reads: "said housing being of substantially cylindrical shape from the inlet side of said first stage pump to the inlet side of said second stage pump" is taught by the *Harris* patent (DX–1), the *Hamilton* patent (DX–18), the *Eaton* patent (DX–22), the Italian patent (DX–11), and the *Stallman* patent (DX–7), figure 7. Limitation "AA" which reads: "and the said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump", is taught by the printed publication entitled *The Design of Water Jet Propulsion Systems for Hydrofoil Craft* by Joseph Levy, (DX–17), particularly figure one. More specifically, the housing surrounding part three, the pump, teaches a housing that diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage

pump. Limitation "BB", which reads: "and then said housing converges rearwardly at its discharge portion" is taught by the Italian patent (DX–11), the *Jensen* patent (DX–4), the *Stallman* patent (DX–7), the *Brill* patent (DX–8), the *Hamilton* patent (DX–18), and the *Eaton* patent (DX–22). Limitation "CC", which reads: "straightening vanes located rearwardly of each of said first and second stage pumps" is specifically taught by the 1959 *Yachting Magazine* printed publication, (DX–12); see particularly figure 1 entitled the *Hamilton-Buehler Jet Unit* is based upon an axial flow pump on page seventy-one of said exhibit, which depicts stator blades following each of its impeller blades to straighten out the flow of water. Moreover, such straightening vanes or stator blades are also taught in the prior art by the *Harris* patent (DX–1), the *Stallman* patent (DX–7), the *Hamilton* patent (DX–18), and the *Eaton* patent (DX–22). Limitation "DD", which reads: "means for rotationally driving said pumps and said second stage pump faster than said first stage pump, said means for rotationally driving said pumps includes" is disclosed by the Italian patent (DX–11), particularly lines twelve to thirteen of page 3 of the English translation which reads: "with the smaller diameter (second stage pump) which ... revolves at a larger rpm, which gives us the further speed increase". Limitation "EE", which reads: "an engine and gear reduction unit" is again taught by the Italian patent (DX–11), particularly the sole figure of that patent, and by lines 5 through 8 of page 3 of the English translation which reads: "the power furnished by the motor 8 is taken from the output shaft of the reducer 7 and is transmitted to the shafts 4 and 5 by the gear torques 6 which have a different transmission ratio precisely in order to give us a different number of rpm's on the two shafts." Limitation "FF" and "GG" which read: "said pumps being in co-axial alignment and driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven", are taught by the Italian patent, particularly figure 1,

and lines 1 through 8 of the English translation on page 3 which reads:

The object of this invention, illustrated in plate I, essentially consists of two screws 1 and 2 with different diameters, dove-tailed [fitted] on two co-axial shafts 4 and 5, the latter of which is hollow and both of which can revolve at different rmp's (rpm's). The power furnished by the motor 8 is taken from the output shaft of the reducer 7 and is transmitted to the shafts 4 and 5 by the gear torques 6 which have a different transmission ratio precisely in order to give us a different number of rpm in the two shafts.

For the aforesaid reasons, *i.e.*, that each and every limitation in claim 6 of the '526 patent is disclosed in the prior art, we find that the subject matter as a whole of claim 6 of the '526 patent would have been obvious at the time the invention was made to a mechanical engineer with ordinary skill in the turbomachinery propulsion pump art as related to ships.

*Obviousness-type Double Patenting*

Defendant asserts that all the claims of the '526 patent are invalid because the inventions claimed therein are nothing more than obvious variations of the inventions claimed in claims 6 to 10 of the '961 patent. Defendant's Requested Findings of Fact and Conclusions of Law Number 129. Defendant avers that claims 1 through 6, the only claims in the '516 patent, claim the same kind of waterjet propulsion unit described in claims 6 through 10 of the '961 patent, but only in a slightly more detailed language. Defendant further contends, that each of the duly added details in the claims of the '526 patent, were known or used to others by persons having ordinary skill in the waterjet propulsion art at the time the application of the '961 patent was filed. For these reasons, defendant urges that the claims of the '526 patent are nothing more than obvious variants of the claims of the '961 patent, and should be invalid for obviousness-type double-patenting. Plaintiff countervails by arguing that the relationship between the claims in the '526 patent (the second-to-expire patent)

and claims 6 through 10 of the '961 patent (the first-to-expire patent) is the same as the relationship between *Vogel's* claim 11 in their application which became their second-to-expire patent and the claims in their previously issued patent. We disagree with plaintiff's analysis.

 *In re Application of Vogel,* 422 F.2d 438, 164 U.S.P.Q. 619 (CCPA 1970) holds, *inter alia,* the following: in determining whether there would be double patenting of the "obvious variation" type so as to determine whether a terminal disclaimer would be required, only that portion of the patent specification supporting the patent claims should be considered; if the same invention is not being claimed twice but some claim in the application defines merely obvious variations of the early invention disclosed in claim in a patent, a terminal disclaimer is required to prevent an undue extension of the first patent. As the court's opinion explained, the cardinal issue in the *Vogel* case, was not the "same invention" double patenting, but rather the "obvious variation" double patenting. *Vogel,* 422 F.2d at 440. The first question in the *Vogel* analysis is: "Is the same invention being claimed twice?" *Id.* at 441. We do not have to address this question since it is not one of defendant's assertions. The second question in the *Vogel* analysis is: "Does any claim in the application define merely an obvious variation of an invention disclosed and claimed in the patent?" *Id.* at 441. We address this second question, since it is defendant's precise contention that claims 1 through 6 of the '526 patent are merely obvious variations of claims 6 through 10 of the '961 patent. Plaintiff erroneously states that the facts of the instant case are the same as the facts of *Vogel.* Plaintiff argues "that the relationship between the claim in Twin Disc's second-to-expire patent (*i.e.,* the '526 patent) and its first-to-expire patent (*i.e.,* the '961 patent) is the same as the relationship between *Vogel's* claim 11 ... and the claims in their previously issued patent." This statement is inaccurate, and plaintiff's argument must fail for the reason stated in the last paragraph of the court's opinion in

*Vogel.* In *Vogel,* the patent contained only claims to a species (pork); while the second filed application contained a generic claim (meat) and a claim to a second species (beef). In the instant case, the first filed/issued patent contains species and *generic claims;* the second filed/issued patent contains only *species claims.* This scenario is the exact opposite of the *Vogel* fact situation. The *Vogel* court found the second species (beef, in claim 11) not obvious in view of the first species (pork), and *a priori* there was no obviousness-type double patenting between these species claims.

 The *Vogel* court did indeed explicate specifically on the instant fact situation when it said: "It is further noted that viewing the inventions in reverse order, *i.e.,* as though the broader claims issued first [meat/pork] does *not* reveal that the narrower (pork) process is in any way unobvious over the broader (meat) invention disclosed and claimed in the instant application" (emphasis added). 422 F.2d at 442–43. Thus, under the first stage impeller/axial flow pump and second stage impeller/mixed flow pump factual situation in the instant case, we clearly have the *Vogel* court example of the meat/pork scenario, where the broader claims were issued first. Moreover, *Gongwer,* DX–16, pp. 448–49, teaches that there are basically three different types of water pumps (impellers in a housing): (1) axial-flow pumps; (2) mixed-flow pumps; and (3) radial or centrifugal flow pumps. Additionally, Levy (DX–17 at p. 16) teaches that the first stage pump should be of the axial-flow type when the second stage pump is of the mixed-flow type, in order to suppress cavitation. In addition, the obviousness-type double patenting rejection is analogous to the rejection under section 103 of the statute, even though the rejection is not made under that section. Consequently, any relevant prior art that could have been used against the earlier patent is applicable to the claims of the newer patent. *In re Braithwaite,* 154 U.S.P.Q. 29 (CCPA 1967). When considering the relevant prior art in combination with the first stage pump/axi-

al flow pump and second stage pump/mixed flow pump relationship addressed in the *Vogel* case, we find that claims 1 through 6 of the '526 patent are not valid on the basis of obvious-type double patenting, as demonstrated by the obvious-type double patenting claims chart set forth below:

OBVIOUS–TYPE DOUBLE PATENTING CLAIMS CHART

| First Patent (Reference) ('961 patent, filed 10/13/65) | Second Patent (Subject) ('526 patent, filed 3/1/67) | Relevant Prior Art | Comments or Explanations |
|---|---|---|---|
| Claim 6 of '961 patent | Claim 1 of '526 patent | | |
| Preamble: A multi-stage, hydraulic jet propulsion unit for waterborne craft | Preamble: A multi-stage, hydraulic jet propulsion unit for waterborne craft | Not necessary | Identical |
| (52) a housing, having | (B) a housing | Not necessary | Identical |
| (53) a forward intake portion for receiving water | (C) a forward intake portion and | Not necessary | Identical |
| (54) a rearward discharge portion for discharging water rearwardly of the stern of the craft | (D) a rearward discharge portion for discharging (sic) rearwardly of the stern of the craft | Not necessary | Identical |
| (55) a first stage impel-ler mounted within said housing for being rotationally driven (Emphasis supplied) | (E) a first stage axial flow pump in said hous-ing (Emphasis supplied) | Levy, DX–17, p. 16, prior art article which was not before PTO, entitled "The Design of Water-Jet Propulsion Systems for Hydrofoil Craft", teaches that the first stage pump (inducer pump) should be axial when the second stage pump (main pump) is mixed flow for suppression of cavitation. | 1st patent-claim element 55 is dominant to second patent-claim element E. There is also a genus-species relationship. See Gongwer, DX–16, pp. 448-49, which teaches that there are basically three different types of pumps (impellers in a housing): axial-flow pumps, mixed-flow pumps, or radial (centrifugal) flow pumps. |
| (56) a second stage impel-ler mounted within said housing (emphasis supplied). | (F) a second stage mix-ed-flow pump in said housing (emphasis supplied). | Levy, DX–17, p. 16, 2nd col., top of page, teaches a mixed-flow pump in the second stage (main) pump, when the first stage (inducer) pump is of the axial flow type in order to suppress cavitation. | 1st patent-claim element 56 is *dominant to the second patent-claim element F. There is also a genus-species relationship.* See Gongwer, DX–16, pp. 448–49, which teaches that there are basically three different types of impeller pumps (impellers in a housing): axial flow pumps, mixed-flow pumps, or radial (centrifugal) flow pumps. |
| (57) located rearwardly of said first stage impel-ler | (G) located rearwardly of said first stage pump for receiving water therefrom | Not necessary | Basically identical, i.e., the second stage pump is to the rear of the first stage pump |
| Claim 7 of first patent | | | |
| A unit as defined in claim 6 including stator blades fixed within said housing and located be- | (H) straightening vanes located rearwardly of each of said first and second stage pumps | Harris, DX–1, p. 2, dis-closes elements EE, which are stator blades, Harris calls | Basically identical, i.e., stator blades immediately following (to the rear) of each pump or impel-ler in a housing. |

## OBVIOUS–TYPE DOUBLE PATENTING CLAIMS CHART

| First Patent (Reference) ('961 patent' filed 10/13/65) | Second Patent (Subject) ('526 patent, filed 3/1/67 | Relevant Prior Art | Comments or Explanations |
|---|---|---|---|
| tween said impellers, and other stator blades located rearwardly of said second stage impeller for straightening out the flow of water | | them "stationary ribs". DX–7, Stallman, col. 5, ln. 23, teaches stator blades, elements 60 and 61, called "guide vanes". See also elements 60 and 61 in Fig. 7. DX–18, Hamilton, teaches stator blades, element 14, called "stationary guide vanes". See col. 3, lines 21 and 22. | |
| Claim 6, Element 61 | | | |
| means for rotationally driving said second stage impeller faster than said first stage impeller | (I) means for rotationally driving said pumps and second stage pump faster than said first stage pump | Not necessary, but taught by Italian patent DX–11; Corbett, DX–6; Westgard, DX–5. | Identical |
| A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising a housing having | A multi-stage, hydraulic jet propulsion unit for waterborne craft comprising (R) a water-conveying housing having | | Identical: prior art not necessary. |
| Claim 6, Element 53 a forward intake portion for receiving water | (S) a forward intake portion | | Identical: prior art not necessary. |
| Claim 6, Element 54 a rearward discharge portion for discharging water rearwardly of the stern of the craft | (T) a rearward discharge portion for discharging rearwardly of the stern of the craft; | | Identical: prior art not necessary. |
| Claim 8, Element 62 said housing has an inlet in the bottom of said craft. | (U) said forward intake portion has an inlet side and | | Identical: prior art not necessary. |
| Claim 8, Elements 62, 63—said housing has an inlet in the bottom of said craft, and also a rearwardly inclined forward portion extending from said inlet. | (V) a discharge side (still at the front of the waterjet, i.e., not the stern) | It is inherent in a forward intake portion of any waterjet that it have an inlet side and a discharge side. See, e.g., Stallman, DX–7, fig. 7, discharge area near element 57. In the '526 patent, the discharge side area is labeled "W". | Substantially identical: prior art not necessary. |
| Claim 8, Elements 62, 63—said housing has an inlet in the bottom of said craft, and also a rearwardly and upwardly inclined forward portion extending from said inlet | (W) said inlet side being of smaller cross-sectional area than said discharge side (of forward intake portion) | DX–30, "Fluid Mechanics of Turbomachinery" article, page 409, teaches the prior art principle of "diffusion inlets". See particularly Fig. 166, and explanatory paragraph | Element (W) of the '526 patent reads on a "diffusion inlet" in a waterjet. |

OBVIOUS–TYPE DOUBLE PATENTING CLAIMS CHART

| First Patent (Reference) ('961 patent, filed 10/13/65) | Second Patent (Subject) ('526 patent, filed 3/1/67) | Relevant Prior Art | Comments or Explanations |
|---|---|---|---|
| Claim 6, Element 55 a first stage impeller mounted within said housing for being rotationally driven | (X) a first stage, axial flow pump in said housing | Levy, DX–17, p. 16, prior art article which was not before the PTO, entitled "The Design of Water-Jet Propulsion Systems for Hydrofoil Craft", teaches that the first stage pump (inducer pump) should be axial when the second stage pump (main pump) is mixed-flow for suppression of cavitation. | 1st patent-claim element 55 is dominant to 2nd patent-claim element X. There is also a genus-species relationship. See Gongwer, DX–16, pp. 448–49, which teaches that there are basically three different types of impeller pumps (impellers in a housing); axial flow pumps, mixed-flow pumps, or radical (centrifugal) flow pumps. |
| Claim 6, Elements 56, 57—a second stage impeller mounted within said housing located first stage impeller | (Y) a second stage, pump in said housing and located rearwardly of said first-receiving water therefrom; | Levy, DX–17, p. 16, 2nd col., top of page, teaches a mixed-flow pump in (main) pump, when the first stage (inducer) pump is of the axial flow type in order to suppress cavitation | 1st patent-claim element 56 is dominant to the 2nd patent-claim element Y. There is also a genus-rearwardly Gongwer, DX–16, pp. 448–49, which teaches that there are basically three different types of impeller pumps (impellers in a housing): axial flow pumps, mixed-flow pumps, or radical (centrifugal) flow pumps. |
| Claim 6, Element 59 said housing closely surrounding said impellers in complementary relationship therewith | (Z) said housing being substantially cylindrical in shape from the inlet side of said first stage pump to the inlet side of said second stage pump, and | Not necessary; substantially identical: such housing shape, however, is taught by Stallman, DX–7. | See PX–52, outside housing area from "W" to "Y" corresponds to the area described. Also, it is inherent in pump designs that the outer housing match the contours of the outer tips of the impeller blades (tip radius). |
| Claim 6, Element 59 said housing closely surrounding said impellers in complementary relationship therewith | (AA) the said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump (which is before the beginning of the 2nd stage stator blades) | Not necessary; substantially identical; such housing shape, however, is taught by Stallman, DX–7. See PX–52–A, outer housing area from "Y" to "17" for area described in element (AA). See also PX–66, where discharge of 2nd stage impeller (purple) would occur prior to 2nd stage stators (green). | The cited art shows that the outer housing of an axial pump or axial inducer is substantially cylindrical (e.g., Gongwer, DX–9, DX–16). The outer housing of a mixed-flow pump diverges and then converges in the area of its stator blades which immediately follows the 2nd stage impeller blades. See Stallman, DX–7 |
| Claim 10, Element 64 a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle, and | (BB) then said housing converges rearwardly at its discharge portion | Not necessary; substantially identical. But see Stallman, DX–7, Eaton, DX–22, Hamilton, DX–18, all of which disclose this housing shape. | Almost all prior art propulsion pumps narrow to a nozzle, except for Gongwer, DX–9. Gongwer's invention is a special nozzle shaped like a shower head. |

OBVIOUS–TYPE DOUBLE PATENTING CLAIMS CHART

| First Patent (Reference) ('961 patent, filed 10/13/65) | Second Patent (Subject) ('526 patent, filed 3/1/67) | Relevant Prior Art | Comments or Explanations |
|---|---|---|---|
| Claim 7—a unit as defined in claim 6 including stator blades fixed within said housing and located between said impellers, and other stator blades located rearwardly of said second stage impeller for straightening out the flow of water | (CC) straightening vanes located rearwardly of each of said first and second stage pumps, and | Not necessary; basically identical; i.e., stator blades immediately following (to the rear) of each pump or impeller | Harris, DX–1, p. 2, discloses elements EE, which are stator blades, Harris calls them "stationary ribs". Stallman, DX–7, col. 5, ln. 23, teaches stator blades, elements 60 and 61, called "guide vanes". See also elements 60 and 61 in Fig. 7. |
| Claim 6, Element 61 means for rotationally driving said second stage impeller faster than said first stage impeller | (DD) means for rotationally driving said pumps and said second stage pump faster than said first stage pump, said means for rotationally driving said pumps includes, | Not necessary, but taught by Italian patent DX–11; Corbett, DX–6; Westgard, DX–5. | Identical. |
| Claim 10, Element 65 said means for driving said impellers includes an engine and gear reduction unit. | (EE) and engine and gear reduction unit | This is an engineering problem which has been solved in the prior art. The details are described in Westgard, DX–5. | Identical |
| Claim 6, Element 58 in co-axial (sic) therewith | (FF) said pumps being in co-axial alignment and | | Identical |
| Claim 10, Element 65 means for driving said impellers . . . | driven by a sleeve and a shaft. | Prior art Westgard, DX–5 and Italian patent DX–11 both illustrate sleeve and shaft drive means | |
| Claim 10, Element 65 said means for driving said impellers includes an engine and gear reduction unit | (GG) said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven. Claim 4—The propulsion unit described in claim 1 further characterized in that | | Identical |
| Claim 10, Element 65 Said means for driving said impellers includes (sic) an engine and gear reduction unit | said means for rotationally driving said pumps includes (O) an engine and gear reduction unit | This is an engineering problem which has often been solved in the prior art. The details are described in Westgard and DX–5. | Identical: prior art not necessary. |
| Claim 6, Element 58 in co-axial (sic) therewith | (P) said pumps being in co-axial alignment | Reads on Italian patent DX–11, e.g., Acosta, Claim 1, DX–14, also teaches co-axial alignment: see p. 534, 1st sentence, last paragraph. | Identical: prior art not necessary. |
| Claim 11, Element 65 said means for driving | (Q) driven by a sleeve and a shaft, said sleeve | Prior art, Westgard, DX–5 and Italian patent DX– | |

OBVIOUS–TYPE DOUBLE PATENTING CLAIMS CHART

| First Patent (Reference) ('961 patent, filed 10/13/65) | Second Patent (Subject) ('526 patent, filed 3/1/67) | Relevant Prior Art | Comments or Explanations |
|---|---|---|---|
| said impellers includes an engine and gear reduction unit | and shaft each being connected to said gear reduction unit for being rotationally driven | 11 both illustrate sleeve and shaft drive means | |
| Claim 10, Element 65 said means for driving said impellers includes an engine and gear reduction unit | Claim 5—The propulsion unit described in claim 3 further characterized in that said means for rotationally driving said pumps includes an engine and gear reduction unit | This is an engineering problem which has often been solved in the prior art, e.g., see Westgard, DX–5, details. | Identical: prior art not necessary. |
| Claim 6, Element 58 in co-axial (sic) therewith | said pumps being in co-axial alignment | | Identical: prior art not necessary. |
| Claim 10, Element 65 means for driving said impellers . . . | driven by a sleeve and a shaft | Prior art Westgard DX–5 and Italian patent DX–11 both illustrate sleeve and shaft drive means | |
| Claim 10, Element 65 said means for driving said impellers includes an engine and gear reduction unit | said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven. | | Identical: prior art not necessary. |
| Claim 6, Element 53 A forward intake portion for receiving water (emphasis supplied) | Claim 2—a unit as defined in claim 1 further characterized in that (sic) (J) said forward (sic) portion is of the diffusing type (emphasis supplied) | DX–30, "Fluid Mechanics of Turbomachinery" article, p. 409, teaches that "for water (ship propulsion), the axial diffuser arrangement shown in Fig. 166 can be used effectively to avoid cavitation. | DX–30, the article by Wislicenus, provides great detail regarding the advantages of an axial diffuser inlet arrangement. |
| Claim 8, Element 62 said housing has an inlet in the bottom of said craft, | (K) has an inlet and a discharge side, said inlet side being of smaller cross-sectional area than said discharge side. See also DX–16, "Water-Jet Propulsion for Surface Craft", prior art article, not before PTO, page 450, which teaches "waterjet scoop" inlets and the desirability of 50–75% diffusion. See also picture on top of p. 45 displaying a diffusing "Ram or Leading-Edge Scoop" | See DX–30, explanation, supra, regarding the well-known prior art principle of diffusion inlets. | By definition, it is inherent that a pump have an inlet and an outlet. Prior art teaches the desirability of a diffusing type inlet. |
| Claim 6, Element 59 said housing closely surrounding said impellers in complementary relationship therewith | Claim 3—The unit as set forth in claim 1 further characterized in that (L) said housing is of substantially cylindrical shape from the inlet side | See Stallman, DX–7, particularly Fig. 7, which shows a "substantially cylindrical shape" housing enclosing a 1st stage impeller, a 2nd stage im- | Basically identical because it is inherent in a pump design, to eliminate unnecessary weight, that the housing matches the contour of the outer tips of the impel- |

## OBVIOUS–TYPE DOUBLE PATENTING CLAIMS CHART

| First Patent (Reference) ('961 patent, filed 10/13/65) | Second Patent (Subject) ('526 patent, filed 3/1/67) | Relevant Prior Art | Comments or Explanations |
|---|---|---|---|
| | of said first stage pump to the inlet side of said second stage pump, and the | peller, and respective stator blades | ler blades (tip radius). |
| Claim 6, Element 59 said housing closely surrounding said impellers in complementary relationship therewith | (M) said housing then diverges rearwardly from the inlet side of said second stage pump to the discharge side of said second stage pump, and | See Stallman, DX–7 | Stallman discloses a water jet housing that diverges rearwardly from the inlet side of said second stage pump. Compare its similarity with outside housing of '526 patent drawing, Fig. 1, at area of impeller 12. See also PX–52A from outside-housing area "Y" to "Z" for similar-shaped housing |
| Claim 10, Element 64 a nozzle connected to said discharge portion whereby said housing discharges water into said nozzle. | (N) then said housing converges rearwardly at its discharge portion | See Stallman, DX–7, Fig. 7, which discloses an identically-shaped housing in a water jet. See particularly the outside housing on the area of element 61. See also Hamilton, DX–18. | All prior art propulsion pumps narrow to a nozzle except Gongwer, DX–9. |

---

## INFRINGEMENT OF THE CLAIMS OF THE '961 PATENT

The law of infringement requires that the claim or claims asserted be compared with and read on the devices or processes accused of infringement. *Graver Tank and Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 U.S.P.Q. 328, *reh. denied*, 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed. 620 (1950); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 221 U.S.P.Q. 649 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984); *Astra-Sjuco A.B. v. International Trade Commission*, 629 F.2d 682, 207 U.S.P.Q. 1 (CCPA 1980). There are two steps in determining patent infringement: (1) the subject matter of the claim or claims must be determined from a study of all relevant patent documents; and (2) the claims must be applied to the accused structures. *Caterpillar Tractor Co. v. Berco, S.P.A.* 714 F.2d 1110, 219 U.S.P.Q. 185 (Fed.Cir.1983); *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 401, 155 U.S.P.Q. 697, 705 (1967). Moreover, resort to the prosecution history as well as the specification disclosure, is always appropriate in construing the scope of the claims at issue, regardless of whether the claims were amended during prosecution. Furthermore, while an estoppel may be applied only as result of amendments or arguments directed at establishing patentability over the prior art, the entire prosecution history may be used to determine construction of the claim language. *McGill, Inc. v. John Zink, Co.*, 736 F.2d 666, 221 U.S.P.Q. 944 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *SSIH Equipment, S.A. v. International Trade*

*Commission,* 718 F.2d 365, 218 U.S.P.Q. 678 (Fed.Cir.1983); *Fromson v. Advanced Offset Plate, Inc.,* 720 F.2d 1565, 219 U.S.P.Q. 1137 (Fed.Cir.1983). In addition, infringement is not to be determined by a comparison between parts of the description of a patent and the accused device, nor by comparison between the accused and a patented devide, *Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 221 U.S.P.Q. 649 (Fed.Cir.), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984); *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 221 U.S.P.Q. 929 (Fed. Cir.1984); *McGill, Inc. v. John Zink, Co.,* 736 F.2d 666, 221 U.S.P.Q. 944 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); and claims should be construed, if at all possible, to sustain their validity. *ACS Hospital Systems, Inc. v. Montefiore Hospital, supra; Carman Industries, Inc., v. Wahl,* 724 F.2d 932, 937 n. 5, 220 U.S.P.Q. 481, 485 n. 5 (Fed.Cir. 1983); *Klein v. Russell,* 19 Wall. 433, 466, 86 U.S. 433, 466, 22 L.Ed. 116 (1874).

Before we determine the infringement *vel non* of the claims of the '526 and '961 patent, we must address the fact that different terms are used in each of these patents to describe the same elements. The claims of the '961 patent use the term impeller to name the principal rotating element in a housing while the claims of the '526 patent uses the term pump to name the same element. For the purposes of the court's discussion, the term pump is used to describe a unit which comprises a housing containing a rotating element known as an impeller which imparts energy to liquid, which housing could also contain a series of impellers, stators, and co-axial shafts. PX–3; PX–5; Carmichael Tr.W.– 910; Stakee Tr.S.–1275–76. Moreover, in a device with multiple rotating elements, each rotating element and its attendant parts is a separate pump and is known as a stage. Carmichael Tr.W.–911. In addition, the limits of a stage are from the beginning of the rotor to the end of the stators or the transition point of the fluid stream before it enters any following stages. Carmichael Tr.W.–911. While the entire device has been loosely called a pump, the entire device should be referred to as a propulsion pump to distinguish it from pumps which make up the individual stages. We therefore find that the term "pump" is used in the '526 with the same meaning as the term "impeller" as used in the '961 patent. PX–3; PX–5.

Defendant asserts that the claims of the '961 patent are not infringed by either of the accused devices, *i.e.,* the SES 100A water jet pump, or the PHM water jet pump. Insofar as claim 6 of the '961 patent is concerned, the broadest claim of the '961 patent, defendant asserts it claims in essence a two stage, two speed pump, limited only by the requirements that the two impellers are placed in the same housing and that the second impeller turns faster than the first. Defendant further avers that there is no limitation on the size of the impellers, their direction of rotation, their type (axial, mixed flow, radial), rates of rotation, types of inlets, nozzles, or the like. Defendant contends that claim 6 is so broad that it encompasses the general concept of a two stage, two speed pump. Defendant maintains that the specification of the '961 patent also does not specify or describe what is meant by the term "impeller". Defendant explicates that the drawing of the '961 patent merely displays a specific arrangement of two unusually-shaped axial-type impellers with a nontraditional decreasing tip radius and a traditional constant hub radius. Finally, defendant contends, that if the term "impeller" is not limited to what is shown in the drawing in the '961 patent, then the term must encompass all impellers or combinations of impellers known in the prior art at the time the application was filed, including those shown in *Acosta* (DX–14), *Gongwer* (DX–9 and DX–16), *Levy* (DX–17), and *Brill* (DX–8). Defendant further asserts, that such a broad reading of the term "impeller" in claims 6 through 10 of the '961 patent, would invalidate those claims since the

term "impeller" would read on those impellers in *Acosta, Gongwer, Levy,* and *Brill,* herein mentioned above. On the other hand, defendant asserts that if the term "impeller" as used in claims 1 through 10 of the '961 patent, is limited to the unique structure shown in the '961 drawing, then claims 1 through 10 of the '961 patent are not infringed by the accused aerojet pumps.

Insofar as the limitation that "[t]he flow rate of the water through the first stage impeller being the same as that through the second state impeller ..." which is found in claims 1 through 10 of the '961 patent, is concerned, defendant maintains that this phrase is a truism in any turbomachine with pumps in a series operating on a noncompressible fluid such as water, unless the water is removed from a take off valve. In this regard, defendant avers that the flow rate of water through the first and second stage impellers of the SES 100A waterjet pump are different because water is being removed by a cooling water take-off value located between the two stages, *i.e.,* the first stage pump is used for other functions in addition to propelling the ship. Therefore, defendant argues that, the same amount of water does not leave the second stage impeller as entered the first stage impeller as required by the above-stated limitation, and there is no literal infringement of any of the 10 claims of the '961 patent by the accused SES 100A waterjet pumps. Plaintiff countervails by arguing that testimony by Mr. Aschauer, the inventor, demonstrated that for all practical purposes, the flow rate would be the same even if a small quantity was removed between the first stage impeller and the second stage impeller. We agree with plaintiff.

While defendant's expert, Mr. Schlappi, stated that, with respect to the SES 100A waterjet propulsor, all the water that went through the first stage did not go through the second stage; on cross, Mr. Schlappi could not remember how much water could be pulled from the tap. He stated that it could have been 125 gallons per minute or 150 gallons per minute, and perhaps even 250 gallons per minute. Schlappi Tr.S.–289–90. He recalled, however, that the amount of water passing through the SES 100A water propulsor during the operation was 16,500 gallons per minute, and that 125 gallons per minute is *less than 1 percent* of the 16,500 per minute figure. Schlappi Tr.S.–991–992. The inventor, Mr. Aschauer, also testified that the flow rate through the accused waterjets was the same in both stages. He stated, that for all practical purposes, the flow rate would be the same even if a small quantity was removed, *e.g.,* through a gasket. Aschauer, Tr.W.–80. We therefore find that, insofar as the limitation "the flow rate of the water through the first stage impeller being the same as that through the second stage impeller" we find that that limitation, which is one of the limitations in each of the 10 claims of the '961 patent, reads on the water jet propulsors used in the SES 100A surface effect ship and used in the class of hydrofoil vessels known as the PHM.

*Flush with the Bottom of the Waterborne Craft*

Claims 3, 4, and 5 of the '961 patent include the limitation that the waterjet housing has an inlet flush with the bottom of the waterborne craft for receiving water. Defendant asserts that this limitation is not met by the water jet propulsors used in the SES 100A surface effect ship or used in the class of hydrofoil vessels known as the PHM. Testimony from Dr. Cuthbert, Defendant's expert, whom the court accepted as an expert in navy architecture, adduced that in a hydrofoil vessel, the term "bottom of the boat" means the bottom of the hull of the vessel. Pursuant to this reasoning, defendant maintains that because the hull of a hydrofoil is lifted clear of the water when the vessel is foilborne, *i.e.,* supported on its foils, and since the vessel must draw water into the propulsor

through its foil when the vessel is foil-borne, the inlet for drawing water is not in the bottom of the vessel. Moreover, defendant contends that since the inlet in the foil is usually located in the front pod located at the lower end of the foil strut, that the inlet wasn't flush with the bottom of the vessel. Plaintiff countervails by arguing that because the foil is, during foilborne operation, the lowest portion of the craft in the water, the inlet in the foil is actually flush with the bottom of the craft, *i.e.*, the bottom of the craft in the foilborne mode is indeed the lowest part of the foil. Moreover, plaintiff maintains that the PHM vessel has auxiliary inlets in the hull of the vessel which are exposed to the water when the foils are up or retracted. These inlets, plaintiff avers, permit emergency operation of the vessel when hullborne by using the foilborne propulsors, which are normally used when the craft is foilborne rather than the much smaller hullborne propulsors. Finally, plaintiff asserts that Mr. Aschauer, the inventor, admitted that even when the hull of a hydrofoil lifts out of the sea when the vessel is traveling in the foilborne mode, he still considered the foils to be, in the context of the patent, the bottom of the vessel. We agree with plaintiff.

In examining the testimony of the inventor, Mr. Aschauer, we observe that at least twice he testified that in the flying or foilborne mode, the foils become the bottom of the craft. Portions of his pertinent testimony are as follows:

MR. SPEVACK: Now, your testimony is that only in those circumstances when the ship is flying [foilborne mode] when it's up on its wings, foils, at that point the foils become the bottom of the craft?

MR. ASCHAUER: In the flying mode, the *foils become the bottom of the craft,* there supporting the craft.

\* \* \* \* \* \*

MR. SPEVACK: Now, depending on where the ship is, whether it's foilborne or hullborne, is it your testimony that the bottom of the water craft charges?

MR. ASCHAUER: Yes ... I am saying the bottom of the water craft is the foils when it's flying [foilborne mode] in the water.

Aschauer Tr.W.–188; 199 (Emphasis added).

Dr. Cuthbert, during cross-examination, also admitted that whatever portion of the ship is in the sea is the lower most portion of the craft, *i.e.*, the bottom of the boat. The following colloquy between Mr. Miller and Dr. Cuthbert is elucidating on this point:

MR. MILLER: So when the hull is out of the water and the strut is the only thing left in the water, it would be logical to get the water out of the sea up into the waterjet through the struts, right?

DR. CUTHBERT: Through whatever it is you have yet dipped into the sea, yes.

\* \* \* \* \* \*

MR. MILLER: Why, because that is the lower most portion of the craft that is in the water. Correct?

DR. CUTHBERT: Correct.

MR. MILLER: There is no other part of the craft that is lower, is there?

DR. CUTHBERT: Lower than the struts?

MR. MILLER: Lower than the struts.

DR. CUTHBERT: Well, the pod.

MR. MILLER: The pod is an integral part of the strut.

DR. CUTHBERT: if we establish that convention, very well.

MR. MILLER: Fine.

\* \* \* \* \* \*

DR. CUTHBERT: Yes, it means to me exactly what it says, and at the risk of repeating—or pretending to answer the question by repeating it, it means that

the PHM as auxiliary inlets that are exposed when the main foils are retracted.

MR. MILLER: Now where are those inlets? Where would they have to be? In the hull, correct?

DR. CUTHBERT: I can reason that. I don't know it other than—

MR. MILLER: I am asking you as a Navy architect. Where would it be logical to place those inlets?

DR. CUTHBERT: They would have to be, I should think, in the hull.

Cuthbert Tr.W.–1712; 1718–19.

Pursuant to the testimony of defendant's expert, Dr. Cuthbert, as well as the testimony of the inventor, Mr. Aschauer, we find that the limitation "inlet flush with the bottom of said craft" is met by the waterjet propulsors used in the SES 100A surface effect ship and the propulsors used by the class of hydrofoil vessels known as the PHM.

### The Rearwardly Converging Portion Containing Both the First and Second Stage Impellers

Claims 1 through 5 of the '961 patent all contain the limitation "said housing having a rearwardly converging portion, a first stage impeller mounted within said converging portion . . . a second stage impeller mounted within said converging portion". DX–97, p. 6. This limitation, contained in claims 1 through 5 of the '961 patent, therefore requires that both the first and second stage impellers be located in the converging portion of the housing. Intrinsic in this limitation is, of course, that the second stage impeller will be of smaller diameter than the first stage impeller. The housing is also required to be one that closely surrounds the impellers in a "complementary converging relationship". Defendant asserts that the accused pumps do not meet this limitation in that they do not have a *continuous* converging housing. More specifically, defendant maintains that

the housing of the accused pumps is a complex curvaceous structure which more closely resembles the propulsion pump illustrated in figure 7 of the *Stallman* patent than in the '961 or '526 patents. Defendant maintains that the first stage inducer of the accused propulsion pumps is located in a cylindrical housing as opposed to a converging housing. Defendant explicates that the two housings of the impellers in the accused pump do not meet smoothly but are joined by a constriction or neck portion which serves a particular necessary function of accelerating the flow into the following stage. Moreover, defendant contends that the second stage impeller is not located in a converging portion of the housing, but in the diverging portion of a spherical housing. Defendant asserts that the diameter of the second stage impeller of the accused pumps is smaller than its outlet diameter and that the second stage impeller of the accused propulsion pumps resembles the impeller illustrated in figure 3 of the *Stallman* patent. Defendant concludes that the impellers in the accused pumps are not located in a converging housing, nor is the housing of the accused pumps converging as the term is used in the '961 patent. Therefore, defendant urges the accused pumps do not infringe claims 1 to 5 of the '961 patent, since they do not meet this particular limitation. Plaintiff countervails by arguing that the inventor, Mr. Aschauer, demonstrated, in PX–52A, that the diameter of the first stage impeller is larger than the diameter of the second stage impeller and therefore meets the above-stated limitation. We find plaintiff's arguments unpersuasive.

In examining plaintiff's exhibit 52A, and in particular element 11, the second stage impeller, it is readily observed that the second stage impeller is mounted within that section of the housing which diverges rather than converges. Moreover, if one measures the diameter of the housing on PX–52A at position "Y" (the inlet side of the second stage pump) one can see that it is substantially smaller than the diameter

of the housing at position "Z" (the outlet side of the second stage pump). Therefore, we find that the second stage impeller in the accused device, the foilborne propulsor water jet, is not mounted within a converging portion of its housing, and therefore does not infringe this particular limitation found in claims 1 through 5 of the '961 patent. Thus we are in agreement with Dr. Carmichael's testimony, to wit:

> MR. SPEVACK: One last question before we leave plaintiff's exhibit 52 on that. Do you consider the housing as shown in plaintiff's exhibit 52 or as illustrated in defendant's exhibit 61 to be a converging housing?

> DR. CARMICHAEL: It is not continuously converging. Parts of it are converging, but it is not continuously converging, so to me, it is not a converging housing.

## DOCTRINE OF EQUIVALENTS

Since this court has not found the accused waterjet propulsors used in the SES 100A surface effect ships and the class of hydrofoil vessels known as the PHM to meet the herein above discussed limitation, it must address the issue of infringement *vel non* pursuant to the doctrine of equivalents.

The genesis of the doctrine of equivalents, of course, was the historic 1854 case of *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1854), where the Supreme Court first expanded the literal wording of a claim to capture an infringer. This was followed by a series of Supreme Court cases, ending with the much-quoted 1950 case, *Graver Tank and Manufacturing Co., v. Linde Air Products Co.,* 339 U.S. 605, 607–08, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 330–31 (1950), wherein the Supreme Court stated:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If the accused matter falls clearly within the

claim, infringement is made out and that is the end of it.

Thus, the theory on which this doctrine is founded is that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same even though they differ in name, form, or shape. *Machine Co. v. Murphy,* 97 U.S. (7 Otto) 120, 125, 24 L.Ed. 935 (1877).

Once a determination is made that the doctrine of equivalents is applicable, as this court has done, we must look to the prosecution history to determine limitations, if any, on its applicability, while at the same time assuming that the proposed construction of claims is not inconsistent with the patentable scope to be accorded the claim in light of the prior art. *Carman Industries, Inc., v. Wahl,* 724 F.2d 932, 220 U.S.P.Q. 481 (Fed.Cir.1983). In searching the prosecution history, we find no impediment for using the doctrine of equivalents, *i.e.,* we find no prosecution history estoppel which would establish a limitation of the doctrine of equivalents. We further find that the housing of the foilborne propulsor waterjet as depicted in PX–52A, and PX–52, has a substantially continuous converging housing and that it performs "substantially the same function in substantially the same way to obtain the same result" as patentee's limitation "rearwardly converging housing", as set forth in claims 1 through 5 of the '961 patent. We therefore find, pursuant to the doctrine of equivalents, that the waterjet propulsors used in the SES 100A surface effect ship and the class of hydrofoil vessels known as the PHM, infringe this particular limitation as contained in claims 1 through 5 of the '961 patent.

In summary, we find that the waterjet propulsors used in the SES 100A surface effect ship and used in the class of hydrofoil vessels known as the PHM infringe: (1) the limitation "the flow rate of the water through the first stage impeller being the same as that through the second stage impeller" found in all ten of the

claims of the '961 patent; (2) the limitation which reads "a housing having an inlet flush with the bottom of said craft, for receiving water" as found in claims 3, 4, 5, and 8, of the '961 patent; and (3) the limitation which reads "said housing having a rearwardly converging portion, a first-stage impeller mounted within said converging portion for being rotationally driven, a second stage impeller mounted within said converging portion" as found in claims 1 through 5 of the '961 patent. Since defendant did not assert the noninfringement of any other limitations of claims 1 through 10 of the '961 patent in either its post-trial brief or post-trial proposed findings of fact, we find that those particular defenses are waived by defendant, and therefore find claims 1 through 10 of the '961 patent infringed by the waterjet propulsors used in the SES 100A surface effect ship and used in the class of hydrofoil vessels known as the PHM. *See Bendix Corp. v. United States*, 600 F.2d 1364, 220 Ct.Cl. 507 (Ct.Cl.1975).

## INFRINGEMENT OF THE CLAIMS OF THE '526 PATENT

The claims of the '526 patent comprise claims 1 through 6, and generally claim the same subject matter as claims 6 through 10 of the '961 patent, but with more specificity. Claim 1 of the '526 patent defines the first stage impeller of claim 6 of the '961 patent as an axial-flow pump, and the second stage impeller of claim 6 of the '961 patent, as a mixed flow pump. Claim 2 is dependent upon claim 1 of the '526 patent, and adds the further limitations previously labeled "J" and "K". Limitation "J" reads as follows: "said forward portion is of the diffusing type and, limitation "K" reads as follows: "has an inlet and a discharge side, said inlet side being of smaller cross-sectional area than said discharge side. Claim 3 is dependent also upon claim I and has two limitations, earlier designated as "L" and "N". Limitation "L" reads: "said housing is of substantially cylindrical shape from the inlet side of said first stage pump to the inlet side of said second pump, and limitation "N" reads: "then said housing

converges rearwardly at its discharge portion". Claim 4 is also dependent upon claim 1 and adds previously mentioned limitations "O", "P", and "Q". Limitation "O" reads: "an engine and gear reduction unit; limitation "P" reads: "said pumps being in co-axial alignment; and limitation "Q" reads: "driven by a sleeve and a shaft, said sleeve and shaft each being connected to said gear reduction unit for being rotationally driven. Claim 5 is the same as claim 4 but is dependent upon claim 3. Claim 6 is an independent claim which combines all the limitations of the previously five claims in the '526 patent.

Defendant asserts *inter alia,* that the first stage of the accused water jet propulsors used in the SES 100A surface effect ship and the class of hydrofoil vessels known as the PHM, is not an "axial flow pump" but is an inducer. Defendant contends that an inducer is a specific type of impeller with its own geometry, parameters and design techniques. Defendant maintains further, that an inducer impeller (inducer) is also known as an "axial inducer", but the phrase does not denote a similarity to an axial flow pump. Defendant explicates that an inducer is a device which was originally designed as early as the 1940's for use in the fuel pumps used on German rockets. Defendant asserts that this is a very unusual design for an impeller, since it has a very low blade angle and the blades are very long and overlap as they wrap in many turns around the hub from the inlet to the outlet which gives an inducer the appearance of a wood screw. More specifically, defendant contends the specific speed of the accused inducer is about 4,300 rpm which corresponds to a mixed flow pump by the correlation shown in the specific speed chart in DX-17. Thus, defendant explains, the accused inducer has many aspects of a mixed-flow pump as opposed to a axial flow pump. Defendant therefore concludes that the accused inducers used by the water jet propulsors in the SES 100A surface effect ship, and in the class of hydrofoil vessels known as the PHM's, utilizes different geometries (pa-

rameters) and design techniques which are not found in "axial flow pumps" as that term is understood in the art or used in the '526 patent.

Thus, this limitation which requires the first stage pump to be axial, and which is found in all six claims of the '526 patent, is not met, according to defendant. Plaintiff adversatively adduces the fact that Mr. Aschauer, the inventor, testified that the first state of the PHM is an axial flow pump. Plaintiff further relies upon the testimony of Mr. Brandau, who assertedly testified that the first stage of the PHM pump function the same as the first stage of both the inventions claimed in the '961 patent and the '526 patent, i.e., the first stage in all three consists of an inducer or "booster" pump. Further, plaintiff relies on the testimony of Mr. Perry Brown, a pump expert, who plaintiff avers testified that the term "axial flow pump" is generic to both axial flow pumps (sometimes called propeller pumps) and axial flow inducers. Plaintiff further argues that the geometric characteristic of a pump that dictates whether or not it is considered to be axial, mixed or radial is "the direction of flow of the liquid at the discharge of the impeller". Finally, plaintiff contends that, only the following two parameters must be met for a pump to be deemed an axial pump: (1) the housing and outside diameter of the impeller blade is cylindrical, and (2) the fluid flow lines, as they leave the impeller, are at a straight axial direction parallel to the axis of rotation. In closing, plaintiff also argues that an axial impeller hub does not have to be cylindrical, relying on the testimony of Mr. Brown, who, plaintiff says, testified that he had personally seen many axial flow pumps with hubs that were not cylindrical. We find plaintiff's arguments persuasive.

In regard to the "axial flow pump in said housing" limitation which appears in all six of the claims of the '526 patent, we make the following findings: (1) In regard to the PHM pump as depicted on PX–52A, element 10, labeled the "inducer", is a first stage axial flow pump (Aschauer Tr.W.–669); (2) if the flow leaving the pump im-

peller is parallel to the center line axis of the impeller, then the pump is an axial flow pump (Brandau Tr.W.–147); (3) that the term axial flow pump is generic to both axial flow pumps (sometimes called propeller pumps) and axial flow inducers. (Brown Tr.W.–2088); (4) the geometric characteristic of a pump that make it either axial, mixed, or radial, is the direction of the flow of the liquid at the discharge of the impeller. (Brown Tr.W.–2089; PX–94); (5) that for a pump to be categorized as an axial-flow pump, the impeller hub does not have to be cylindrical (Brown Tr.W.–2097); (6) that the first stage of the accused PHM waterjet propulsor as seen in PX–52A, is an axial flow pump because it has a cylindrical housing surrounding the pump and because the discharge of the inducer impeller is parallel to the axis of the rotating shaft (Brown Tr.W.–2114); that just two parameters need be met for an impeller and a housing to be considered an axial flow pump: (i) the housing and the outside diameter of the impeller blade must be cylindrical, and (ii) the fluid flow lines, as they leave the impeller, are at a straight axial direction parallel to the axis of rotation of the impeller (Brown Tr.W.–2117); and (8) that the first and second stages of the SES 100A waterjet pump are, for the purposes of this case, the same as the first and second stages of the PHM waterjet pump (Stipulation, Spevack Tr.W.–104). For the reasons stated above, we find that the limitation "a first stage axial flow pump in said housing" which is found in all six claims of the '526 patent is met by the first stage of the SES 100A waterjet pump as well as the first stage of the PHM waterjet pump.

*Forward Portion is of the Diffusing Type*

Claims 2 and 6 of the '526 patent have a limitation that requires that the forward intake portion of the housing be of the "diffusing" type. Plaintiff asserts that the inlet system of the PHM water jet propulsor is of the diffusing type as required by claims 2 and 6 of the '526 patent. Defendant appears not to have addressed this particular infringement issue either in its post-trial brief or its post-trial proposed

findings of fact. Therefore, pursuant to the doctrine of waiver announced in *Bendix Corp. v. United States*, 600 F.2d 1364, 220 Ct.Cl. 507 (Ct.Cl.1975), we do not have to address any countervailing views. We therefore find that the inlet system of the PHM water jet propulsor has a diffusing forward intake portion as required by claims 2 and 6 of the '526 patent. Davis Tr.W.–412.

*Housing of Substantially Cylindrical Shape*

Claims 3 and 6 of the '526 patent require that "said housing being substantially cylindrical in shape from the inlet side of said first stage pump to the inlet side of said second stage pump". Plaintiff asserts that this limitation is met by the waterjet propulsors used in the SES 100A surface effect ship and the class of hydrofoil vessels known as the PHM. Plaintiff basically relies on the testimony of Mr. Aschauer, wherein Mr. Aschauer testified that when looking at PX–52A, from points "W" to point "Y", the housing between these two points in PX–52A is "substantially cylindrical". Moreover, plaintiff points out that the area "W" to "X" constitutes 62 percent of the total area of "W" to "Y" and that this 62 percent of the housing area was perfectly cylindrical. Therefore, plaintiff argues, that since the majority of the area between "W" to "Y", in PX–52A, is perfectly cylindrical, the entire area between "W" to "Y" may be deemed "substantially cylindrical". Defendant countervails that the region covered by the area between "W" to "Y" was not substantially cylindrical because the area between "X" and "Y" substantially converges. We find defendant's arguments unpersuasive.

In regard to the substantially cylindrical shape issue, we make the following findings of fact: (1) that the area between "W" to "Y" as depicted in PX–52A is substantially cylindrical. (Aschauer Tr.W.–385); (2) we find that the new 16 ounce Coke bottle is also substantially cylindrical (Aschauer, Tr.W.–386; Ct.–3); (3) we find that the area from "W" to "X" in PX–52A is perfectly cylindrical and comprises 62 percent of the total distance between the areas "W" to "Y" (Aschauer Tr.W.–431–432); and (4) we find that both waterjets depicted in PX–5A and PX–52A functioned, in the region "W" to "Y", in substantially the same way since they both discharge water from the first stage in an axial direction (Aschauer Tr.W.–432). Other testimony supporting the "substantially cylindrical" characteristic of the waterjet depicted in PX–52 between the areas of "W" to "Y" came from Mr. Perry Brown. (Brown Tr. W.–2120–21). For the reasons stated above, we find that the waterjet propulsors used in the SES 100A surface effect ship and the class of hydrofoil vessels known as the PHM meet the limitation set forth in claims 3 and 6 of the '526 patent "said housing being substantially cylindrical in shape from the inlet side of said first stage pump to the inlet side of said second stage pump". Because defendant has not addressed any other noninfringement issues relevancy to the other limitations in claims 1 through 6 of the '526 patent in its post-trial proposed findings of fact or in its brief, we find that the waterjet propulsors used in the SES 100A surface effect ship and used in the class of hydrofoil vessels known as the PHM infringe claims 1 through 6 of the '526 patent. *See Bendix Corp. v. United States*, 600 F.2d 1364, 220 Ct.Cl. 507 (Ct.Cl.1975).

*Conclusions of Law*

Upon the findings of fact contained in the text of this opinion, the court finds as a matter of law that: (1) claims 1 through 10 of the '961 patent are invalid, but infringed if they were valid; (2) claims 1 through 6 of the '526 patent are invalid, but infringed if they were valid; (3) and that the claims pertaining to the three SES 100A pumps are barred by the statute of limitations. Plaintiff, accordingly, is not entitled to recover, and its petition is therefore to be dismissed.

IT IS SO ORDERED.

## LEGEND

Tr.S.–# Transcript of testimony taken in Sacramento.

Tr.W.–# Transcript of testimony taken in Washington.

Tr.O.–# Transcript of testimony from Oral Argument.

DX–# Defendant's Exhibit.

PX–# Plaintiff's Exhibit.

Ct.–# Court's Exhibit.